# In the United States Court of Appeals for the District of Columbia Circuit

## Nos. 21-1042 and 21-1109

————————

VILLAGE OF MORRISVILLE, VERMONT,
*Petitioner,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Scott Ray Ediger
  Attorney

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

INITIAL BRIEF:  June 18, 2024

**Certificate as to Parties, Rulings, and Related Cases**

**A.  Parties:**

The parties appearing before this Court and before the Federal

Energy Regulatory Commission are as stated in Petitioner's brief.

**B.  Rulings under review:**

1.  *Vill. of Morrisville, Vermont*, Declaratory Order on Waiver of Water Quality Certification, 173 FERC ¶ 61,156 (2020), R. 245, JA ____;

2.  *Vill. of Morrisville, Vermont*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 174 FERC ¶ 62,040 (2021), R. 250, JA ____; and

3.  *Vill. of Morrisville, Vermont*, Order Addressing Arguments Raised on Rehearing, 174 FERC ¶ 61,141 (2021), R. 253, JA ____.

**C.  Related cases:**

As explained *infra* pp. 7-12, a number of recent court decisions,

from this and other circuit courts of appeals, address the issue

presented here, concerning whether a state has waived its Clean Water

Act certificate authority when an applicant withdraws and then

resubmits its request for state certification, over a period exceeding one

year.  One pending case before this Court addresses a similar waiver

question. *See Nevada Irrigation District v. FERC,* D.C. Cir. Nos. 23-1342, *et al.*

/s/ Scott Ray Ediger
Scott Ray Ediger
Attorney

June 18, 2024

# Table of Contents

Statement of Issue ....................................................................... 1

Statutes and Regulations ........................................................... 3

Statement of Facts ...................................................................... 3

I.   Statutory background ........................................................ 3

II.  Recent court precedent interpreting Clean Water Act section 401, 33 U.S.C. § 1341 ........................................................ 8

III. Factual background ........................................................ 12

    A.   The Morrisville Hydroelectric Project .................................... 12

    B.   Commission relicensing proceedings ..................................... 13

    C.   Vermont's water quality certification .................................. 14

        1.   Morrisville's original request (January 2014) ............. 14

        2.   Morrisville's first withdrawal and resubmission (November 2014) ........................................................ 16

        3.   Morrisville's second withdrawal and resubmission (September 2015) ........................................................ 17

        4.   Vermont's certification (August 2016) ........................ 19

IV.  Procedural background ................................................. 20

    A.   Morrisville's request for declaratory order ........................... 20

    B.   Challenged FERC orders ................................................ 22

        1.   Declaratory Order ........................................................ 22

        2.   Rehearing Order .......................................................... 25

## Table of Contents

C.    Subsequent events ................................................. 27

Summary of Argument .......................................................... 28

Argument ............................................................................. 30

I.    Standard of review ....................................................... 30

II.    The Commission properly found that Vermont had not waived its authority to issue Clean Water Act certification. ..................... 32

    A.    The statute does not compel a finding of waiver every time a certifying state agency permits an applicant to withdraw and refile. ................................................. 34

    B.    The Commission reasonably found insufficient evidence of coordinated Vermont conduct to justify a finding of waiver. ................................................. 39

        1.    In November 2014, Morrisville unilaterally withdrew its application for the purpose of receiving more favorable conditions. ................................ 41

        2.    In September 2015, Morrisville unilaterally withdrew its application for the purpose of allowing itself more time to advocate for better alternatives. .... 44

    C.    Because Morrisville acted unilaterally, the extent to which later water quality certification requests resembled earlier ones is not controlling. ................................ 47

Conclusion ............................................................................. 49

# Table of Authorities

## COURT CASES:

*Alabama Rivers All. v. FERC,*
  325 F.3d 290 (D.C. Cir. 2003) ......................................................... 31

*Alcoa Power Generating Inc. v. FERC,*
  643 F.3d 963 (D.C. Cir. 2011) ............................................. 4, 6, 7, 31

*Cal. State Water Res. Control Bd. v. FERC,*
  43 F.4th 920 (9th Cir. 2022)................................. 6, 12, 36, 41, 43, 46

*FERC v. Elec. Power Supply Ass'n,*
  577 U.S. 260 (2016) ......................................................................... 31

*Fla. Mun. Power Agency v. FERC,*
  315 F.3d 362 (D.C. Cir. 2003) ......................................................... 32

*Hoopa Valley Tribe v. FERC,*
  913 F.3d 1099 (D.C. Cir. 2019) ..............2, 6, 8, 9, 10, 11, 20, 21, 23,
                                        26, 29, 30, 32, 33, 35, 36, 37, 39, 40

*Millennium Pipeline Co. v. Seggos,*
  860 F.3d 696 (D.C. Cir. 2017) ........................................................... 7

*New York State Dep't of Env't Conservation v. FERC,*
  991 F.3d 439 (2d Cir. 2021).................................................. 10, 37, 38

*North Carolina Dep't of Env't Quality v. FERC,*
  3 F.4th 655 (4th Cir. 2021)................ 9, 10, 11, 36, 37, 40, 42, 46, 47

*PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology,*
  511 U.S. 700 (1994) ....................................................................... 4, 5

*S.D. Warren Co. v. Me. Bd. of Env't Prot.,*
  547 U.S. 370 (2006) .................................................................. 3, 4, 5

# Table of Authorities

*TNA Merchant Projects, Inc. v. FERC,*
    857 F.3d 354 (D.C. Cir. 2017) ........................................................ 31

*Turlock Irrigation District v. FERC,*
    36 F.4th 1179 (D.C. Cir. 2022) ................................................. 9, 36

*U.S. Dep't of Interior v. FERC,*
    952 F.2d 538 (D.C. Cir. 1992) ........................................................ 5

## ADMINISTRATIVE CASES:

*Establishment of Categorical Reasonable Period of Time for Action
    on Requests for Water Quality Certification under Section
    401(a)(1) of the Clean Water Act & Clarifying Types of
    Hydroelectric Project Proc. that May Require Water Quality
    Certification,*
    187 FERC ¶ 61,094 (2024) ............................................................. 7

*KEI (Maine) Power,*
    173 FERC ¶ 61,069 (2020) ......................... 11, 23, 39, 40, 41, 42, 47

*Nevada Irrigation District,*
    187 FERC ¶ 61,095 (2024) ........................................................... 38

*Pacific Gas & Electric Co.,*
    186 FERC ¶ 61,121 (2024) ........................................................... 38

*Placer Cnty. Water Agency,*
    169 FERC ¶ 61,046 (2019) ........................................................... 40

*Pol'y Statement on Establishing License Terms for Hydroelectric
    Projects,*
    161 FERC ¶ 61,078 (2017) ............................................................. 4

# Table of Authorities

<u>**STATUTES**</u>:

**Administrative Procedure Act**

5 U.S.C. § 706 ........................................................................ 30

**Clean Water Act**

33 U.S.C. § 1251 ....................................................................... 5

33 U.S.C. § 1341 .............................................. 1, 2, 4, 5, 6, 7, 32, 35

**Federal Power Act**

16 U.S.C. § 792 ......................................................................... 3

16 U.S.C. § 797 ......................................................................... 4

16 U.S.C. § 808 ......................................................................... 4

16 U.S.C. § 817 ......................................................................... 3

16 U.S.C. § 825*l* ...................................................................... 31

<u>**REGULATIONS**</u>:

18 C.F.R. § 5.23 .................................................................... 7, 8

# Glossary

| | |
|---|---|
| Br. | Opening brief of Petitioner Morrisville |
| **Challenged FERC Orders** | |
|    Declaratory Order | *Vill. of Morrisville, Vermont*, 173 FERC ¶ 61,156 (2020), R. 245, JA ____ |
|    Rehearing Order | *Vill. of Morrisville, Vermont*, 174 FERC ¶ 61,141 (2021), R. 253, JA ____ |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| **Filings at FERC (by date filed)** | |
|    Vermont December 2013 Comments | Vermont's preliminary terms and conditions for water quality certification, R. 46, JA ____ |
|    November 2014 Letter | Morrisville's first withdrawal and resubmittal, attached as Petition, Appendix A, R. 223, JA ____ |
|    September 2015 Letter | Morrisville's second withdrawal and resubmittal, attached as Petition, Appendix A, R. 223, JA ____ |
|    Petition | Morrisville's May 28, 2020 Petition, R. 223, JA ____ |
|    Vermont July 2020 Comment | Vermont's July 1, 2020 Comment, R. 234, JA ____ |

# Glossary

| | |
|---|---|
| Morrisville Response | Morrisville's July 27, 2020 Response, R. 236, JA ____ |
| July 2020 Perry Memorandum | Attachment to Morrisville Response, R. 236, and Rehearing Request, R. 247, JA ____ |
| Rehearing Request | Morrisville's December 21, 2020 Request for Rehearing, R. 247, JA ____ |
| December 2020 Perry Memorandum | Attachment to Rehearing Request, R. 274, JA ____ |
| JA | Joint Appendix |
| P | Paragraph in a FERC order |
| R. | Record Item |

# In the United States Court of Appeals for the District of Columbia Circuit

Nos. 21-1042 and 21-1109

————————

VILLAGE OF MORRISVILLE, VERMONT,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

## Statement of Issue

Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1), requires the Village of Morrisville, Vermont (Morrisville) to obtain water quality certification from the State of Vermont before the Federal Energy Regulatory Commission (Commission) can issue a license for the Morrisville Hydro Project. If the State "fails or refuses to act on a request for certification, within a reasonable period of time (which shall

not exceed one year) after receipt of such request," then certification is waived.  33 U.S.C. § 1341(a)(1).

Here, the State certifying agency, the Vermont Agency of Natural Resources (Vermont), twice acceded to Morrisville's withdrawal and resubmission of its application for certification, which resulted in Vermont's water quality certificate issuing more than one year after Morrisville's initial application.  On that basis, Morrisville subsequently requested that the Commission issue a declaratory judgment that Vermont had waived its certification authority under the Clean Water Act.

In the challenged orders, the Commission denied Morrisville's request.  *See Vill. of Morrisville, Vermont*, Declaratory Order on Waiver of Water Quality Certification, 173 FERC ¶ 61,156 (2020) (Declaratory Order), R. 245, JA ____; Order Addressing Arguments Raised on Rehearing, 174 FERC ¶ 61,141 (2021) (Rehearing Order), R. 253, JA ____ (collectively, Challenged Orders).  Under this Court's precedent, a state waives its Clean Water Act authority when, pursuant to "agreement" with the state, an applicant withdraws and resubmits its request over a period of time greater than one year.  *See Hoopa Valley*

*Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019). Here, the Commission found that Morrisville withdrew and resubmitted its application unilaterally, not pursuant to agreement (or coordination) with, or direction by, Vermont.

*The issue presented for review is:*

Under this Court's precedent, where there was no agreement between the water quality certificate applicant and state certifying authority to delay certification, and where the applicant unilaterally withdrew and resubmitted its certification request, did the Commission reasonably conclude that the state did not waive its authority to issue Clean Water Act certification?

## Statutes and Regulations

Pertinent statutes and regulations are reproduced in the Addendum to this brief.

## Statement of Facts

## I.     Statutory background

The Commission issues federal licenses to construct and operate hydroelectric projects under the Federal Power Act. S*ee S.D. Warren Co. v. Me. Bd. of Env't Prot.,* 547 U.S. 370, 373 (2006) (citing 16 U.S.C.

§§ 792, 817(1)).  And where, as is usually the case, the licenses may result in discharge into the navigable waters, states have the authority to issue water quality certifications that become mandatory conditions on those licenses under Clean Water Act section 401, 33 U.S.C. § 1341. *See Alcoa Power Generating Inc. v. FERC,* 643 F.3d 963, 971 (D.C. Cir. 2011) (citing 33 U.S.C. §§ 1341((a)(1), (d)).

The Commission considers environmental issues and assesses the public interest when deciding whether to grant a hydroelectric project license.  *See* 16 U.S.C. §§ 797(e), 803(a)(1); *see also S.D. Warren*, 547 U.S. at 373; *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 722 (1994).  Any "new license" shall be for a term that the Commission determines to be in the public interest, but not less than 30 years or more than 50 years.  *See* 16 U.S.C. § 808(e); *see also Policy Statement on Establishing License Terms for Hydroelectric Projects,* 161 FERC ¶ 61,078 P 2 n.3 (2017) (explaining that, under the Federal Power Act, "new license" refers to a license issued to replace a project's expiring license).

In the Clean Water Act, Congress sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent,

reduce, and eliminate pollution[.]" 33 U.S.C. § 1251(b). One mechanism by which states can protect their water quality is the certification requirement in Clean Water Act section 401, 33 U.S.C. § 1341. This provision mandates that a federal license may not issue unless the relevant state has granted or waived water quality certification. *See* 33 U.S.C. § 1341(a)(1) (requiring certification (or waiver) for a "Federal license or permit to conduct any activity . . . which may result in a[] discharge into the navigable waters"). Because operating a hydroelectric dam is one such activity that may result in a discharge into the navigable waters, a Commission-issued hydroelectric license is in most cases subject to the state water quality certification process. *See S.D. Warren,* 547 U.S. at 373-74.

When granting certification, a state may impose conditions to limit water pollution and mandate compliance "with any other appropriate requirement of State law set forth in such certification." *PUD No. 1*, 511 U.S. at 712 (internal quotation marks omitted); 33 U.S.C. § 1341(d). These conditions then become a mandatory part of any federal license that issues. *See* 33 U.S.C. § 1341(d); *U.S. Dep't of Interior v. FERC*, 952 F.2d 538, 548 (D.C. Cir. 1992). If, on the other

5

hand, a state denies a certification request, then "no federal 'license or permit shall be granted.'" *Alcoa Power*, 643 F.3d at 971 (quoting 33 U.S.C. § 1341(a)(1)).

But the states' certification power is not unlimited. A state must "act" on a request for certification within one year of receiving it, or else its certification authority "shall be waived with respect to" an application for a "Federal license or permit." 33 U.S.C. § 1341(a)(1); *see also Hoopa Valley,* 913 F.3d at 1103-04. The purpose of this requirement is to prevent a state from indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification. *Hoopa Valley,* 913 F.3d at 1101 (citing *Alcoa Power*, 643 F.3d at 972).

The consequences of waiver can be "significant." *Cal. State Water Res. Control Bd. v. FERC*, 43 F.4th 920, 924 (9th Cir. 2022). Waiver means that a state no longer has authority to impose any conditions on a hydroelectric project's federal license under § 1341. *See id.* Given that federal licenses can last up to 50 years, "project[s] may be noncompliant with prevailing state water quality standards for decades" when waiver is triggered. *Id.*

The Commission, as the agency tasked with licensing hydroelectric projects, determines in the first instance whether a state has waived its certification power under the Clean Water Act. *See Millennium Pipeline Co. v. Seggos*, 860 F.3d 696, 701 (D.C. Cir. 2017) (explaining that the Commission makes waiver determinations under 33 U.S.C. § 1341); *Alcoa Power*, 643 F.3d at 971-72 (compliance with 33 U.S.C. § 1341's requirements "is a question of federal law[] [that is] properly put to the Commission"); *see also* 18 C.F.R. § 5.23(b)(2) (explaining Commission procedure). Under the Commission's regulations, waiver occurs "if the [state] certifying agency has not denied or granted certification by one year after the date the certifying agency received a written request for certification." 18 C.F.R. § 5.23(b)(2); *see also Establishment of Categorical Reasonable Period of Time for Action on Requests for Water Quality Certification under Section 401(a)(1) of the Clean Water Act & Clarifying Types of Hydroelectric Project Proc. that May Require Water Quality Certification*, Notice of Proposed Rulemaking, 187 FERC ¶ 61,094 (2024) (retaining one year as the reasonable period of time for a

certifying authority to act on a certification request under 18 C.F.R. § 5.23(b)).

## II. Recent court precedent interpreting Clean Water Act section 401, 33 U.S.C. § 1341

In the Challenged Orders, the Commission applied this Court's *Hoopa Valley* precedent. *See* Declaratory Order PP 20-24, JA ____-__; Rehearing Order PP 9-10, JA ____-__.

In *Hoopa Valley*, this Court addressed the issue of whether the withdrawal and resubmission of water quality certification requests that collectively exceeded one year resulted in waiver of state certification authority under Clean Water Act section 401. There, the applicant and two state certifying agencies entered into a written "formal agreement," whereby the parties agreed "to defer the one-year statutory limit for Section 401 approval by annually withdrawing-and-resubmitting the water quality certification requests." 913 F.3d at 1101, 1104. Pursuant to this agreement, the applicant withdrew and resubmitted the same water quality certification request for more than a decade. *Id.* at 1104. The states, as promised in the agreement, did not take any action on the applicant's certification requests. *Id.* at 1101-02 (explaining that the agreement "explicitly required abeyance of

all state permitting reviews," specifically including reviews for Clean Water Act certification).

This Court in *Hoopa Valley* recognized that the language of section 401 applies to a specific request for certification, and "cannot be reasonably interpreted to mean that the period of review for one request affects that of any other request." *Id.* at 1104. The Court determined, however, that the withdrawal and resubmission scheme at issue did not involve new requests for certification but, rather, was an attempt by the applicant and reviewing states to "exploit" the process of withdrawal and resubmission to circumvent the one-year statutory limitation. *Id.* at 1104-05. The states' "deliberate and contractual idleness" constituted a failure or refusal to act under the statute that resulted in waiver. *Id.* at 1104.

Thus, as this Court has recognized, the salient fact in *Hoopa Valley* was that "the state agencies and the license applicant entered into a written agreement that obligated the state agencies, year after year, *to take no action at all* on the applicant's § 401 certification request." *Turlock Irrigation District v. FERC*, 36 F.4th 1179, 1183 (D.C. Cir. 2022) (quoting *North Carolina Dep't of Env't Quality v.*

*FERC,* 3 F.4th 655, 669 (4th Cir. 2021), *cert denied*, 143 S. Ct. 1746 (2023).

Subsequent to *Hoopa Valley*, several courts have addressed the issue of waiver in the context of withdrawal and resubmittal of certification requests.  The Second Circuit in *New York State Dep't of Env't Conservation v. FERC,* 991 F.3d 439, 449 (2d Cir. 2021), relied on *Hoopa Valley* to support its determination that Clean Water Act section 401 "was intended to curb conduct by certifying states that upsets the regulatory balance set by Congress."  There, the court found that section 401 prohibited a certifying agency "from entering into an agreement or otherwise coordinating with an applicant to alter the beginning of the review period."  *Id*. at 450.  The court expressly distinguished the situation involved here, where the applicant repeatedly withdraws and resubmits an application without coordination with the state.  *Id*. at 449 (citing Declaratory Order P 22, JA ___).

In *North Carolina*, the Fourth Circuit followed *Hoopa Valley* in recognizing that the language of section 401 applies to a specific application request.  3 F.4th at 667-68 (citing *Hoopa Valley*, 913 F.3d at

1104). "Ordinarily, then, the applicant's withdrawal of its certification request would end the agency's obligation to review that application, and the prior withdrawal would have no effect on the review period available for a subsequent application." *Id*. at 668. Without deciding whether a finding of coordination requires a finding of waiver, the court reversed the Commission's finding of waiver based on state coordination as a factual matter, finding instead that the record demonstrated that the applicant withdrew and resubmitted its application for its own purposes, not at the direction of or by agreement with the state. *Id*. at 673. The court likened the circumstances there to the circumstances here (citing Declaratory Order P 21, JA ___) and to *KEI (Maine) Power*, 173 FERC ¶ 61,069 P 42 (2020), where an applicant acts unilaterally in withdrawing and resubmitting its application "in the hopes of avoiding a certification that imposes unfavorable conditions." *North Carolina*, 3 F.4th at 674.

Similarly, in *California*, the Ninth Circuit declined to determine whether the *Hoopa Valley* coordination standard—drawing a line between state coordination in withdrawal and resubmission versus mere acceptance—was appropriate but found nevertheless that FERC's

finding of waiver based on state coordination was not supported by substantial record evidence. 43 F.4th at 932 (citing Rehearing Order P 22, JA ____) (state's mere acceptance of requests to withdraw and refile is not evidence of coordination). Instead, the court found that the record demonstrated that the applicants chose to withdraw and resubmit their certification requests to avoid denial without prejudice, and that the state merely accepted the withdrawal and resubmission. *Id.* at 935-36.

## III.  Factual background

### A.    The Morrisville Hydroelectric Project

The Morrisville Project is located in north-central Vermont in the Lamoille River Basin and consists of four developments (from upstream to downstream: Green River, Lake Elmore, Morrisville, and Cadys Falls):



Application, Exhibit A, Section 1, Introduction (April 25, 2013), R. 1,

JA ____; *see also* Environmental Assessment at 8-13 (describing each

development's facilities in detail), JA ____-__, 14-17 (same as to project

operations), JA ____-__, R. 102.

## B.    Commission relicensing proceedings

On August 28, 1981, the Commission issued a 35-year license to

construct, operate, and maintain the Morrisville Project.  *See*

Declaratory Order P 2, JA ____.  The license expired on April 30, 2015,

and Morrisville continues to operate the project under an annual

license.  *See id.*

Morrisville filed a timely application for a new license for the project on April 25, 2013.  *See* R. 1.  On November 5, 2013, the Commission issued notice of the application and, as relevant here, solicited comments, recommendations, and preliminary terms and conditions.  *See* R. 38.  On December 27, 2013, Vermont filed with the Commission preliminary terms and conditions for the water quality certification.  *See* R. 46 (Vermont December 2013 Comments); *see also* Declaratory Order P 3 (discussing same), JA ____.  Vermont indicated that its final position would be reflected in its water quality certification.  *See* Vermont December 2013 Comments at 1, JA ____; *see also id.* at 21-22 (describing recommended articles, including, for example, flow management conditions (run-of-river operation in "true run-of-river" mode for each development); tailrace dissolved oxygen standards; and recreation), JA ____-__.

### C.    Vermont's water quality certification

#### 1.    Morrisville's original request (January 2014)

Morrisville requested a water quality certification for the project from Vermont in January 2014.  *See* Declaratory Order P 3, JA ____.  Vermont acknowledged receipt of the application and confirmed that

the application was administratively complete.  *See id.* P 3 (citing

Vermont's letter, filed February 4, 2014, R. 57, JA ____), JA ____.

Later, Vermont informed Morrisville that although its application

was "administratively complete," it was "not technically complete,"

and required additional information.  *See* Declaratory Order P 3 n.5

(citing Vermont July 2020 Comment at 3, JA ____ (citing Attachment 4,

Vermont February 28, 2014 letter to Morrisville, JA ____)), R. 234,

JA ___.  Therefore, Vermont indicated that Morrisville's "application

may be denied without prejudice" and that it "may reapply at any

time."  Vermont February 28, 2014 letter to Morrisville, JA ____.

In June 2014, Morrisville proposed flow measures that differed

from those proposed in its original January 2014 application, as well as

phasing in the water quality conditions contained in Vermont's

December 2013 preliminary terms and conditions.  *See* Declaratory

Order P 4, JA ____.  In response to Morrisville's new proposal, Vermont

provided comments.  *See* Vermont July 2020 Comment at 4 (citing

Attachment 9, Vermont Comments, JA ____-__, and Attachment 10,

Vermont email, JA ____), JA ____.  A revised proposal followed.  *See id.*

(citing Attachment 11, Morrisville October 31, 2014 letter, JA ____),

JA ____.

### 2. Morrisville's first withdrawal and resubmission (November 2014)

In October 2014, Morrisville and Vermont discussed whether
Morrisville should withdraw and refile the water quality certification
application, "in order to give the parties more time to solve their issues."
Declaratory Order P 4 (quoting July 2020 Perry Memorandum at 1,
R. 247, JA ____), JA ____.  Although Vermont did not promise more
favorable treatment with withdrawal and resubmission, Morrisville
apparently believed that Vermont action on its current application
"would definitely be unfavorable."  July 2020 Perry Memorandum at 1,
JA ____; *see also* Declaratory Order P 4 (citing Vermont July 2020
Comment at 3-4, JA ____-__), JA ____.

On November 7, 2014, Morrisville withdrew and simultaneously
reapplied for water quality certification.  *See* Petition, Appendix A,
Morrisville November 2014 letter, JA ____.  In its application,
Morrisville stated that it was withdrawing and resubmitting its
application "to accommodate [Vermont's] review of Morrisville's various
proposals, including its recently submitted phase-in proposal."  *Id.*

Morrisville described the contents of its original January 2014 application, and asked Vermont to consider that documentation in addition to "all documents and information" filed with the Commission and Vermont since April 25, 2013, in support of its initial application for water quality certification as its "renewed application." *Id.* Morrisville requested acknowledgement of receipt of the "reapplication," and Vermont obliged. *Id.*; *see also* Declaratory Order P 5 (describing exchange of correspondence), JA ____.

### 3. Morrisville's second withdrawal and resubmission (September 2015)

In August 2015, Morrisville asked Vermont to support withdrawing and refiling the water quality certification application a second time, to give Morrisville more time to review a river flow analysis and littoral habitat report, consider the use of micro-turbines, and develop a cost/benefit plan for various factors including cost of improvements, operation and management costs, cost of implementing license conditions, and market forecasting. *See* Declaratory Order P 6 (citing Vermont July 2020 Comment, Attachment 16, Morrisville August 27, 2015 email at 1, JA ____), ____. Morrisville stated that it did not want Vermont to issue a water quality certificate until

Morrisville had a chance to evaluate these additional considerations. *Id*.

On September 9, 2015, Morrisville withdrew its second application and submitted a third application for water quality certification. *See* Declaratory Order P 7, JA ____. As in its earlier withdrawal and refiling letter, Morrisville stated that it was reapplying "to accommodate [Vermont's] review of Morrisville's various proposals, including a phase-in proposal of bypass flows, and in consideration of other factors that have arisen in discussions with [Vermont] over the course of the past year." Petition, Appendix A, September 2015 letter, JA ____. And again in this request, Morrisville asked Vermont to consider "all documents and information furnished to [the Commission] and [Vermont] since April 25, 2013," in support of its "renewed application." *Id.* Morrisville also similarly asked Vermont to acknowledge receipt of the "reapplication," and Vermont obliged Morrisville's request. *Id.*; *see also* Declaratory Order P 7 (describing correspondence), JA ____.

### 4. Vermont's certification (August 2016)

Following the second withdrawal and resubmission, Vermont continued work on the application. *See* Vermont July 2020 Comment at 7, JA ____. That work included issuance of a report identifying concerns with aquatic plant cover, further negotiations, and submissions by Morrisville of additional information with a revised phase-in proposal. *See* Vermont July 2020 Comment at 7-8 (describing meetings and Morrisville's submission of a counterproposal), JA ____-__.

Vermont issued a water quality certification in August 2016. *See* Declaratory Order P 8, JA ____. Vermont explained that in December 2013, it proposed requiring instantaneous run-of-river operation, but that condition evolved in the August 2016 water quality certificate to modified run-of-river operation. *See* Vermont July 2020 Comment at 8 (comparing Attachment 3, December 2013 preliminary conditions, JA ____-__, to Attachment 1, August 2016 Certification, JA ____-__), JA ____. According to Vermont, the evolution of its conditions was based on "further analysis of the habitat-flow study results for the Green River" based on: (1) Morrisville's proposals; (2) the Green River Reservoir littoral habitat study results; and (3) the Green River

Reservoir water balance model developed by Vermont. *Id.* at 8, JA ____; *see also id.* at 20-22 (explaining that final water quality certification included "revised conditions" based on Morrisville's revised proposals and additional information), JA ____-__. Morrisville pursued state judicial review of the certification, which culminated in a final decision affirming the state's action in August 2020. *See* Declaratory Order P 8, JA ____.

## IV. Procedural background

### A. Morrisville's request for declaratory order

Nearly four years after Vermont issued the water quality certificate in August 2016, Morrisville requested a Commission order declaring that the state had waived its certification authority. *See* Declaratory Order PP 1, 8-9, JA ____, ____-__. Morrisville argued that the *Hoopa Valley* decision supports a finding of waiver in this proceeding, claiming that Morrisville had an agreement with Vermont to withdraw and resubmit its application. *See* Petition at 8, JA ____; *see also supra* pp. 8-10 (discussing *Hoopa Valley*). Although Vermont and Morrisville did not have a formal written agreement, Morrisville claimed that it had a functional agreement with Vermont, evidenced by

Vermont accepting the withdrawal and refiling letters and thanking Morrisville for its cooperation. *See* Petition at 8, JA \_\_\_\_.

Morrisville also pointed to correspondence among Morrisville representatives describing communications with Vermont as evidence of an agreement. *See* Morrisville Response at 3, R. 236, JA \_\_\_\_. Morrisville stated that the emails and other communications demonstrate that Morrisville's motivation to withdraw and refile in 2014 was to obtain more favorable conditions in the State water quality certification, based on Morrisville's impression from Vermont that, if it did not withdraw and refile, the conditions would be unfavorable. *See id.* Additionally, Morrisville argued that *Hoopa Valley* supports a finding of waiver because neither refiled application significantly changed the project proposal. *See id.*; *see also* Declaratory Order P 20 (describing Morrisville's arguments), JA \_\_\_\_.

Vermont opposed the petition, arguing that *Hoopa Valley* did not support waiver in this case. *See* Vermont July 2020 Comment, R. 234, JA \_\_\_\_; *see also* Declaratory Order P 10 (describing filing), JA \_\_\_\_. American Whitewater, Vermont Paddlers Club, Vermont Natural Resources Council, and Vermont Council of Trout Unlimited also

argued that *Hoopa Valley* is inapplicable in the circumstances here. *See* Declaratory Order P 10, JA ____.

Morrisville's response included a memorandum (July 2020 Memorandum) with seven attachments that it believed showed coordination between Morrisville and Vermont. *See* Declaratory Order P 11 (describing Morrisville Response, R. 236, JA ____), JA ____.

## B. Challenged FERC orders

In the Challenged Orders, the Commission denied Morrisville's request for an order finding waiver by Vermont. *See* Declaratory Order P 1, JA ____; Rehearing Order P 2, JA ____. The Commission concluded that Vermont did not coordinate or otherwise agree with Morrisville in a manner designed to subvert the timeliness requirement (no more than one year) of the Clean Water Act. The Commission thus found that Vermont had not waived its Clean Water Act authority.

### 1. Declaratory Order

The Commission found that Morrisville's unilateral action was an insufficient basis for waiver. *See* Declaratory Order PP 21-23, JA ____-__. While *Hoopa Valley* did not specify the level of coordination necessary to find that a state waived its certification authority, the

Commission found "deliberate . . . idleness" necessary to find that a state defied the one-year deadline. *Id.* P 21 (quoting *Hoopa Valley*, 913 F.3d at 1104), JA ____. In prior cases where the Commission had found a functional agreement to delay between the state and the applicant, the certifying state agency had either "requested or directed" withdrawal with the motivation of restarting the clock. *Id.* By contrast, where (as here) the applicant merely wants to "avoid potentially unfavorable water quality certification conditions," the applicant acts "unilaterally for its own benefit and by its own initiative." *Id.* In such cases, there is no waiver. *See id.* (citing *KEI*, 173 FERC ¶ 61,069 P 42 & n.63, as an example of no waiver "where the licensee withdrew and refiled its water quality certification application on its own initiative to provide itself more time to negotiate fish passage measures with resource agencies"), JA ___.

Applying those standards here, the Commission found that Vermont's "mere acceptance" of the withdrawal/refile requests in November 2014 and September 2015 was not a functional agreement. Declaratory Order P 22, JA ____. Rather, Morrisville had acted unilaterally and in its own interest. *See id.*

As to Morrisville's first withdrawal in November 2014, the Commission found that Morrisville withdrew and refiled for the purpose of allowing time for Vermont to consider Morrisville's newly-proposed flow conditions and a phased-in application of the preliminary water quality certification conditions. *See* Declaratory Order P 22, JA ____. Morrisville did this "with the hope that the proposals would result in more favorable certification conditions." *Id.* (citing Morrisville Response at 3, JA ____), JA ____.

As to Morrisville's second withdrawal in September 2015, the Commission found that Morrisville withdrew its application to give itself more time to review study reports, consider alternatives such as the use of microturbines, and conduct a cost-benefit analysis. *See* Declaratory Order P 22 (citing Vermont July 2020 Comment, Attachment 16 at 1, JA ____), JA ____.

The Commission further found that the correspondence submitted by Morrisville to support its waiver claims failed to demonstrate that Vermont sought withdrawal and resubmittal to circumvent the one-year statutory deadline. *See* Declaratory Order P 23, JA ____. Because the record lacked evidence that Vermont had deliberately circumvented the

one-year deadline or entered into an agreement with Morrisville to do so, the Commission found that the extent to which the water quality certificate applications resembled earlier ones to be "not dispositive." *Id.* P 24, JA \_\_\_\_.

## 2. Rehearing Order

Morrisville requested rehearing. *See* R. 247, JA \_\_\_\_. The rehearing request included a memorandum (December 2020 Memorandum) that was intended to "clarify certain factual details" in response to the Declaratory Order. *See* December 2020 Memorandum at 1, JA \_\_\_\_. (Morrisville also attached another copy of the July 2020 Memorandum, along with all of its attachments.)

The Commission denied Morrisville's Rehearing Request. *See* Rehearing Order P 1, JA \_\_\_\_. The Commission rejected Morrisville's argument that Vermont necessarily waived its certification authority by failing to act on Morrisville's initial certification request within one year. *Id.* P 10, JA \_\_\_. Rather, the Commission found that *Hoopa Valley* indicates that the motivations of the applicant and the certifying agencies, as indicated by their communications and conduct, are material facts bearing on the question whether a certifying agency

waived its certification authority. *See id.* P 10 (citing *Hoopa Valley,* 913 F.3d at 1104-05); *see also id.* P 10 n.18 (citing various *Hoopa Valley* passages focusing on party motivations, especially those of certifying agencies), JA ____.

With respect to the state's motivation, the Commission again found that Vermont's actions did not justify a finding of waiver here. *See* Rehearing Order P 12, JA ____. The Commission reiterated its Declaratory Order finding that in both November 2014 and September 2015, Morrisville acted "unilaterally and in its own interest," rather than "at the behest" of Vermont. *Id.* (citing Declaratory Order PP 22-23, JA ____-__).

The Commission determined that Morrisville's proffered evidence did not show that Vermont directed the 2014 and 2015 withdrawals and submittals; rather, the evidence showed that Vermont accommodated Morrisville's requests for delay, not that Vermont itself directed or sought withdrawal and resubmittal to circumvent the statutory deadline. *See* Rehearing Order PP 13-17, JA ____-__. Finally, the Commission continued to find that, absent agreement or coordination, an applicant's voluntary delay is not sufficient to find waiver, "even if

there were not a new application." Rehearing Order P 19 (citing

Declaratory Order P 24, JA ____), JA ____.

### C. Subsequent events

Morrisville filed petitions for review, which this Court held in

abeyance at Morrisville's request to await decisions in related judicial

proceedings. *See, e.g.*, Morrisville April 30, 2021 Motion, No. 21-1042,

Doc. No. 1896868.

After the Commission filed the administrative record in this case,

Morrisville filed with the Commission an application for administrative

amendment to its license. *See* Morrisville's February 15, 2022

Application, FERC No. P-2629, Accession No. 20220215-5108; *see also*

May 23, 2024 Notice, FERC No. P-2629, Accession No. 20240523-3066.

Specifically, Morrisville sought to amend its license by removing two

developments (the Cadys Falls Development and the Morrisville

Development) from the current license (P-2629) and assigning them to a

new license with a new license number. *See* Application at 1. The

remaining developments (the Green River Development and the Lake

Elmore Development) would remain licensed as Project No. 2629. *See*

*id.* Morrisville explained that the purpose of the amendment was to

"pursue relicensing" separately so that the Cadys Falls Development and the Morrisville development could be "removed from the uncertainty and pall surrounding" the Green River Development. Application at 2.

Morrisville explained that "[s]eparating the Green River Development would facilitate ongoing discussions with Vermont concerning the possible decommissioning of the Green River Development," which could "remove the current controversy" before this Court. Application at 3-4; *see also* May 2024 Notice at 3 ("On March 12, 2024, [Morrisville] notified the Commission that it intends to submit an application to surrender the Green River Development after the Commission issues its decision on the proposed amendment application."). The deadline for comments to the agency on Morrisville's application is June 24, 2024. *See* May 2024 Notice at 1.

## Summary of Argument

Section 401 of the Clean Water Act requires a state, such as Vermont here, to act on a request for water quality certification within one year; if the state is untimely, then its certification authority is waived. In the Challenged Orders here, the Commission reasonably

determined that Vermont, by acceding to Morrisville's unilateral requests to withdraw and resubmit its certification applications, did not waive its Clean Water Act certification authority. This determination is based on substantial record evidence and should be respected.

Morrisville argues that the statute requires that a certifying agency act on a certification request within one year, and that withdrawal and resubmission cannot restart the one-year deadline. However, *Hoopa Valley* recognized that the statute's reference to "a request" for certification applies to a specific request, and, as the courts have recognized, an applicant's withdrawal of its certification request ordinarily ends the agency's obligation to review that application.

*Hoopa Valley* found no new request where state certifying agencies and the applicant agreed to withdraw and resubmit the same water quality certification request without any state action for the purpose of circumventing the statutory time limit. While *Hoopa Valley* did not specify the level of coordination between state and applicant necessary to constitute waiver, there must be evidence of "deliberate ... idleness" by the state for the purpose of defying the statutory requirement that the state act within a reasonable period of time. 913

F.3d at 1104. In cases following *Hoopa Valley* where the Commission found that the state and applicant functionally agreed to a withdrawal/resubmit scheme, the certifying agency had either requested or directed withdrawal and resubmission with the motivation to restart the one-year clock.

Here, in contrast, the Commission found, based on the record, that, on both occasions of withdrawing and refiling its application, Morrisville acted unilaterally and in its own interest and not at the behest of Vermont. Morrisville's arguments to the contrary fail to demonstrate that Vermont either requested or directed withdrawal and resubmittal for the purpose of restarting the one-year clock. Under these circumstances, the Commission reasonably concluded that Vermont's mere acceptance of Morrisville's requests to withdraw and refile is not evidence of a functional agreement between the parties sufficient to constitute waiver of Vermont's certification authority.

## Argument

## I.    Standard of review

The Court applies a deferential arbitrary and capricious standard when reviewing Commission orders. *See* 5 U.S.C. § 706(2)(A). Review

30

under this standard is narrow. *FERC v. Elec. Power Supply Ass'n,* 577 U.S. 260, 292 (2016). "A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Id.* "Rather, the court must uphold a [decision] if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up).

The Commission enjoys deference in its interpretations of the Federal Power Act, a statute it administers in issuing hydroelectric licenses, *see Alabama Rivers All. v. FERC,* 325 F.3d 290, 296-97 (D.C. Cir. 2003), whereas its interpretations of the Clean Water Act—a statute administered by the Environmental Protection Agency—receive no such deference, *see Alcoa Power,* 643 F.3d at 972. *See also TNA Merchant Projects, Inc. v. FERC*, 857 F.3d 354, 358 (D.C. Cir. 2017).

When reviewing Commission decisions, this Court accepts the Commission's findings of fact as "conclusive" if they are "supported by substantial evidence." 16 U.S.C. § 825*l*(b); *see also Alabama Rivers,* 325 F.3d at 296 (citing statute). Moreover, the relevant question is not "whether record evidence supports [petitioner's] version of events, but

whether it supports [the Commission's]." *Fla. Mun. Power Agency v. FERC,* 315 F.3d 362, 368 (D.C. Cir. 2003). While Morrisville's brief initially recognizes the deferential scope of review of the agency's factual findings (*see* Br. 2), it later strays from that standard (*see, e.g.,* Br. 33 (explaining that "substantial evidence" supports its contrary position)).

## II. The Commission properly found that Vermont had not waived its authority to issue Clean Water Act certification.

Under section 401 of the Clean Water Act, if a state "fails or refuses to act on a request for [water quality] certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request," then the certification requirement is waived. 33 U.S.C. § 1341(a)(1). In the Challenged Orders, the Commission reasonably determined that Vermont, by acceding to Morrisville's requests to withdraw and resubmit its certification applications, did not waive its Clean Water Act certification authority.

Under this Court's decision in *Hoopa Valley* and the Commission's orders applying it, waiver occurs when applicant and state agree to repeatedly withdraw and resubmit a request for water quality certification over a period of time greater than one year. *See*

Declaratory Order, PP 14-19, JA ___-__ (summarizing *Hoopa Valley* and

Commission orders).  Although *Hoopa Valley* did not specify the level of

coordination between state and applicant necessary to constitute

waiver, there must be evidence of "deliberate ... idleness" by the state

for the purpose of defying the Clean Water Act section 401 requirement

that the state act within a reasonable period of time.  913 F.3d at 1104;

*see also* Declaratory Order P 21, JA ____; Rehearing Order P 12,

JA ____.  In prior agency cases where the Commission found that state

and applicant "functionally agreed" to a withdrawal/resubmit scheme,

the certifying agency had either "requested or directed" withdrawal and

resubmission "with the motivation to restart the one-year clock."

Declaratory Order P 21, JA ___ (citing cases); *see also* Rehearing Order

P 12, JA ____.

Here, in contrast, the Commission found that, "on both occasions

of withdrawing and refiling its application, Morrisville acted

unilaterally and in its own interest, and nothing in the record leads us

to conclude that Morrisville's withdrawal and resubmittal was made at

the behest of the state certifying agency to delay a certification

decision."  Rehearing Order P 12, JA ___ (quoting Declaratory Order

P 22, JA ___).  Under these circumstances, the Commission reasonably

concluded that Vermont's "mere acceptance of Morrisville's requests to

withdraw and refile is not evidence of a functional agreement between

the parties with the motivation to restart the one-year clock." *Id.*

(quoting Declaratory Order P 22, JA ___).

Morrisville challenges this determination, arguing both that the

statutory language requires a finding of waiver and that the

Commission lacked substantial evidence for its determination.  Neither

argument has merit.

## A.    The statute does not compel a finding of waiver every time a certifying state agency permits an applicant to withdraw and refile.

Morrisville argues that, under the statute, upon receipt of an

application for water quality certification, a state certifying authority

has only three options:  "(i) issue the certification (with or without

conditions), (ii) deny the certification (with or without prejudice) or (iii)

waive its certification authority."  Br. 36.  In its view, Vermont's

allowance of Morrisville's withdrawal and resubmission of its

application waived certification authority regardless of whether

Morrisville acted unilaterally or in concert with Vermont.  *Id.*

Before the Commission, Morrisville argued that *Hoopa Valley* meant that withdrawal and resubmission could never restart the one-year deadline. *See* Rehearing Request at 4, JA ___. On brief, Morrisville properly does not continue to rely on *Hoopa Valley* for this argument—indeed Morrisville does not once cite *Hoopa Valley* in its 20-page argument. *See* Br. 34-54. But, as the Commission found, *Hoopa Valley* (and related caselaw) do not support the conclusion that the statute requires a finding of waiver every time a certification application is withdrawn and resubmitted. *See* Rehearing Order PP 10, 12, JA ____, ____.

Rather, as the Commission found, this Court in *Hoopa Valley* considered the communications and conduct of the certifying state agencies as evidence of intent to "exploit" withdrawal and submission for the purpose of defying the statutory time limit. Rehearing Order PP 10, 12, JA ___, ___ (quoting *Hoopa Valley*, 913 F.3d at 1105). *Hoopa Valley* recognized that "the statute's reference 'to act on *a request* for certification'" applies to a specific request. 913 F.3d at 1104 (quoting 33 U.S.C. § 1341(a)(1)) (emphasis by Court). "This text cannot be reasonably interpreted to mean that the period of review for one request

affects that of any other request." *Id*. "Ordinarily, then, the applicant's withdrawal of its certification request would end the agency's obligation to review that application, and the prior withdrawal would have no effect on the review period available for a subsequent application." *North Carolina*, 3 F.4th at 668 (citing *Hoopa Valley,* 913 F.3d at 1104); *see also California*, 43 F.4th at 931 ("Ordinarily . . . the withdrawal of the request removes it from the state's consideration, and the resubmission of the certification request begins a new one-year review period.").

However, the court in *Hoopa Valley* found no new request where the states and applicant agreed to withdraw and resubmit the same water quality certification request for more than a decade for the purpose of circumventing the statutory time limit. *See* Rehearing Order P 10 (citing 913 F.3d at 1104), JA ____. The state's "deliberate and contractual idleness" constituted failure or refusal to act within the meaning of the statute. *Id*. (quoting *Hoopa Valley*, 913 F.3d at 1104); *see also Turlock*, 36 F.4th at 1183 ("The Fourth Circuit accurately described *Hoopa Valley* as a case in which 'the state agencies and the license applicant entered into a written agreement that obligated the

state agencies, year after year, *to take no action at all* on the applicant's § 401 certification request.'") (quoting *North Carolina,* 3 F.4th at 669).

Accordingly, it is not the withdrawal and resubmission of the certification request that triggers waiver. Rather, consistent with *Hoopa Valley*, the Commission finds waiver where the state agency expressly or functionally agrees to a withdrawal or resubmission scheme with the motivation to restart the one-year clock. *See* Rehearing Order P 12, JA ___; Declaratory Order P 21, JA ___. Mere acceptance of the applicant's request to withdraw and refile does not evidence such agreement. *See* Rehearing Order P 12, JA ___; Declaratory Order P 22, JA ___.

Morrisville cites the Second Circuit's *New York* decision in support of strict construction of the statutory one-year deadline. *See* Br. at 35 (citing *New York,* 991 F.3d at 442). But that court followed *Hoopa Valley* in determining that Clean Water Act section 401 "was intended to curb conduct by certifying states that upsets the regulatory balance set by Congress." *New York,* 991 F.3d at 449. There, the court found that section 401 prohibited a certifying state agency "from entering into

an agreement or otherwise coordinating with an applicant to alter the beginning of the review period." *Id.* at 450. The *New York* court expressly distinguished the situation involved here, where the applicant repeatedly withdrew and resubmitted an application without coordination with the state. *See id.* at 449 (citing Declaratory Order PP 15-19, 21-22, JA ___-__, ___-__). Moreover, the *New York* court found that the state there had, in order to give itself more time to act, asked the applicant to stipulate to a different certification application receipt date, a fact pattern completely distinguishable from this case. *Id.* at 447-48.

Morrisville also cites *Pacific Gas & Electric Co.,* 186 FERC ¶ 61,121 P 24 (2024), but that order (which post-dates the orders at issue here) rejected the applicant's speculation regarding the state's motives as evidence, where it was unsupported by the state's communications or conduct. *See also Nevada Irrigation District,* 187 FERC ¶ 61,095 P 20 (2024) (affirming on rehearing finding that applicant's purported evidence of state motive was "pure speculation").

### B. The Commission reasonably found insufficient evidence of coordinated Vermont conduct to justify a finding of waiver.

To support a finding of waiver, Morrisville argues that Vermont "requested or directed" Morrisville's two withdrawals and resubmissions in November 2014 and September 2015. *See* Br. 38-43; *see also* Br. 37-38 (arguing that Vermont and other state officials "were actively complicit" in the withdrawals and reapplications). Morrisville asserts that the Commission erred by finding no functional agreement between Morrisville and Vermont. *See* Br. 44-48. However, the Commission reasonably determined that Vermont's conduct did not rise to the level of coordinated action or agreement with Morrisville justifying waiver pursuant to *Hoopa Valley* and agency precedent. *See* Declaratory Order PP 22-23 (citing *KEI,* 173 FERC ¶ 61,069), JA ____; Rehearing Order PP 11-13, JA ____.

In *Hoopa Valley,* this Court explained that Congress intended the waiver provision to prevent a state from indefinitely delaying licensing. 913 F.3d at 1105. As the Commission has explained, *Hoopa Valley* does not require a formal agreement between applicant and state certifying agency; rather "exchanges between entities could amount to an ongoing

agreement." *KEI,* 173 FERC ¶ 61,069 P 40; *see also* Declaratory Order

P 21 (citing *KEI*); *Placer Cnty. Water Agency,* 169 FERC ¶ 61,046 PP 16-

18 (2019) (finding functional agreement where applicant and state

certifying agency created a procedure that delayed certificate by over

six years whereby the state certifying agency expected and in some

instances requested withdrawal and resubmittal).

In *Hoopa Valley*, there was an agreement to delay action on the

certification request, not an actual new request. *See* 913 F.3d at 1104.

By contrast, the agency record here indicates that in both the November

2014 and the September 2015 withdrawals and resubmissions,

Morrisville asked Vermont to consider the filing of a new request

supported by "all documents and information furnished to [the

Commission and Vermont] since April 25, 2013." November 2014 Letter

at 1, JA ____; September 2015 Letter at 2, JA ____.

Moreover, as the Commission found, any delay occasioned by the

November 2014 and September 2015 withdrawals and resubmittals was

caused by Morrisville, not Vermont, and occurred because Morrisville

sought delay to further its own interests. *See* Declaratory Order PP 22-

23, JA ___-__; Rehearing Order PP 13-17, JA ___-__; *see also North*

*Carolina*, 3 F.4th at 673 (observing that applicant acted to further its own interests); *California*, 43 F.4th at 934 (explaining that applicants "stood to benefit" from delays because certification likely would have imposed additional environmental-protection measures).

      **1.    In November 2014, Morrisville unilaterally withdrew its application for the purpose of receiving more favorable conditions.**

      The Commission reasonably determined that Morrisville's 2014 withdrawal and resubmittal was made in Morrisville's own interest and not at the behest of Vermont.  *See* Declaratory Order P 22, JA ___.  Based on substantial record evidence, the Commission found that in 2014, Morrisville withdrew and refiled its certification request to have Vermont consider Morrisville's newly-proposed flow conditions and a phased application of Vermont's preliminary water quality certification conditions, with the hope that the proposals would result in more favorable certification conditions.  *See id.* (citing Morrisville Response at 3, JA ___).  The Commission reasonably found these facts similar to those in the *KEI* order, where the Commission concluded that the state did not waive its certification authority when the licensee withdrew and refiled its certification request to provide itself time to negotiate fish

41

passage measures with resource agencies.  *See* Declaratory Order P 22 (citing *KEI*, 173 FERC ¶ 61,069 P 42), JA ___.  The *KEI* order distinguished *Hoopa Valley* and previous agency findings of waiver based on the applicant's desire to avoid unfavorable conditions, which "cannot be blamed on the state."  173 FERC ¶ 61,069 P 42.

In *North Carolina*, the Fourth Circuit upset Commission orders finding waiver where the court concluded that the evidence showed that the applicant unilaterally withdrew and resubmitted its certification request to avoid undesirable state action.  *See* 3 F.4th at 675.  The court discussed the Declaratory Order here as well as the *KEI* order at length in support of this conclusion.  *See id.* at 674-75.  The court stated that emails from the certifying state agency to the applicant provided procedural information following the applicant's stated intention to withdraw and resubmit, but did not demonstrate improper coordination between the certifying agency and the applicant.  *See id.* at 675.

In *California*, the Ninth Circuit likewise overturned FERC orders finding waiver where it concluded that the evidence showed only that the certifying state agency "acquiesced in the Project Applicants' own decisions to withdraw and resubmit their applications rather than have

them denied." 43 F.4th at 932. Like the *North Carolina* court, the *California* court cited the Challenged Orders in support of this conclusion. *See id.* (citing Rehearing Order at P 22, JA ___). "[A] state's mere acceptance of a withdrawal-and-resubmission is not enough to show that the state engaged in a coordinated scheme to avoid its statutory deadline for action." *Id.* at 936.

Similarly here, as the Commission found, the evidence shows that Morrisville desired more time to try to obtain more favorable certification conditions, not that Vermont sought additional time to process Morrisville's application. *See* Declaratory Order P 23, JA ___; Rehearing Order PP 14-15, JA ___-__; *see also* July 2020 Memorandum, Attachment 1, October 29, 2014 email (sent from one Morrisville representative to another), JA ____, Attachment 2, October 30, 2014 email (same), JA ____. Emails cited by Morrisville indicate that Morrisville believed an immediate certification decision could occur but that it "would definitely be unfavorable" and that withdrawal and resubmittal would result in more favorable conditions than staying the course. Morrisville October 30, 2014 email at 1, JA ____; *see also* Morrisville October 29, 2014 email at 1, JA ____; Staying the course

43

meant unfavorable conditions that Morrisville could not tolerate. *See* July 2020 Memorandum at 1, JA ____; *see also* Declaratory Order P 4 (quoting same), JA ____.

By citing its own emails, Morrisville only highlights the lack of evidence that Vermont "itself sought more time" to process the application. Rehearing Order P 15, JA ___; Declaratory Order P 23, JA ___. After reviewing the evidence, the Commission reasonably concluded that the "direct evidence" supports the finding that Morrisville's desire for more favorable conditions explained the 2014 withdrawal and resubmittal. *See* Declaratory Order P 23, JA ____.

> **2. In September 2015, Morrisville unilaterally withdrew its application for the purpose of allowing itself more time to advocate for better alternatives.**

The Commission reasonably concluded, based on record evidence, that Morrisville unilaterally chose to withdraw and refile in September 2015 for the purpose of giving itself more time to "[1] study reports, [2] consider alternatives (including the use of micro-turbines), and [3] conduct a cost-benefit analysis." *See* Declaratory Order P 22 (citing Vermont July 2020 Comment, Attachment 16, Morrisville August 27, 2015 email at 1-2, JA ____), JA ____. Morrisville's August 27, 2015

email indicated that Morrisville was "concerned about the impending deadline" and therefore Morrisville "want[ed] to inquire whether [Vermont] would be willing to support a further extension—by way of withdrawing and resubmitting the [water quality certification] application[.]" Morrisville August 27, 2015 email at 1. Morrisville explained that the extension would provide time to "resolv[e] old issues" and "incorporate new ideas that have been offered over the last month." *Id.* Without a second extension of time, Morrisville added, there would not be "any meaningful exploration of . . . other alternatives." *Id.* and because its request "would only be the second extension" it would "not unduly delay[] a final decision." *Id.*; *see also* Declaratory Order P 23 (citing Morrisville Response, Attachment 5, JA ____, and explaining that Morrisville said that it needed more time to study reports, consider alternatives, and conduct a cost-benefit analysis), JA ____.

Morrisville cites emails sent on September 9 and 11, 2015 (both from Vermont to Morrisville explaining process for withdrawing and resubmitting application). *See* Br. 21, 44, 52. But, as the Commission explained, these emails are not persuasive when placed in context. In the days before these email messages were sent, Morrisville had written

to Vermont inquiring whether Vermont "would be willing to support" a second withdrawal/resubmittal for the purpose of: (1) reviewing a river flow analysis and littoral habitat report; (2) considering the use of micro-turbines; and (3) developing a cost-benefit analysis. *See* Rehearing Order P 17 (citing Declaratory Order P 6, JA ____, and Morrisville August 27, 2015 email at 1, JA ____), JA ____.

Based on these communications, the Commission reasonably found that Vermont simply "desire[d] to accommodate Morrisville's request for more time," not to direct or seek withdrawal and resubmittal to circumvent the one-year statutory deadline. Rehearing Order P 17, JA ____. And, as the Commission found, Vermont's provision of procedural information to Morrisville, such as information on how and when to withdraw and submit its application, does not show that Vermont did so to circumvent the one-year statutory deadline. *See id.;* Declaratory Order P 23, JA ___. Both *North Carolina* and *California* held that "'it must take more than routine informational emails to show coordination,' because the states' 'rights and responsibilities to ensure compliance with their own water-quality standards are too important to be so easily stripped away.'" *California*, 43 F.4th at 936 (quoting *North*

*Carolina*, 3 F.4th at 675); *see also KEI*, 173 FERC 61,069 P 45

(explaining that evidence that state had assisted the licensee as to

procedure for withdrawing and resubmitting merely shows that the

state "worked with" the licensee, "but does not demonstrate that the

state either encouraged or supported withdrawal and resubmittal").

> **C.    Because Morrisville acted unilaterally, the extent to which later water quality certification requests resembled earlier ones is not controlling.**

Morrisville argues that the Commission erred by not determining

whether the applications filed in November 2014 and September 2015

differed from the original.  *See* Br. 48-51.  But the Commission

reasonably found the similarity of applications was "not dispositive."

Declaratory Order P 24, JA \_\_\_\_; Rehearing Order P 19, JA \_\_\_\_.  The

pertinent issue is whether the state deliberately circumvents the one-

year deadline or coordinates with the applicant to do so.  Declaratory

Order P 24, JA \_\_\_.  If, instead, the applicant voluntarily withdraws

and refiles its application, absent an agreement (or some degree of

coordination) with the state, then waiver is not warranted, regardless of

whether or to what extent the refiled application changes from the

original.  *Id.; see also North Carolina,* 3 F.4th at 675-76 ("[E]ven if the

applications here were identical, the dispositive issue under FERC's own standard is whether the state agency encourages the withdrawal or otherwise coordinates with the applicant on a process of withdrawing and resubmitting the applications.") (citing Declaratory Order P 24, JA ____).

Here, Morrisville on its own initiative withdrew and refiled the applications to obtain more favorable certification conditions and give itself more time to consider various studies and alternatives, so the Commission had no need to consider the extent to which the various applications differed.[1]  *See* Declaratory Order PP 22, 24, JA ____, ____; Rehearing Order P 19, JA ___.

---

[1] Although not directly addressed by the Commission because it concluded that question need not be decided (*see* Declaratory Order P 24, JA ____; Rehearing Order P 19, JA ____), it is not clear that the applications were in fact identical.  In its August 2016 Certification, Vermont indicated that the record includes, among other documents, the "many other documents related to the project and its relicensing filed through April 29, 2016."  August 2016 Certification at 1, JA  ____.  In the November 2014 and September 2015 withdrawal/resubmittal letters, Morrisville indicated that it wanted Vermont to consider "all documents and information furnished to [the Commission and Vermont] since April 25, 2013, in support of [its] initial application" for water quality certification.  *See* Comment, Attachment 12 at 1-2, JA ____-__; *id.*, Attachment 17 at 2, JA ____.

## Conclusion

For the foregoing reasons, the Court should deny Morrisville's petitions for review.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Scott Ray Ediger*
Scott Ray Ediger
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8509
scott.ediger@ferc.gov

June 18, 2024

# Certificate of Compliance

In accordance with Fed. R. App. P 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P 32(a)(7)(B) because it contains 8,634 words, excluding the parts of the brief exempted by Fed. R. App. P 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared using Century Schoolbook 14-point font, in Microsoft Word.

*/s/ Scott Ray Ediger*
Scott Ray Ediger
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8509
scott.ediger@ferc.gov

June 18, 2024

# ADDENDUM

## STATUTES

**TABLE OF CONTENTS**

**PAGE**

<u>**STATUTES**</u>**:**

**Administrative Procedure Act**

5 U.S.C. § 706 ........................................................................ A1

**Clean Water Act**

33 U.S.C. § 1251........................................................................ A3

33 U.S.C. § 1341........................................................................ A9

**Federal Power Act**

16 U.S.C. § 792........................................................................ A11

16 U.S.C. § 797........................................................................ A13

16 U.S.C. § 808........................................................................ A18

16 U.S.C. § 817........................................................................ A21

16 U.S.C. § 825*l* ........................................................................ A22

<u>**REGULATIONS**</u>**:**

18 C.F.R. § 5.23........................................................................ A24



to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

#### Editorial Notes

###### AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the re-

viewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

###### ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.　Congressional review.
802.　Congressional disapproval procedure.
803.　Special rule on statutory, regulatory, and judicial deadlines.
804.　Definitions.
805.　Judicial review.
806.　Applicability; severability.
807.　Exemption for monetary policy.
808.　Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same



Sec.
### SUBCHAPTER V—GENERAL PROVISIONS

1361. Administration.
1362. Definitions.
1363. Water Pollution Control Advisory Board.
1364. Emergency powers.
1365. Citizen suits.
1366. Appearance.
1367. Employee protection.
1368. Federal procurement.
1369. Administrative procedure and judicial review.
1370. State authority.
1371. Authority under other laws and regulations.
1372. Labor standards.
1373. Public health agency coordination.
1374. Effluent Standards and Water Quality Information Advisory Committee.
1375. Reports to Congress; detailed estimates and comprehensive study on costs; State estimates.
1375a. Report on coastal recreation waters.
1376. Authorization of appropriations.
1377. Indian tribes.
1377a. Green infrastructure promotion.

### SUBCHAPTER VI—STATE WATER POLLUTION CONTROL REVOLVING FUNDS

1381. Grants to States for establishment of revolving funds.
1382. Capitalization grant agreements.
1383. Water pollution control revolving loan funds.
1384. Allotment of funds.
1385. Corrective action.
1386. Audits, reports, and fiscal controls; intended use plan.
1387. Authorization of appropriations.
1388. Requirements.
1389. Clean watersheds needs survey.

#### Editorial Notes

##### Codification

The Federal Water Pollution Control Act, comprising this chapter, was originally enacted by act June 30, 1948, ch. 758, 62 Stat. 1155, and amended by acts July 17, 1952, ch. 927, 66 Stat. 755; July 9, 1956, ch. 518, §§1, 2, 70 Stat. 498–507; June 25, 1959, Pub. L. 86–70, 73 Stat. 141; July 12, 1960, Pub. L. 86–624, 74 Stat. 411; July 20, 1961, Pub. L. 87–88, 75 Stat. 204; Oct. 2, 1965, Pub. L. 89–234, 79 Stat. 903; Nov. 3, 1966, Pub. L. 89–753, 80 Stat. 1246; Apr. 3, 1970, Pub. L. 91–224, 84 Stat. 91; Dec. 31, 1970, Pub. L. 91–611, 84 Stat. 1818; July 9, 1971, Pub. L. 92–50, 85 Stat. 124; Oct. 13, 1971, Pub. L. 92–137, 85 Stat. 379; Mar. 1, 1972, Pub. L. 92–240, 86 Stat. 47, and was formerly classified first to section 466 et seq. of this title and later to section 1151 et seq. of this title. The act is shown herein, however, as having been added by Pub. L. 92–500 without reference to such intervening amendments because of the extensive amendment, reorganization, and expansion of the act's provisions by Pub. L. 92–500.

### SUBCHAPTER I—RESEARCH AND RELATED PROGRAMS

#### § 1251. Congressional declaration of goals and policy

#### (a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

(7) it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

#### (b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

#### (c) Congressional policy toward Presidential activities with foreign countries

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

#### (d) Administrator of Environmental Protection Agency to administer chapter

Except as otherwise expressly provided in this chapter, the Administrator of the Environ-

mental Protection Agency (hereinafter in this chapter called ''Administrator'') shall administer this chapter.

**(e) Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**(f) Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

**(g) Authority of States over water**

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

(June 30, 1948, ch. 758, title I, § 101, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816; amended Pub. L. 95–217, §§ 5(a), 26(b), Dec. 27, 1977, 91 Stat. 1567, 1575; Pub. L. 100–4, title III, § 316(b), Feb. 4, 1987, 101 Stat. 60.)

### Editorial Notes

#### AMENDMENTS

1987—Subsec. (a)(7). Pub. L. 100–4 added par. (7).

1977—Subsec. (b). Pub. L. 95–217, § 26(b), inserted provisions expressing Congressional policy that the States manage the construction grant program under this chapter and implement the permit program under sections 1342 and 1344 of this title.

Subsec. (g). Pub. L. 95–217, § 5(a), added subsec. (g).

### Statutory Notes and Related Subsidiaries

#### SHORT TITLE OF 2021 AMENDMENT

Pub. L. 117–58, div. E, § 50001, Nov. 15, 2021, 135 Stat. 1135, provided that: ''This division [see Tables for classification] may be cited as the 'Drinking Water and Wastewater Infrastructure Act of 2021'.''

Pub. L. 116–337, § 1, Jan. 13, 2021, 134 Stat. 5120, provided that: ''This Act [amending section 1330 of this title] may be cited as the 'Protect and Restore America's Estuaries Act'.''

Pub. L. 116–294, § 1, Jan. 5, 2021, 134 Stat. 4899, provided that: ''This Act [amending section 1268 of this title] may be cited as the 'Great Lakes Restoration Initiative Act of 2019' or the 'GLRI Act of 2019'.''

#### SHORT TITLE OF 2019 AMENDMENT

Pub. L. 115–436, § 1, Jan. 14, 2019, 132 Stat. 5558, provided that: ''This Act [enacting section 1377a of this title and section 4370j of Title 42, The Public Health and Welfare, amending sections 1319, 1342, and 1362 of this title, enacting provisions set out as a note under section 4370j of Title 42, and renumbering provisions set out as a note under this section] may be cited as the 'Water Infrastructure Improvement Act'.''

#### SHORT TITLE OF 2018 AMENDMENT

Pub. L. 115–282, title IX, § 901, Dec. 4, 2018, 132 Stat. 4322, provided that: ''This title [enacting sections 4729 and 4730 of Title 16, Conservation, amending sections 1319, 1322, 1365, and 1369 of this title, sections 4712 and 4725 of Title 16, section 42 of Title 18, Crimes and Criminal Procedure, and section 11301 of Title 46, Shipping, repealing section 4711 of Title 16, enacting provisions set out as a note under section 1322 of this title and section 4711 of Title 16, and repealing provisions set out as a note under section 1342 of this title] may be cited as the 'Vessel Incidental Discharge Act of 2018'.''

#### SHORT TITLE OF 2017 AMENDMENT

Pub. L. 115–91, div. C, title XXXV, § 3508(a), Dec. 12, 2017, 131 Stat. 1915, provided that: ''This section [amending sections 1321, 2701, and 2715 of this title] may be cited as the 'Foreign Spill Protection Act of 2017'.''

#### SHORT TITLE OF 2008 AMENDMENT

Pub. L. 110–365, § 1, Oct. 8, 2008, 122 Stat. 4021, provided that: ''This Act [amending sections 1268 and 1271a of this title] may be cited as the 'Great Lakes Legacy Reauthorization Act of 2008'.''

Pub. L. 110–288, § 1, July 29, 2008, 122 Stat. 2650, provided that: ''This Act [amending sections 1322, 1342, and 1362 of this title] may be cited as the 'Clean Boating Act of 2008'.''

#### SHORT TITLE OF 2002 AMENDMENT

Pub. L. 107–303, § 1(a), Nov. 27, 2002, 116 Stat. 2355, provided that: ''This Act [enacting section 1271a of this title, amending sections 1254, 1266, 1268, 1270, 1285, 1290, 1324, 1329, 1330, and 1375 of this title, enacting provisions set out as notes under this section, section 1254 of this title, and section 1113 of Title 31, Money and Finance, and repealing provisions set out as a note under section 50 of Title 20, Education] may be cited as the 'Great Lakes and Lake Champlain Act of 2002'.''

Pub. L. 107–303, title I, § 101, Nov. 27, 2002, 116 Stat. 2355, provided that: ''This title [enacting section 1271a of this title and amending section 1268 of this title] may be cited as the 'Great Lakes Legacy Act of 2002'.''

Pub. L. 107–303, title II, § 201, Nov. 27, 2002, 116 Stat. 2358, provided that: ''This title [amending section 1270 of this title] may be cited as the 'Daniel Patrick Moynihan Lake Champlain Basin Program Act of 2002'.''

#### SHORT TITLE OF 2000 AMENDMENTS

Pub. L. 106–457, title II, § 201, Nov. 7, 2000, 114 Stat. 1967, provided that: ''This title [amending section 1267 of this title and enacting provisions set out as a note under section 1267 of this title] may be cited as the 'Chesapeake Bay Restoration Act of 2000'.''

Pub. L. 106–457, title IV, § 401, Nov. 7, 2000, 114 Stat. 1973, provided that: ''This title [amending section 1269 of this title] may be cited as the 'Long Island Sound Restoration Act'.''

Pub. L. 106–457, title V, § 501, Nov. 7, 2000, 114 Stat. 1973, provided that: ''This title [enacting section 1273 of this title] may be cited as the 'Lake Pontchartrain Basin Restoration Act of 2000'.''

Pub. L. 106–457, title VI, § 601, Nov. 7, 2000, 114 Stat. 1975, provided that: ''This title [enacting section 1300 of this title] may be cited as the 'Alternative Water Sources Act of 2000'.''

Pub. L. 106–284, § 1, Oct. 10, 2000, 114 Stat. 870, provided that: ''This Act [enacting sections 1346 and 1375a of this

title and amending sections 1254, 1313, 1314, 1362, and 1377 of this title] may be cited as the 'Beaches Environmental Assessment and Coastal Health Act of 2000'.''

#### SHORT TITLE OF 1994 AMENDMENT

Pub. L. 103–431, §1, Oct. 31, 1994, 108 Stat. 4396, provided that: ''This Act [amending section 1311 of this title] may be cited as the 'Ocean Pollution Reduction Act'.''

#### SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–596, §1, Nov. 16, 1990, 104 Stat. 3000, provided that: ''This Act [enacting sections 1269 and 1270 of this title, amending sections 1268, 1324, and 1416 of this title, and enacting provisions set out as notes under this section and section 1270 of this title] may be cited as the 'Great Lakes Critical Programs Act of 1990'.''

Pub. L. 101–596, title II, §201, Nov. 16, 1990, 104 Stat. 3004, provided that: ''This part [probably means 'title, enacting section 1269 of this title and amending section 1416 of this title] may be cited as the 'Long Island Sound Improvement Act of 1990'.''

Pub. L. 101–596, title III, §301, Nov. 16, 1990, 104 Stat. 3006, provided that: ''This title [enacting section 1270 of this title, amending section 1324 of this title, and enacting provisions set out as a note under section 1270 of this title] may be cited as the 'Lake Champlain Special Designation Act of 1990'.''

#### SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–653, title X, §1001, Nov. 14, 1988, 102 Stat. 3835, provided that: ''This title [amending section 1330 of this title and enacting provisions set out as notes under section 1330 of this title] may be cited as the 'Massachusetts Bay Protection Act of 1988'.''

#### SHORT TITLE OF 1987 AMENDMENT

Pub. L. 100–4, §1(a), Feb. 4, 1987, 101 Stat. 7, provided that: ''This Act [enacting sections 1254a, 1267, 1268, 1281b, 1329, 1330, 1377, 1381 to 1387, and 1414a of this title, amending this section and sections 1254, 1256, 1262, 1281, 1282 to 1285, 1287, 1288, 1291, 1311 to 1313, 1314, 1317 to 1322, 1324, 1342, 1344, 1345, 1361, 1362, 1365, 1369, 1375, and 1376 of this title, and enacting provisions set out as notes under this section, sections 1284, 1311, 1317, 1319, 1330, 1342, 1345, 1362, 1375, and 1414a of this title, and section 1962d–20 of Title 42, The Public Health and Welfare] may be cited as the 'Water Quality Act of 1987'.''

#### SHORT TITLE OF 1981 AMENDMENT

Pub. L. 97–117, §1, Dec. 29, 1981, 95 Stat. 1623, provided that: ''This Act [enacting sections 1298, 1299, and 1313a of this title, amending sections 1281 to 1285, 1287, 1291, 1292, 1296, 1311, and 1314 of this title, and enacting provisions set out as notes under sections 1311 and 1375 of this title] may be cited as the 'Municipal Wastewater Treatment Construction Grant Amendments of 1981'.''

#### SHORT TITLE OF 1977 AMENDMENT

Pub. L. 95–217, §1, Dec. 27, 1977, 91 Stat. 1566, provided: ''That this Act [enacting sections 1281a, 1294 to 1296, and 1297 of this title, amending this section and sections 1252, 1254 to 1256, 1259, 1262, 1263, 1281, 1282 to 1288, 1291, 1292, 1311, 1314, 1315, 1317 to 1319, 1321 to 1324, 1328, 1341, 1344, 1345, 1362, 1364, 1375, and 1376 of this title, enacting provisions set out as notes under this section and sections 1286, 1314, 1321, 1342, 1344, and 1376 of this title, and amending provisions set out as a note under this section] may be cited as the 'Clean Water Act of 1977'.''

#### SHORT TITLE

Pub. L. 92–500, §1, Oct. 18, 1972, 86 Stat. 816, provided that: ''That this Act [enacting this chapter, amending section 24 of Title 12, Banks and Banking, sections 633 and 636 of Title 15, Commerce and Trade, and section 711 of former Title 31, Money and Finance, and enacting provisions set out as notes under this section and sec-

tions 1281 and 1361 of this title] may be cited as the 'Federal Water Pollution Control Act Amendments of 1972'.''

Act June 30, 1948, ch. 758, title V, §520, formerly §518, as added by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 896, amended Pub. L. 95–217, §2, Dec. 27, 1977, 91 Stat. 1566, renumbered §519, Pub. L. 100–4, title V, §506, Feb. 4, 1987, 101 Stat. 76, renumbered §520, Pub. L. 115–436, §5(b)(1), Jan. 14, 2019, 132 Stat. 5561, provided that: ''This Act [this chapter] may be cited as the 'Federal Water Pollution Control Act' (commonly referred to as the Clean Water Act).''

#### SAVINGS PROVISION

Pub. L. 92–500, §4, Oct. 18, 1972, 86 Stat. 896, provided that:

''(a) No suit, action, or other proceeding lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall abate by reason of the taking effect of the amendment made by section 2 of this Act [which enacted this chapter]. The court may, on its own motion or that of any party made at any time within twelve months after such taking effect, allow the same to be maintained by or against the Administrator or such officer or employee.

''(b) All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972], and pertaining to any functions, powers, requirements, and duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall continue in full force and effect after the date of enactment of this Act [Oct. 18, 1972] until modified or rescinded in accordance with the Federal Water Pollution Control Act as amended by this Act [this chapter].

''(c) The Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act [Oct. 18, 1972] shall remain applicable to all grants made from funds authorized for the fiscal year ending June 30, 1972, and prior fiscal years, including any increases in the monetary amount of any such grant which may be paid from authorizations for fiscal years beginning after June 30, 1972, except as specifically otherwise provided in section 202 of the Federal Water Pollution Control Act as amended by this Act [section 1282 of this title] and in subsection (c) of section 3 of this Act.''

#### SEPARABILITY

Act June 30, 1948, ch. 758, title V, §512, as added by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 894, provided that: ''If any provision of this Act [this chapter], or the application of any provision of this Act [this chapter] to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the remainder of this Act [this chapter], shall not be affected thereby.''

#### NATIONAL SHELLFISH INDICATOR PROGRAM

Pub. L. 102–567, title III, §308, Oct. 29, 1992, 106 Stat. 4286; as amended by Pub. L. 105–362, title II, §201(b), Nov. 10, 1998, 112 Stat. 3282, provided that:

''(a) ESTABLISHMENT OF A RESEARCH PROGRAM.—The Secretary of Commerce, in cooperation with the Secretary of Health and Human Services and the Administrator of the Environmental Protection Agency, shall establish and administer a 5-year national shellfish research program (hereafter in this section referred to as the 'Program') for the purpose of improving existing classification systems for shellfish growing waters using the latest technological advancements in microbiology and epidemiological methods. Within 12 months

after the date of enactment of this Act [Oct. 29, 1992], the Secretary of Commerce, in cooperation with the advisory committee established under subsection (b) and the Consortium, shall develop a comprehensive 5-year plan for the Program which shall at a minimum provide for—

''(1) an environmental assessment of commercial shellfish growing areas in the United States, including an evaluation of the relationships between indicators of fecal contamination and human enteric pathogens;

''(2) the evaluation of such relationships with respect to potential health hazards associated with human consumption of shellfish;

''(3) a comparison of the current microbiological methods used for evaluating indicator bacteria and human enteric pathogens in shellfish and shellfish growing waters with new technological methods designed for this purpose;

''(4) the evaluation of current and projected systems for human sewage treatment in eliminating viruses and other human enteric pathogens which accumulate in shellfish;

''(5) the design of epidemiological studies to relate microbiological data, sanitary survey data, and human shellfish consumption data to actual hazards to health associated with such consumption; and

''(6) recommendations for revising Federal shellfish standards and improving the capabilities of Federal and State agencies to effectively manage shellfish and ensure the safety of shellfish intended for human consumption.

''(b) ADVISORY COMMITTEE.—(1) For the purpose of providing oversight of the Program on a continuing basis, an advisory committee (hereafter in this section referred to as the 'Committee') shall be established under a memorandum of understanding between the Interstate Shellfish Sanitation Conference and the National Marine Fisheries Service.

''(2) The Committee shall—

''(A) identify priorities for achieving the purpose of the Program;

''(B) review and recommend approval or disapproval of Program work plans and plans of operation;

''(C) review and comment on all subcontracts and grants to be awarded under the Program;

''(D) receive and review progress reports from the Consortium and program subcontractors and grantees; and

''(E) provide such other advice on the Program as is appropriate.

''(3) The Committee shall consist of at least ten members and shall include—

''(A) three members representing agencies having authority under State law to regulate the shellfish industry, of whom one shall represent each of the Atlantic, Pacific, and Gulf of Mexico shellfish growing regions;

''(B) three members representing persons engaged in the shellfish industry in the Atlantic, Pacific, and Gulf of Mexico shellfish growing regions (who shall be appointed from among at least six recommendations by the industry members of the Interstate Shellfish Sanitation Conference Executive Board), of whom one shall represent the shellfish industry in each region;

''(C) three members, of whom one shall represent each of the following Federal agencies: the National Oceanic and Atmospheric Administration, the Environmental Protection Agency, and the Food and Drug Administration; and

''(D) one member representing the Shellfish Institute of North America.

''(4) The Chairman of the Committee shall be selected from among the Committee members described in paragraph (3)(A).

''(5) The Committee shall establish and maintain a subcommittee of scientific experts to provide advice, assistance, and information relevant to research funded under the Program, except that no individual who is awarded, or whose application is being considered for, a grant or subcontract under the Program may serve on such subcommittee. The membership of the subcommittee shall, to the extent practicable, be regionally balanced with experts who have scientific knowledge concerning each of the Atlantic, Pacific, and Gulf of Mexico shellfish growing regions. Scientists from the National Academy of Sciences and appropriate Federal agencies (including the National Oceanic and Atmospheric Administration, Food and Drug Administration, Centers for Disease Control, National Institutes of Health, Environmental Protection Agency, and National Science Foundation) shall be considered for membership on the subcommittee.

''(6) Members of the Committee and its scientific subcommittee established under this subsection shall not be paid for serving on the Committee or subcommittee, but shall receive travel expenses as authorized by section 5703 of title 5, United States Code.

''(c) CONTRACT WITH CONSORTIUM.—Within 30 days after the date of enactment of this Act [Oct. 29, 1992], the Secretary of Commerce shall seek to enter into a cooperative agreement or contract with the Consortium under which the Consortium will—

''(1) be the academic administrative organization and fiscal agent for the Program;

''(2) award and administer such grants and subcontracts as are approved by the Committee under subsection (b);

''(3) develop and implement a scientific peer review process for evaluating grant and subcontractor applications prior to review by the Committee;

''(4) in cooperation with the Secretary of Commerce and the Committee, procure the services of a scientific project director;

''(5) develop and submit budgets, progress reports, work plans, and plans of operation for the Program to the Secretary of Commerce and the Committee; and

''(6) make available to the Committee such staff, information, and assistance as the Committee may reasonably require to carry out its activities.

''(d) AUTHORIZATION OF APPROPRIATIONS.—(1) Of the sums authorized under section 4(a) of the National Oceanic and Atmospheric Administration Marine Fisheries Program Authorization Act (Public Law 98–210; 97 Stat. 1409), there are authorized to be appropriated to the Secretary of Commerce $5,200,000 for each of the fiscal years 1993 through 1997 for carrying out the Program. Of the amounts appropriated pursuant to this authorization, not more than 5 percent of such appropriation may be used for administrative purposes by the National Oceanic and Atmospheric Administration. The remaining 95 percent of such appropriation shall be used to meet the administrative and scientific objectives of the Program.

''(2) The Interstate Shellfish Sanitation Conference shall not administer appropriations authorized under this section, but may be reimbursed from such appropriations for its expenses in arranging for travel, meetings, workshops, or conferences necessary to carry out the Program.

''(e) DEFINITIONS.—As used in this section, the term—

''(1) 'Consortium' means the Louisiana Universities Marine Consortium; and

''(2) 'shellfish' means any species of oyster, clam, or mussel that is harvested for human consumption.''

### LIMITATION ON PAYMENTS

Pub. L. 100–4, § 2, Feb. 4, 1987, 101 Stat. 8, provided that: ''No payments may be made under this Act [see Short Title of 1987 Amendment note above] except to the extent provided in advance in appropriation Acts.''

### SEAFOOD PROCESSING STUDY; SUBMITTAL OF RESULTS TO CONGRESS NOT LATER THAN JANUARY 1, 1979

Pub. L. 95–217, §74, Dec. 27, 1977, 91 Stat. 1609, provided that the Administrator of the Environmental Protection Agency conduct a study to examine the geographical, hydrological, and biological characteristics

of marine waters to determine the effects of seafood processes which dispose of untreated natural wastes into such waters and to include in this study an examination of technologies which may be used in such processes to facilitate the use of the nutrients in these wastes or to reduce the discharge of such wastes into the marine environment and to submit the result of this study to Congress not later than Jan. 1, 1979.

### OVERSIGHT STUDY

Pub. L. 92–500, § 5, Oct. 18, 1972, 86 Stat. 897, authorized the Comptroller General of the United States to conduct a study and review of the research, pilot, and demonstration programs related to prevention and control of water pollution conducted, supported, or assisted by any Federal agency pursuant to any Federal law or regulation and assess conflicts between these programs and their coordination and efficacy, and to report to Congress thereon by Oct. 1, 1973.

### INTERNATIONAL TRADE STUDY

Pub. L. 92–500, § 6, Oct. 18, 1972, 86 Stat. 897, provided that:

‘‘(a) The Secretary of Commerce, in cooperation with other interested Federal agencies and with representatives of industry and the public, shall undertake immediately an investigation and study to determine—

‘‘(1) the extent to which pollution abatement and control programs will be imposed on, or voluntarily undertaken by, United States manufacturers in the near future and the probable short- and long-range effects of the costs of such programs (computed to the greatest extent practicable on an industry-by-industry basis) on (A) the production costs of such domestic manufacturers, and (B) the market prices of the goods produced by them;

‘‘(2) the probable extent to which pollution abatement and control programs will be implemented in foreign industrial nations in the near future and the extent to which the production costs (computed to the greatest extent practicable on an industry-by-industry basis) of foreign manufacturers will be affected by the costs of such programs;

‘‘(3) the probable competitive advantage which any article manufactured in a foreign nation will likely have in relation to a comparable article made in the United States if that foreign nation—

‘‘(A) does not require its manufacturers to implement pollution abatement and control programs.

‘‘(B) requires a lesser degree of pollution abatement and control in its programs, or

‘‘(C) in any way reimburses or otherwise subsidizes its manufacturers for the costs of such program;

‘‘(4) alternative means by which any competitive advantage accruing to the products of any foreign nation as a result of any factor described in paragraph (3) may be (A) accurately and quickly determined, and (B) equalized, for example, by the imposition of a surcharge or duty, on a foreign product in an amount necessary to compensate for such advantage; and

‘‘(5) the impact, if any, which the imposition of a compensating tariff or other equalizing measure may have in encouraging foreign nations to implement pollution and abatement control programs.

‘‘(b) The Secretary shall make an initial report to the President and Congress within six months after the date of enactment of this section [Oct. 18, 1972] of the results of the study and investigation carried out pursuant to this section and shall make additional reports thereafter at such times as he deems appropriate taking into account the development of relevant data, but not less than once every twelve months.’’

### INTERNATIONAL AGREEMENTS

Pub. L. 92–500, § 7, Oct. 18, 1972, 86 Stat. 898, provided that: ‘‘The President shall undertake to enter into international agreement to apply uniform standards of performance for the control of the discharge and emission of pollutants from new sources, uniform controls over the discharge and emission of toxic pollutants, and uniform controls over the discharge of pollutants into the ocean. For this purpose the President shall negotiate multilateral treaties, conventions, resolutions, or other agreements, and formulate, present, or support proposals at the United Nations and other appropriate international forums.’’

### NATIONAL POLICIES AND GOAL STUDY

Pub. L. 92–500, § 10, Oct. 18, 1972, 86 Stat. 899, directed President to make a full and complete investigation and study of all national policies and goals established by law to determine what the relationship should be between these policies and goals, taking into account the resources of the Nation, and to report results of his investigation and study together with his recommendations to Congress not later than two years after Oct. 18, 1972.

### EFFICIENCY STUDY

Pub. L. 92–500, § 11, Oct. 18, 1972, 86 Stat. 899, directed President, by utilization of the General Accounting Office, to conduct a full and complete investigation and study of ways and means of most effectively using all of the various resources, facilities, and personnel of the Federal Government in order to most efficiently carry out the provisions of this chapter and to report results of his investigation and study together with his recommendations to Congress not later than two hundred and seventy days after Oct. 18, 1972.

### SEX DISCRIMINATION

Pub. L. 92–500, § 13, Oct. 18, 1972, 86 Stat. 903, provided that: ‘‘No person in the United States shall on the ground of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance under this Act [see Short Title note above] the Federal Water Pollution Control Act [this chapter], or the Environmental Financing Act [set out as a note under section 1281 of this title]. This section shall be enforced through agency provisions and rules similar to those already established, with respect to racial and other discrimination, under title VI of the Civil Rights Act of 1964 [section 2000d et seq. of Title 42, The Public Health and Welfare]. However, this remedy is not exclusive and will not prejudice or cut off any other legal remedies available to a discriminatee.’’

### DEFINITION OF ‘‘ADMINISTRATOR’’

Pub. L. 100–4, § 1(d), Feb. 4, 1987, 101 Stat. 8, provided that: ‘‘For purposes of this Act [see Short Title of 1987 Amendment note above], the term ‘Administrator’ means the Administrator of the Environmental Protection Agency.’’

## Executive Documents

### STANDARDS

For provisions relating to the responsibility of the head of each Executive agency for compliance with applicable legislation for pollution control standards, see Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

### CONTIGUOUS ZONE OF UNITED STATES

For extension of contiguous zone of United States, see Proc. No. 7219, set out as a note under section 1331 of Title 43, Public Lands.

### PREVENTION, CONTROL, AND ABATEMENT OF ENVIRONMENTAL POLLUTION AT FEDERAL FACILITIES

Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of Title 42, The Public Health and Welfare, provides for the prevention, control, and abatement of environmental pollution at federal facilities.

EXECUTIVE ORDER NO. 11548

Ex. Ord. No. 11548, July 20, 1970, 35 F.R. 11677, which related to the delegation of Presidential functions, was superseded by Ex. Ord. No. 11735, Aug. 3, 1973, 38 F.R. 21243, formerly set out as a note under section 1321 of this title.

EX. ORD. NO. 11742. DELEGATION OF FUNCTIONS TO SECRETARY OF STATE RESPECTING THE NEGOTIATION OF INTERNATIONAL AGREEMENTS RELATING TO THE ENHANCEMENT OF THE ENVIRONMENT

Ex. Ord. No. 11742, Oct. 23, 1973, 38 F.R. 29457, provided:

Under and by virtue of the authority vested in me by section 301 of title 3 of the United States Code and as President of the United States, I hereby authorize and empower the Secretary of State, in coordination with the Council on Environmental Quality, the Environmental Protection Agency, and other appropriate Federal agencies, to perform, without the approval, ratification, or other action of the President, the functions vested in the President by Section 7 of the Federal Water Pollution Control Act Amendments of 1972 (Public Law 92–500; 86 Stat. 898) with respect to international agreements relating to the enhancement of the environment.

RICHARD NIXON.

## § 1252. Comprehensive programs for water pollution control

### (a) Preparation and development

The Administrator shall, after careful investigation, and in cooperation with other Federal agencies, State water pollution control agencies, interstate agencies, and the municipalities and industries involved, prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters. In the development of such comprehensive programs due regard shall be given to the improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife, recreational purposes, and the withdrawal of such waters for public water supply, agricultural, industrial, and other purposes. For the purpose of this section, the Administrator is authorized to make joint investigations with any such agencies of the condition of any waters in any State or States, and of the discharges of any sewage, industrial wastes, or substance which may adversely affect such waters.

### (b) Planning for reservoirs; storage for regulation of streamflow

(1) In the survey or planning of any reservoir by the Corps of Engineers, Bureau of Reclamation, or other Federal agency, consideration shall be given to inclusion of storage for regulation of streamflow, except that any such storage and water releases shall not be provided as a substitute for adequate treatment or other methods of controlling waste at the source.

(2) The need for and the value of storage for regulation of streamflow (other than for water quality) including but not limited to navigation, salt water intrusion, recreation, esthetics, and fish and wildlife, shall be determined by the Corps of Engineers, Bureau of Reclamation, or other Federal agencies.

(3) The need for, the value of, and the impact of, storage for water quality control shall be determined by the Administrator, and his views on these matters shall be set forth in any report or presentation to Congress proposing authorization or construction of any reservoir including such storage.

(4) The value of such storage shall be taken into account in determining the economic value of the entire project of which it is a part, and costs shall be allocated to the purpose of regulation of streamflow in a manner which will insure that all project purposes, share equitably in the benefit of multiple-purpose construction.

(5) Costs of regulation of streamflow features incorporated in any Federal reservoir or other impoundment under the provisions of this chapter shall be determined and the beneficiaries identified and if the benefits are widespread or national in scope, the costs of such features shall be nonreimbursable.

(6) No license granted by the Federal Energy Regulatory Commission for a hydroelectric power project shall include storage for regulation of streamflow for the purpose of water quality control unless the Administrator shall recommend its inclusion and such reservoir storage capacity shall not exceed such proportion of the total storage required for the water quality control plan as the drainage area of such reservoir bears to the drainage area of the river basin or basins involved in such water quality control plan.

### (c) Basins; grants to State agencies

(1) The Administrator shall, at the request of the Governor of a State, or a majority of the Governors when more than one State is involved, make a grant to pay not to exceed 50 per centum of the administrative expenses of a planning agency for a period not to exceed three years, which period shall begin after October 18, 1972, if such agency provides for adequate representation of appropriate State, interstate, local, or (when appropriate) international interests in the basin or portion thereof involved and is capable of developing an effective, comprehensive water quality control plan for a basin or portion thereof.

(2) Each planning agency receiving a grant under this subsection shall develop a comprehensive pollution control plan for the basin or portion thereof which—

(A) is consistent with any applicable water quality standards effluent and other limitations, and thermal discharge regulations established pursuant to current law within the basin;

(B) recommends such treatment works as will provide the most effective and economical means of collection, storage, treatment, and elimination of pollutants and recommends means to encourage both municipal and industrial use of such works;

(C) recommends maintenance and improvement of water quality within the basin or portion thereof and recommends methods of adequately financing those facilities as may be necessary to implement the plan; and

(D) as appropriate, is developed in cooperation with, and is consistent with any comprehensive plan prepared by the Water Resources Council, any areawide waste manage-



SUBCHAPTER IV—PERMITS AND LICENSES

## § 1341. Certification

### (a) Compliance with applicable requirements; application; procedures; license suspension

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is re-

ceived from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(6) Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

(June 30, 1948, ch. 758, title IV, § 401, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 877; amended Pub. L. 95–217, §§ 61(b), 64, Dec. 27, 1977, 91 Stat. 1598, 1599.)

### Editorial Notes

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–217 inserted reference to section 1313 of this title in pars. (1), (3), (4), and (5), struck out par. (6) which provided that no Federal agency be deemed an applicant for purposes of this subsection, and redesignated par. (7) as (6).

## § 1342. National pollutant discharge elimination system

**(a) Permits for discharge of pollutants**

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4) All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

(5) No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter to issue permits for discharges into the navigable waters within the ju-

Sec.

FINDINGS

Pub. L. 113–23, §2, Aug. 9, 2013, 127 Stat. 493, provided that: ''Congress finds that—

''(1) the hydropower industry currently employs approximately 300,000 workers across the United States;

''(2) hydropower is the largest source of clean, renewable electricity in the United States;

''(3) as of the date of enactment of this Act [Aug. 9, 2013], hydropower resources, including pumped storage facilities, provide—

''(A) nearly 7 percent of the electricity generated in the United States; and

''(B) approximately 100,000 megawatts of electric capacity in the United States;

''(4) only 3 percent of the 80,000 dams in the United States generate electricity, so there is substantial potential for adding hydropower generation to nonpowered dams; and

''(5) according to one study, by utilizing currently untapped resources, the United States could add approximately 60,000 megawatts of new hydropower capacity by 2025, which could create 700,000 new jobs over the next 13 years.''

## SUBCHAPTER I—REGULATION OF THE DEVELOPMENT OF WATER POWER AND RESOURCES

### Statutory Notes and Related Subsidiaries

CODIFICATION; CONSTRUCTION

Act Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847, provided that sections 1 to 29 of the Federal Water Power Act, as amended (sections 792, 793, 794 to 797, 798 to 818, 819, and 820 to 823 of this title) shall constitute part I of the act. Said section 212 also repealed sections 25 and 30 of the act (sections 819, 791 of this title). It also contained a proviso as follows: ''That nothing in that Act, as amended, shall be construed to repeal or amend the provisions of the amendment to the Federal Water Power Act approved March 3, 1921 (41 Stat. 1353 [section 797a of this title]), or the provisions of any other Act relating to national parks and national monuments.''

### § 791. Repealed. Aug. 26, 1935, ch. 687, title II, § 212, 49 Stat. 847

Section, act June 10, 1920, ch. 285, §30, 41 Stat. 1077, designated the act as The Federal Water Power Act.

### § 791a. Short title

This chapter may be cited as the ''Federal Power Act''.

(June 10, 1920, ch. 285, pt. III, §321, formerly §320, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 863; renumbered Pub. L. 95–617, title II, §212, Nov. 9, 1978, 92 Stat. 3148.)

#### Editorial Notes

CODIFICATION

Section was enacted as part of part III of the Federal Power Act, and not as part of part I of that Act which comprises this subchapter.

#### Statutory Notes and Related Subsidiaries

SHORT TITLE OF 2013 AMENDMENT

Pub. L. 113–23, §1(a), Aug. 9, 2013, 127 Stat. 493, provided that: ''This Act [amending sections 798, 823a, and 2705 of this title and enacting provisions set out as notes preceding section 791 and under section 797 of this title] may be cited as the 'Hydropower Regulatory Efficiency Act of 2013'.''

SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–575, §1, Nov. 15, 1990, 104 Stat. 2834, provided that: ''This Act [enacting section 2243 of Title 42, The Public Health and Welfare, amending sections 796 and 824a–3 of this title and sections 2014, 2061, 2201, and 2284 of Title 42, and enacting provisions set out as a note under section 796 of this title] may be cited as the 'Solar, Wind, Waste, and Geothermal Power Production Incentives Act of 1990'.''

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–473, §1, Oct. 6, 1988, 102 Stat. 2299, provided that: ''This Act [amending section 824e of this title and enacting provisions set out as notes under section 824e of this title] may be cited as the 'Regulatory Fairness Act'.''

SHORT TITLE OF 1986 AMENDMENT

Pub. L. 99–495, §1(a), Oct. 16, 1986, 100 Stat. 1243, provided that: ''This Act [enacting sections 797b and 823b of this title, amending sections 797, 800, 802, 803, 807, 808, 817, 823a, 824a–3, and 824j of this title, and enacting provisions set out as notes under sections 797, 803, 823a, 824a–3, and 825h of this title] may be cited as the 'Electric Consumers Protection Act of 1986'.''

### § 792. Federal Power Commission; creation; number; appointment; term; qualifications; vacancies; quorum; chairman; salary; place of holding sessions

A commission is created and established to be known as the Federal Power Commission (hereinafter referred to as the ''commission'') which shall be composed of five commissioners who shall be appointed by the President, by and with the advice and consent of the Senate, one of whom shall be designated by the President as chairman and shall be the principal executive officer of the commission. Each chairman, when so designated, shall act as such until the expiration of his term of office.

The commissioners first appointed under this section, as amended, shall continue in office for terms of one, two, three, four, and five years, respectively, from June 23, 1930, the term of each to be designated by the President at the time of nomination. Their successors shall be appointed each for a term of five years from the date of the expiration of the term for which his predecessor was appointed and until his successor is appointed and has qualified, except that he shall not so continue to serve beyond the expiration of the next session of Congress subsequent to the expiration of said fixed term of office, and except that any person appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the unexpired term. Not more than three of the commissioners shall be appointed from the same political party. No person in the employ of or holding any official relation to any licensee or to any person, firm, association, or corporation engaged in the generation, transmission, distribution, or sale of power, or owning stock or bonds thereof, or who is in any manner pecuniarily interested therein, shall enter upon the duties of or hold the office of commissioners. Said commissioners shall not engage in any other business, vocation, or employment. No vacancy in the commission shall

impair the right of the remaining commissioners to exercise all the powers of the commission. Three members of the commission shall constitute a quorum for the transaction of business, and the commission shall have an official seal of which judicial notice shall be taken. The commission shall annually elect a vice chairman to act in case of the absence or disability of the chairman or in case of a vacancy in the office of chairman.

Each commissioner shall receive necessary traveling and subsistence expenses, or per diem allowance in lieu thereof, within the limitation prescribed by law, while away from the seat of government upon official business.

The principal office of the commission shall be in the District of Columbia, where its original sessions shall be held; but whenever the convenience of the public or of the parties may be promoted or delay or expense prevented thereby, the commission may hold special sessions in any part of the United States.

(June 10, 1920, ch. 285, pt. I, § 1, 41 Stat. 1063; June 23, 1930, ch. 572, § 1, 46 Stat. 797; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, § 212, 49 Stat. 847; 1950 Reorg. Plan No. 9, § 3, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265; Pub. L. 86–619, § 1, July 12, 1960, 74 Stat. 407.)

### Editorial Notes

#### Codification

Provisions which prescribed the compensation of commissioners were omitted as obsolete. Compensation of the Chairman and members of the Commission was prescribed by sections 5314 and 5315 of Title 5, Government Organization and Employees, prior to termination of the Commission. See Termination of Federal Power Commission; Transfer of Functions note below.

#### Amendments

1960—Pub. L. 86–619 provided for continuation in office of a commissioner upon termination of his term until a successor is appointed and has qualified, not beyond expiration of next session of Congress subsequent to the expiration of said fixed term of office.

1930—Act June 23, 1930, amended section generally. Prior to amendment section read as follows: "A commission is hereby created and established, to be known as the Federal Power Commission (hereinafter referred to as the commission), which shall be composed of the Secretary of War, the Secretary of the Interior, and the Secretary of Agriculture. Two members of the commission shall constitute a quorum for the transaction of business, and the commission shall have an official seal, which shall be judicially noticed. The President shall designate the chairman of the commission."

### Statutory Notes and Related Subsidiaries

#### Repeals

Act Oct. 15, 1949, ch. 695, § 5(a), 63 Stat. 880, formerly cited as a credit to this section, was repealed by Pub. L. 89–554, § 8(a), Sept. 6, 1966, 80 Stat. 655.

#### Termination of Federal Power Commission; Transfer of Functions

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

### Executive Documents

#### Transfer of Functions

Executive and administrative functions of Federal Power Commission, with certain reservations, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 9 of 1950, set out below.

### REORGANIZATION PLAN NO. 9 OF 1950

Eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, March 13, 1950, pursuant to the provisions of the Reorganization Act of 1949, approved June 20, 1949 [see 5 U.S.C. 901 et seq.].

#### Federal Power Commission

Section 1. Transfer of Functions to the Chairman

(a) Subject to the provisions of subsection (b) of this section, there are hereby transferred from the Federal Power Commission, hereinafter referred to as the Commission, to the Chairman of the Commission, hereinafter referred to as the Chairman, the executive and administrative functions of the Commission, including functions of the Commission with respect to (1) the appointment and supervision of personnel employed under the Commission, (2) the distribution of business among such personnel and among administrative units of the Commission, and (3) the use and expenditure of funds.

(b)(1) In carrying out any of his functions under the provisions of this section the Chairman shall be governed by general policies of the Commission and by such regulatory decisions, findings, and determinations as the Commission may by law be authorized to make.

(2) The appointment by the Chairman of the heads of major administrative units under the Commission shall be subject to the approval of the Commission.

(3) Personnel employed regularly and full time in the immediate offices of Commissioners other than the Chairman shall not be affected by the provisions of this reorganization plan.

(4) There are hereby reserved to the Commission its functions with respect to revising budget estimates and with respect to determining upon the distribution of appropriated funds according to major programs and purposes.

Sec. 2. Performance of Transferred Functions

The Chairman may from time to time make such provisions as he shall deem appropriate authorizing the performance by any officer, employee, or administrative unit under his jurisdiction of any functions transferred to the Chairman by the provisions of this reorganization plan.

Sec. 3. Designation of Chairman

The functions of the Commission with respect to choosing a chairman from among the commissioners composing the Commission are hereby transferred to the President.

### § 793. Appointment of officers and employees of Commission; duties, and salaries; detail of officers and employees from other departments; expenditures authorized

The commission shall have authority to appoint, prescribe the duties, and fix the salaries of, a secretary, a chief engineer, a general counsel, a solicitor, and a chief accountant; and may, subject to the civil service laws, appoint such other officers and employees as are necessary in the execution of its functions and fix their sala-



## Editorial Notes

### REFERENCES IN TEXT

Section 79z–5a of title 15, referred to in par. (25), was repealed by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974.

### AMENDMENTS

2005—Par. (17)(C). Pub. L. 109–58, §1253(b)(1), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "'qualifying small power production facility' means a small power production facility—

"(i) which the Commission determines, by rule, meets such requirements (including requirements respecting fuel use, fuel efficiency, and reliability) as the Commission may, by rule, prescribe; and

"(ii) which is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities);".

Par. (18)(B). Pub. L. 109–58, §1253(b)(2), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "'qualifying cogeneration facility' means a cogeneration facility which—

"(i) the Commission determines, by rule, meets such requirements (including requirements respecting minimum size, fuel use, and fuel efficiency) as the Commission may, by rule, prescribe; and

"(ii) is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities);".

Pars. (22), (23). Pub. L. 109–58, §1291(b)(1), added pars. (22) and (23) and struck out former pars. (22) and (23) which read as follows:

"(22) 'electric utility' means any person or State agency (including any municipality) which sells electric energy; such term includes the Tennessee Valley Authority, but does not include any Federal power marketing agency.

"(23) TRANSMITTING UTILITY.—The term 'transmitting utility' means any electric utility, qualifying cogeneration facility, qualifying small power production facility, or Federal power marketing agency which owns or operates electric power transmission facilities which are used for the sale of electric energy at wholesale."

Pars. (26) to (29). Pub. L. 109–58, §1291(b)(2), added pars. (26) to (29).

1992—Par. (22). Pub. L. 102–486, §726(b), inserted "(including any municipality)" after "State agency".

Pars. (23) to (25). Pub. L. 102–486, §726(a), added pars. (23) to (25).

1991—Par. (17)(E). Pub. L. 102–46 struck out ", and which would otherwise not qualify as a small power production facility because of the power production capacity limitation contained in subparagraph (A)(ii)" after "geothermal resources" in introductory provisions.

1990—Par. (17)(A). Pub. L. 101–575, §3(a), inserted "a facility which is an eligible solar, wind, waste, or geothermal facility, or".

Par. (17)(E). Pub. L. 101–575, §3(b), added subpar. (E).

1980—Par. (17)(A)(i). Pub. L. 96–294 added applicability to geothermal resources.

1978—Pars. (17) to (22). Pub. L. 95–617 added pars. (17) to (22).

1935—Act Aug. 26, 1935, §201, amended definitions of "reservations" and "corporations", and inserted definitions of "person", "licensee", "commission", "commissioner", "State commission" and "security".

### Statutory Notes and Related Subsidiaries

#### FERC REGULATIONS

Pub. L. 101–575, §4, Nov. 15, 1990, 104 Stat. 2834, provided that: "Unless the Federal Energy Regulatory Commission otherwise specifies, by rule after enactment of this Act [Nov. 15, 1990], any eligible solar, wind, waste, or geothermal facility (as defined in section 3(17)(E) of the Federal Power Act as amended by this Act [16 U.S.C. 796(17)(E)]), which is a qualifying small power production facility (as defined in subparagraph (C) of section 3(17) of the Federal Power Act as amended by this Act)—

"(1) shall be considered a qualifying small power production facility for purposes of part 292 of title 18, Code of Federal Regulations, notwithstanding any size limitations contained in such part, and

"(2) shall not be subject to the size limitation contained in section 292.601(b) of such part."

#### STATE AUTHORITIES; CONSTRUCTION

Pub. L. 102–486, title VII, §731, Oct. 24, 1992, 106 Stat. 2921, provided that: "Nothing in this title [enacting sections 824l, 824m, and 825o–1 of this title and former sections 79z–5a and 79z–5b of Title 15, Commerce and Trade, and amending this section, sections 824, 824j, 824k, 825n, 825o, and 2621 of this title, and provisions formerly set out as a note under former section 79k of Title 15] or in any amendment made by this title shall be construed as affecting or intending to affect, or in any way to interfere with, the authority of any State or local government relating to environmental protection or the siting of facilities."

#### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

#### ABOLITION OF INTERSTATE COMMERCE COMMISSION AND TRANSFER OF FUNCTIONS

Interstate Commerce Commission abolished and functions of Commission transferred, except as otherwise provided in Pub. L. 104–88, to Surface Transportation Board effective Jan. 1, 1996, by section 1302 of Title 49, Transportation, and section 101 of Pub. L. 104–88, set out as a note under section 1301 of Title 49. References to Interstate Commerce Commission deemed to refer to Surface Transportation Board, a member or employee of the Board, or Secretary of Transportation, as appropriate, see section 205 of Pub. L. 104–88, set out as a note under section 1301 of Title 49.

## § 797. General powers of Commission

The Commission is authorized and empowered—

### (a) Investigations and data

To make investigations and to collect and record data concerning the utilization of the water resources of any region to be developed, the water-power industry and its relation to other industries and to interstate or foreign commerce, and concerning the location, capacity, development costs, and relation to markets of power sites, and whether the power from Government dams can be advantageously used by the United States for its public purposes, and what is a fair value of such power, to the extent the Commission may deem necessary or useful for the purposes of this chapter.

### (b) Statements as to investment of licensees in projects; access to projects, maps, etc.

To determine the actual legitimate original cost of and the net investment in a licensed project, and to aid the Commission in such determinations, each licensee shall, upon oath, within a reasonable period of time to be fixed by

the Commission, after the construction of the original project or any addition thereto or betterment thereof, file with the Commission in such detail as the Commission may require, a statement in duplicate showing the actual legitimate original cost of construction of such project addition, or betterment, and of the price paid for water rights, rights-of-way, lands, or interest in lands. The licensee shall grant to the Commission or to its duly authorized agent or agents, at all reasonable times, free access to such project, addition, or betterment, and to all maps, profiles, contracts, reports of engineers, accounts, books, records, and all other papers and documents relating thereto. The statement of actual legitimate original cost of said project, and revisions thereof as determined by the Commission, shall be filed with the Secretary of the Treasury.

**(c) Cooperation with executive departments; information and aid furnished Commission**

To cooperate with the executive departments and other agencies of State or National Governments in such investigations; and for such purpose the several departments and agencies of the National Government are authorized and directed upon the request of the Commission, to furnish such records, papers, and information in their possession as may be requested by the Commission, and temporarily to detail to the Commission such officers or experts as may be necessary in such investigations.

**(d) Publication of information, etc.; reports to Congress**

To make public from time to time the information secured hereunder, and to provide for the publication of its reports and investigations in such form and manner as may be best adapted for public information and use. The Commission, on or before the 3d day of January of each year, shall submit to Congress for the fiscal year preceding a classified report showing the permits and licenses issued under this subchapter, and in each case the parties thereto, the terms prescribed, and the moneys received if any, or account thereof.

**(e) Issue of licenses for construction, etc., of dams, conduits, reservoirs, etc.**

To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: *Provided*, That licenses shall be issued within any

reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation:[1] The license applicant and any party to the proceeding shall be entitled to a determination on the record, after opportunity for an agency trial-type hearing of no more than 90 days, on any disputed issues of material fact with respect to such conditions. All disputed issues of material fact raised by any party shall be determined in a single trial-type hearing to be conducted by the relevant resource agency in accordance with the regulations promulgated under this subsection and within the time frame established by the Commission for each license proceeding. Within 90 days of August 8, 2005, the Secretaries of the Interior, Commerce, and Agriculture shall establish jointly, by rule, the procedures for such expedited trial-type hearing, including the opportunity to undertake discovery and cross-examine witnesses, in consultation with the Federal Energy Regulatory Commission.[2] *Provided further*, That no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting the navigation have been approved by the Chief of Engineers and the Secretary of the Army. Whenever the contemplated improvement is, in the judgment of the Commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the Commission and shall become a part of the records of the Commission: *Provided further*, That in case the Commission shall find that any Government dam may be advantageously used by the United States for public purposes in addition to navigation, no license therefor shall be issued until two years after it shall have reported to Congress the facts and conditions relating thereto, except that this provision shall not apply to any Government dam constructed prior to June 10, 1920: *And provided further*, That upon the filing of any application for a license which has not been preceded by a preliminary permit under subsection (f) of this section, notice shall be given and published as required by the proviso of said subsection. In deciding whether to issue any license under this subchapter for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

---

[1] So in original. The colon probably should be a period.
[2] So in original. The period probably should be a colon.

**(f) Preliminary permits; notice of application**

To issue preliminary permits for the purpose of enabling applicants for a license hereunder to secure the data and to perform the acts required by section 802 of this title: *Provided, however,* That upon the filing of any application for a preliminary permit by any person, association, or corporation the Commission, before granting such application, shall at once give notice of such application in writing to any State or municipality likely to be interested in or affected by such application; and shall also publish notice of such application once each week for four weeks in a daily or weekly newspaper published in the county or counties in which the project or any part hereof or the lands affected thereby are situated.

**(g) Investigation of occupancy for developing power; orders**

Upon its own motion to order an investigation of any occupancy of, or evidenced intention to occupy, for the purpose of developing electric power, public lands, reservations, or streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States by any person, corporation, State, or municipality and to issue such order as it may find appropriate, expedient, and in the public interest to conserve and utilize the navigation and water-power resources of the region.

(June 10, 1920, ch. 285, pt. I, §4, 41 Stat. 1065; June 23, 1930, ch. 572, §2, 46 Stat. 798; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§202, 212, 49 Stat. 839, 847; July 26, 1947, ch. 343, title II, §205(a), 61 Stat. 501; Pub. L. 97–375, title II, §212, Dec. 21, 1982, 96 Stat. 1826; Pub. L. 99–495, §3(a), Oct. 16, 1986, 100 Stat. 1243; Pub. L. 109–58, title II, §241(a), Aug. 8, 2005, 119 Stat. 674.)

**Editorial Notes**

AMENDMENTS

2005—Subsec. (e). Pub. L. 109–58, which directed amendment of subsec. (e) by inserting after "adequate protection and utilization of such reservation." at end of first proviso "The license applicant and any party to the proceeding shall be entitled to a determination on the record, after opportunity for an agency trial-type hearing of no more than 90 days, on any disputed issues of material fact with respect to such conditions. All disputed issues of material fact raised by any party shall be determined in a single trial-type hearing to be conducted by the relevant resource agency in accordance with the regulations promulgated under this subsection and within the time frame established by the Commission for each license proceeding. Within 90 days of August 8, 2005, the Secretaries of the Interior, Commerce, and Agriculture shall establish jointly, by rule, the procedures for such expedited trial-type hearing, including the opportunity to undertake discovery and cross-examine witnesses, in consultation with the Federal Energy Regulatory Commission.", was executed by making the insertion after "adequate protection and utilization of such reservation:" at end of first proviso, to reflect the probable intent of Congress.

1986—Subsec. (e). Pub. L. 99–495 inserted provisions that in deciding whether to issue any license under this subchapter, the Commission, in addition to power and development purposes, is required to give equal consideration to purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife, the protection of recreational opportunities, and the preservation of environmental quality.

1982—Subsec. (d). Pub. L. 97–375 struck out provision that the report contain the names and show the compensation of the persons employed by the Commission.

1935—Subsec. (a). Act Aug. 26, 1935, §202, struck out last paragraph of subsec. (a) which related to statements of cost of construction, etc., and free access to projects, maps, etc., and is now covered by subsec. (b).

Subsecs. (b), (c). Act Aug. 26, 1935, §202, added subsec. (b) and redesignated former subsecs. (b) and (c) as (c) and (d), respectively.

Subsec. (d). Act Aug. 26, 1935, §202, redesignated subsec. (c) as (d) and substituted "3d day of January" for "first Monday in December" in second sentence. Former subsec. (d) redesignated (e).

Subsec. (e). Act Aug. 26, 1935, §202, redesignated subsec. (d) as (e) and substituted "streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States" for "navigable waters of the United States" and "subsection (f)" for "subsection (e)". Former subsec. (e) redesignated (f).

Subsec. (f). Act Aug. 26, 1935, §202, redesignated subsec. (e) as (f) and substituted "once each week for four weeks" for "for eight weeks". Former section (f), which related to the power of the Commission to prescribe regulations for the establishment of a system of accounts and the maintenance thereof, was struck out by act Aug. 26, 1935.

Subsec. (g). Act Aug. 26, 1935, §202, added subsec. (g). Former subsec. (g), which related to the power of the Commission to hold hearings and take testimony by deposition, was struck out.

Subsec. (h). Act Aug. 26, 1935, §202, struck out subsec. (h) which related to the power of the Commission to perform any and all acts necessary and proper for the purpose of carrying out the provisions of this chapter.

1930—Subsec. (d). Act June 23, 1930, inserted sentence respecting contents of report.

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Department of War designated Department of the Army and title of Secretary of War changed to Secretary of the Army by section 205(a) of act July 26, 1947, ch. 343, title II, 61 Stat. 501. Section 205(a) of act July 26, 1947, was repealed by section 53 of act Aug. 10, 1956, ch. 1041, 70A Stat. 641. Section 1 of act Aug. 10, 1956, enacted "Title 10, Armed Forces" which in sections 3010 to 3013 continued military Department of the Army under administrative supervision of Secretary of the Army.

EFFECTIVE DATE OF 1986 AMENDMENT

Pub. L. 99–495, §18, Oct. 16, 1986, 100 Stat. 1259, provided that: "Except as otherwise provided in this Act, the amendments made by this Act [enacting section 823b of this title and amending this section and sections 800, 802, 803, 807, 808, 817, 823a, 824a–3, and 824j of this title] shall take effect with respect to each license, permit, or exemption issued under the Federal Power Act after the enactment of this Act [Oct. 16, 1986]. The amendments made by sections 6 and 12 of this Act [enacting section 823b of this title and amending section 817 of this title] shall apply to licenses, permits, and exemptions without regard to when issued."

SAVINGS PROVISION

Pub. L. 99–495, §17(a), Oct. 16, 1986, 100 Stat. 1259, provided that: "Nothing in this Act [see Short Title of 1986 Amendment note set out under section 791a of this title] shall be construed as authorizing the appropriation of water by any Federal, State, or local agency, Indian tribe, or any other entity or individual. Nor shall any provision of this Act—

"(1) affect the rights or jurisdiction of the United States, the States, Indian tribes, or other entities over waters of any river or stream or over any ground water resource;

''(2) alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by the States;

''(3) alter or establish the respective rights of States, the United States, Indian tribes, or any person with respect to any water or water-related right;

''(4) affect, expand, or create rights to use transmission facilities owned by the Federal Government;

''(5) alter, amend, repeal, interpret, modify, or be in conflict with, the Treaty rights or other rights of any Indian tribe;

''(6) permit the filing of any competing application in any relicensing proceeding where the time for filing a competing application expired before the enactment of this Act [Oct. 16, 1986]; or

''(7) modify, supersede, or affect the Pacific Northwest Electric Power Planning and Conservation Act [16 U.S.C. 839 et seq.].''

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions in subsec. (d) of this section relating to submitting a classified annual report to Congress showing permits and licenses issued under this subchapter, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 91 of House Document No. 103–7.

PROMOTING HYDROPOWER DEVELOPMENT AT NONPOWERED DAMS AND CLOSED LOOP PUMPED STORAGE PROJECTS

Pub. L. 113–23, §6, Aug. 9, 2013, 127 Stat. 495, provided that:

''(a) IN GENERAL.—To improve the regulatory process and reduce delays and costs for hydropower development at nonpowered dams and closed loop pumped storage projects, the Federal Energy Regulatory Commission (referred to in this section as the 'Commission') shall investigate the feasibility of the issuance of a license for hydropower development at nonpowered dams and closed loop pumped storage projects in a 2-year period (referred to in this section as a '2-year process'). Such a 2-year process shall include any prefiling licensing process of the Commission.

''(b) WORKSHOPS AND PILOTS.—The Commission shall—

''(1) not later than 60 days after the date of enactment of this Act [Aug. 9, 2013], hold an initial workshop to solicit public comment and recommendations on how to implement a 2-year process;

''(2) develop criteria for identifying projects featuring hydropower development at nonpowered dams and closed loop pumped storage projects that may be appropriate for licensing within a 2-year process;

''(3) not later than 180 days after the date of enactment of this Act, develop and implement pilot projects to test a 2-year process, if practicable; and

''(4) not later than 3 years after the date of implementation of the final pilot project testing a 2-year process, hold a final workshop to solicit public comment on the effectiveness of each tested 2-year process.

''(c) MEMORANDUM OF UNDERSTANDING.—The Commission shall, to the extent practicable, enter into a memorandum of understanding with any applicable Federal or State agency to implement a pilot project described in subsection (b).

''(d) REPORTS.—

''(1) PILOT PROJECTS NOT IMPLEMENTED.—If the Commission determines that no pilot project described in subsection (b) is practicable because no 2-year process is practicable, not later than 240 days after the date of enactment of this Act [Aug. 9, 2013], the Commission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a report that—

''(A) describes the public comments received as part of the initial workshop held under subsection (b)(1); and

''(B) identifies the process, legal, environmental, economic, and other issues that justify the determination of the Commission that no 2-year process is practicable, with recommendations on how Congress may address or remedy the identified issues.

''(2) PILOT PROJECTS IMPLEMENTED.—If the Commission develops and implements pilot projects involving a 2-year process, not later than 60 days after the date of completion of the final workshop held under subsection (b)(4), the Commission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a report that—

''(A) describes the outcomes of the pilot projects;

''(B) describes the public comments from the final workshop on the effectiveness of each tested 2-year process; and

''(C)(i) outlines how the Commission will adopt policies under existing law (including regulations) that result in a 2-year process for appropriate projects;

''(ii) outlines how the Commission will issue new regulations to adopt a 2-year process for appropriate projects; or

''(iii) identifies the process, legal, environmental, economic, and other issues that justify a determination of the Commission that no 2-year process is practicable, with recommendations on how Congress may address or remedy the identified issues.''

IMPROVEMENT AT EXISTING FEDERAL FACILITIES

Pub. L. 102–486, title XXIV, §2404, Oct. 24, 1992, 106 Stat. 3097, as amended by Pub. L. 103–437, §6(d)(37), Nov. 2, 1994, 108 Stat. 4585; Pub. L. 104–66, title I, §1052(h), Dec. 21, 1995, 109 Stat. 718, directed Secretary of the Interior and Secretary of the Army, in consultation with Secretary of Energy, to perform reconnaissance level studies, for each of the Nation's principal river basins, of cost effective opportunities to increase hydropower production at existing federally-owned or operated water regulation, storage, and conveyance facilities, with such studies to be completed within 2 years after Oct. 24, 1992, and transmitted to Congress, further provided that in cases where such studies had been prepared by any agency of the United States and published within ten years prior to Oct. 24, 1992, Secretary of the Interior, or Secretary of the Army, could choose to rely on information developed by prior studies rather than conduct new studies, and further provided for appropriations for fiscal years 1993 to 1995.

WATER CONSERVATION AND ENERGY PRODUCTION

Pub. L. 102–486, title XXIV, §2405, Oct. 24, 1992, 106 Stat. 3098, provided that:

''(a) STUDIES.—The Secretary of the Interior, acting pursuant to the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388) [see Short Title note under section 371 of Title 43, Public Lands], and Acts supplementary thereto and amendatory thereof, is authorized and directed to conduct feasibility investigations of opportunities to increase the amount of hydroelectric energy available for marketing by the Secretary from Federal hydroelectric power generation facilities resulting from a reduction in the consumptive use of such power for Federal reclamation project purposes or as a result of an increase in the amount of water available for such generation because of water conservation efforts on Federal reclamation projects or a combination thereof. The Secretary of the Interior is further authorized and directed to conduct feasibility investigations of opportunities to mitigate damages to or enhance fish and wildlife as a result of increasing the amount of water available for such purposes because of water conservation efforts on Federal reclamation projects. Such feasibility investigations shall include, but not be limited to—

''(1) an analysis of the technical, environmental, and economic feasibility of reducing the amount of water diverted upstream of such Federal hydro-

electric power generation facilities by Federal reclamation projects;

"(2) an estimate of the reduction, if any, of project power consumed as a result of the decreased amount of diversion;

"(3) an estimate of the increase in the amount of electrical energy and related revenues which would result from the marketing of such power by the Secretary;

"(4) an estimate of the fish and wildlife benefits which would result from the decreased or modified diversions;

"(5) a finding by the Secretary of the Interior that the activities proposed in the feasibility study can be carried out in accordance with applicable Federal and State law, interstate compacts and the contractual obligations of the Secretary; and

"(6) a finding by the affected Federal Power Marketing Administrator that the hydroelectric component of the proposed water conservation feature is cost-effective and that the affected Secretary is able to market the hydro-electric power expected to be generated.

"(b) CONSULTATION.—In preparing feasibility studies pursuant to this section, the Secretary of the Interior shall consult with, and seek the recommendations of, affected State, local and Indian tribal interests, and shall provide for appropriate public comment.

"(c) AUTHORIZATION.—There is hereby authorized to be appropriated to the Secretary of the Interior such sums as may be necessary to carry out this section."

PROJECTS ON FRESH WATERS IN STATE OF HAWAII

Pub. L. 102–486, title XXIV, §2408, Oct. 24, 1992, 106 Stat. 3100, directed Federal Energy Regulatory Commission, in consultation with State of Hawaii, to carry out study of hydroelectric licensing in State of Hawaii for purposes of considering whether such licensing should be transferred to State, and directed Commission to complete study and submit report containing results of study to Congress within 18 months after Oct. 24, 1992.

§ 797a. Congressional authorization for permits, licenses, leases, or authorizations for dams, conduits, reservoirs, etc., within national parks or monuments

On and after March 3, 1921, no permit, license, lease, or authorization for dams, conduits, reservoirs, power houses, transmission lines, or other works for storage or carriage of water, or for the development, transmission, or utilization of power within the limits as constituted, March 3, 1921, of any national park or national monument shall be granted or made without specific authority of Congress.

(Mar. 3, 1921, ch. 129, 41 Stat. 1353.)

**Editorial Notes**

CODIFICATION

Provisions repealing so much of this chapter "as authorizes licensing such uses of existing national parks and national monuments by the Federal Power Commission" have been omitted.

Section was not enacted as part of the Federal Power Act which generally comprises this chapter.

**Statutory Notes and Related Subsidiaries**

CONSTRUCTION

Act Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847, provided that nothing in this chapter should be construed to repeal or amend the provisions of the act approved Mar. 3, 1921 (41 Stat. 1353) [16 U.S.C. 797a] or the provisions of any other Act relating to national parks

and national monuments. See note preceding section 791 of this title.

§ 797b. Duty to keep Congress fully and currently informed

The Federal Energy Regulatory Commission shall keep the Committee on Energy and Commerce of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate fully and currently informed regarding actions of the Commission with respect to the provisions of Part I of the Federal Power Act [16 U.S.C. 791a et seq.].

(Pub. L. 99–495, §16, Oct. 16, 1986, 100 Stat. 1259.)

**Editorial Notes**

REFERENCES IN TEXT

The Federal Power Act, referred to in text, is act June 10, 1920, ch. 285, 41 Stat. 1063. Part I of the Federal Power Act is classified generally to this subchapter (§791a et seq.). For complete classification of this Act to the Code, see section 791a of this title and Tables.

CODIFICATION

Section was enacted as part of the Electric Consumers Protection Act of 1986, and not as part of the Federal Power Act which generally comprises this chapter.

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Committee on Energy and Commerce of House of Representatives treated as referring to Committee on Commerce of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Commerce of House of Representatives changed to Committee on Energy and Commerce of House of Representatives, and jurisdiction over matters relating to securities and exchanges and insurance generally transferred to Committee on Financial Services of House of Representatives by House Resolution No. 5, One Hundred Seventh Congress, Jan. 3, 2001.

§ 797c. Dams in National Park System units

After October 24, 1992, the Federal Energy Regulatory Commission may not issue an original license under Part I of the Federal Power Act [16 U.S.C. 791a et seq.] (nor an exemption from such Part) for any new hydroelectric power project located within the boundaries of any unit of the National Park System that would have a direct adverse effect on Federal lands within any such unit. Nothing in this section shall be construed as repealing any existing provision of law (or affecting any treaty) explicitly authorizing a hydroelectric power project.

(Pub. L. 102–486, title XXIV, §2402, Oct. 24, 1992, 106 Stat. 3097.)

**Editorial Notes**

REFERENCES IN TEXT

The Federal Power Act, referred to in text, is act June 10, 1920, ch. 285, 41 Stat. 1063. Part I of the Act is classified generally to this subchapter (§791a et seq.). For complete classification of this Act to the Code, see section 791a of this title and Tables.

CODIFICATION

Section was enacted as part of the Energy Policy Act of 1992, and not as part of the Federal Power Act which generally comprises this chapter.



### § 808. New licenses and renewals

#### (a) Relicensing procedures; terms and conditions; issuance to applicant with proposal best adapted to serve public interest; factors considered

(1) If the United States does not, at the expiration of the existing license, exercise its right to take over, maintain, and operate any project or projects of the licensee, as provided in section 807 of this title, the commission is authorized to issue a new license to the existing licensee upon such terms and conditions as may be authorized or required under the then existing laws and regulations, or to issue a new license under said terms and conditions to a new licensee, which license may cover any project or projects covered by the existing license, and shall be issued on the condition that the new licensee shall, before taking possession of such project or projects, pay such amount, and assume such contracts as the United States is required to do in the manner specified in section 807 of this title: *Provided,* That in the event the United States does not exercise the right to take over or does not issue a license to a new licensee, or issue a new license to the existing licensee, upon reasonable terms, then the commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the existing license until the property is taken over or a new license is issued as aforesaid.

(2) Any new license issued under this section shall be issued to the applicant having the final proposal which the Commission determines is best adapted to serve the public interest, except that in making this determination the Commission shall ensure that insignificant differences with regard to subparagraphs (A) through (G) of this paragraph between competing applications are not determinative and shall not result in the transfer of a project. In making a determination under this section (whether or not more than one application is submitted for the project), the Commission shall, in addition to the requirements of section 803 of this title, consider (and explain such consideration in writing) each of the following:

(A) The plans and abilities of the applicant to comply with (i) the articles, terms, and conditions of any license issued to it and (ii) other applicable provisions of this subchapter.

(B) The plans of the applicant to manage, operate, and maintain the project safely.

(C) The plans and abilities of the applicant to operate and maintain the project in a manner most likely to provide efficient and reliable electric service.

(D) The need of the applicant over the short and long term for the electricity generated by the project or projects to serve its customers, including, among other relevant considerations, the reasonable costs and reasonable availability of alternative sources of power, taking into consideration conservation and other relevant factors and taking into consideration the effect on the provider (including its customers) of the alternative source of power, the effect on the applicant's operating and load characteristics, the effect on communities served or to be served by the project, and in the case of an applicant using power for the applicant's own industrial facility and related operations, the effect on the operation and efficiency of such facility or related operations, its workers, and the related community. In the case of an applicant that is an Indian tribe applying for a license for a project located on the tribal reservation, a statement of the need of such tribe for electricity generated by the project to foster the purposes of the reservation may be included.

(E) The existing and planned transmission services of the applicant, taking into consideration system reliability, costs, and other applicable economic and technical factors.

(F) Whether the plans of the applicant will be achieved, to the greatest extent possible, in a cost effective manner.

(G) Such other factors as the Commission may deem relevant, except that the terms and conditions in the license for the protection, mitigation, or enhancement of fish and wildlife resources affected by the development, operation, and management of the project shall be determined in accordance with section 803 of this title, and the plans of an applicant concerning fish and wildlife shall not be subject to a comparative evaluation under this subsection.

(3) In the case of an application by the existing licensee, the Commission shall also take into consideration each of the following:

(A) The existing licensee's record of compliance with the terms and conditions of the existing license.

(B) The actions taken by the existing licensee related to the project which affect the public.

#### (b) Notification of intention regarding renewal; public availability of documents; notice to public and Federal agencies; identification of Federal or Indian lands included; additional information required

(1) Each existing licensee shall notify the Commission whether the licensee intends to file an application for a new license or not. Such notice shall be submitted at least 5 years before the expiration of the existing license.

(2) At the time notice is provided under paragraph (1), the existing licensee shall make each of the following reasonably available to the public for inspection at the offices of such licensee: current maps, drawings, data, and such other information as the Commission shall, by rule, require regarding the construction and operation of the licensed project. Such information shall include, to the greatest extent practicable pertinent energy conservation, recreation, fish and wildlife, and other environmental information. Copies of the information shall be made available at reasonable costs of reproduction. Within 180 days after October 16, 1986, the Commission shall promulgate regulations regarding the information to be provided under this paragraph.

(3) Promptly following receipt of notice under paragraph (1), the Commission shall provide public notice of whether an existing licensee intends to file or not to file an application for a new license. The Commission shall also promptly notify the National Marine Fisheries Service

and the United States Fish and Wildlife Service, and the appropriate State fish and wildlife agencies.

(4) The Commission shall require the applicant to identify any Federal or Indian lands included in the project boundary, together with a statement of the annual fees paid as required by this subchapter for such lands, and to provide such additional information as the Commission deems appropriate to carry out the Commission's responsibilities under this section.

**(c) Time of filing application; consultation and participation in studies with fish and wildlife agencies; notice to applicants; adjustment of time periods**

(1) Each application for a new license pursuant to this section shall be filed with the Commission at least 24 months before the expiration of the term of the existing license. Each applicant shall consult with the fish and wildlife agencies referred to in subsection (b) and, as appropriate, conduct studies with such agencies. Within 60 days after the statutory deadline for the submission of applications, the Commission shall issue a notice establishing expeditious procedures for relicensing and a deadline for submission of final amendments, if any, to the application.

(2) The time periods specified in this subsection and in subsection (b) shall be adjusted, in a manner that achieves the objectives of this section, by the Commission by rule or order with respect to existing licensees who, by reason of the expiration dates of their licenses, are unable to comply with a specified time period.

**(d) Adequacy of transmission facilities; provision of services to successor by existing licensee; tariff; final order; modification, extension or termination of order**

(1) In evaluating applications for new licenses pursuant to this section, the Commission shall not consider whether an applicant has adequate transmission facilities with regard to the project.

(2) When the Commission issues a new license (pursuant to this section) to an applicant which is not the existing licensee of the project and finds that it is not feasible for the new licensee to utilize the energy from such project without provision by the existing licensee of reasonable services, including transmission services, the Commission shall give notice to the existing licensee and the new licensee to immediately enter into negotiations for such services and the costs demonstrated by the existing licensee as being related to the provision of such services. It is the intent of Congress that such negotiations be carried out in good faith and that a timely agreement be reached between the parties in order to facilitate the transfer of the license by the date established when the Commission issued the new license. If such parties do not notify the Commission that within the time established by the Commission in such notice (and if appropriate, in the judgment of the Commission, one 45-day extension thereof), a mutually satisfactory arrangement for such services that is consistent with the provisions of this chapter has been executed, the Commission shall order the existing licensee to file (pursuant to section 824d of this title) with the Commis-

sion a tariff, subject to refund, ensuring such services beginning on the date of transfer of the project and including just and reasonable rates and reasonable terms and conditions. After notice and opportunity for a hearing, the Commission shall issue a final order adopting or modifying such tariff for such services at just and reasonable rates in accordance with section 824d of this title and in accordance with reasonable terms and conditions. The Commission, in issuing such order, shall ensure the services necessary for the full and efficient utilization and benefits for the license term of the electric energy from the project by the new licensee in accordance with the license and this subchapter, except that in issuing such order the Commission—

(A) shall not compel the existing licensee to enlarge generating facilities, transmit electric energy other than to the distribution system (providing service to customers) of the new licensee identified as of the date one day preceding the date of license award, or require the acquisition of new facilities, including the upgrading of existing facilities other than any reasonable enhancement or improvement of existing facilities controlled by the existing licensee (including any acquisition related to such enhancement or improvement) necessary to carry out the purposes of this paragraph;

(B) shall not adversely affect the continuity and reliability of service to the customers of the existing licensee;

(C) shall not adversely affect the operational integrity of the transmission and electric systems of the existing licensee;

(D) shall not cause any reasonably quantifiable increase in the jurisdictional rates of the existing licensee; and

(E) shall not order any entity other than the existing licensee to provide transmission or other services.

Such order shall be for such period as the Commission deems appropriate, not to exceed the term of the license. At any time, the Commission, upon its own motion or upon a petition by the existing or new licensee and after notice and opportunity for a hearing, may modify, extend, or terminate such order.

**(e) License term on relicensing**

Except for an annual license, any license issued by the Commission under this section shall be for a term which the Commission determines to be in the public interest but not less than 30 years, nor more than 50 years, from the date on which the license is issued.

**(f) Nonpower use licenses; recordkeeping**

In issuing any licenses under this section except an annual license, the Commission, on its own motion or upon application of any licensee, person, State, municipality, or State commission, after notice to each State commission and licensee affected, and after opportunity for hearing, whenever it finds that in conformity with a comprehensive plan for improving or developing a waterway or waterways for beneficial public uses all or part of any licensed project should no longer be used or adapted for use for power purposes, may license all or part of the project

works for nonpower use. A license for nonpower use shall be issued to a new licensee only on the condition that the new licensee shall, before taking possession of the facilities encompassed thereunder, pay such amount and assume such contracts as the United States is required to do, in the manner specified in section 807 of this title. Any license for nonpower use shall be a temporary license. Whenever, in the judgment of the Commission, a State, municipality, interstate agency, or another Federal agency is authorized and willing to assume regulatory supervision of the lands and facilities included under the nonpower license and does so, the Commission shall thereupon terminate the license. Consistent with the provisions of subchapter IV of this chapter, every licensee for nonpower use shall keep such accounts and file such annual and other periodic or special reports concerning the removal, alteration, nonpower use, or other disposition of any project works or parts thereof covered by the nonpower use license as the Commission may by rules and regulations or order prescribe as necessary or appropriate.

(June 10, 1920, ch. 285, pt. I, §15, 41 Stat. 1072; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847; Pub. L. 90–451, §3, Aug. 3, 1968, 82 Stat. 617; Pub. L. 99–495, §§4(a), (b)(1), 5, Oct. 16, 1986, 100 Stat. 1245, 1248.)

#### Editorial Notes

##### AMENDMENTS

1986—Subsec. (a). Pub. L. 99–495, §4(a), (b)(1), designated existing provisions as par. (1), substituted "existing" for "original" wherever appearing, and added pars. (2) and (3).

Subsecs. (b) to (f). Pub. L. 99–495, §§4(a), 5, added subsecs. (b) to (e) and redesignated former subsec. (b) as (f).

1968—Pub. L. 90–451 designated existing provisions as subsec. (a) and added subsec. (b).

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–495 effective with respect to each license, permit, or exemption issued under this chapter after Oct. 16, 1986, see section 18 of Pub. L. 99–495, set out as a note under section 797 of this title.

### § 809. Temporary use by Government of project works for national safety; compensation for use

When in the opinion of the President of the United States, evidenced by a written order addressed to the holder of any license under this chapter, the safety of the United States demands it, the United States shall have the right to enter upon and take possession of any project or part thereof, constructed, maintained, or operated under said license, for the purpose of manufacturing nitrates, explosives, or munitions of war, or for any other purpose involving the safety of the United States, to retain possession, management, and control thereof for such length of time as may appear to the President to be necessary to accomplish said purposes, and then to restore possession and control to the party or parties entitled thereto; and in the event that the United States shall exercise such right it shall pay to the party or parties entitled

thereto just and fair compensation for the use of said property as may be fixed by the commission upon the basis of a reasonable profit in time of peace, and the cost of restoring said property to as good condition as existed at the time of the taking over thereof, less the reasonable value of any improvements that may be made thereto by the United States and which are valuable and serviceable to the licensee.

(June 10, 1920, ch. 285, pt. I, §16, 41 Stat. 1072; renumbered pt. I, Aug. 26, 1935, ch. 687, title II, §212, 49 Stat. 847.)

#### Statutory Notes and Related Subsidiaries

##### TERMINATION OF WAR AND EMERGENCIES

Joint Res. July 25, 1947, ch. 327, §3, 61 Stat. 451, provided that in the interpretation of this section, the date July 25, 1947, shall be deemed to be the date of termination of any state of war theretofore declared by Congress and of the national emergencies proclaimed by the President on September 8, 1939, and May 27, 1941.

### § 810. Disposition of charges arising from licenses

#### (a) Receipts from charges

All proceeds from any Indian reservation shall be placed to the credit of the Indians of such reservation. All other charges arising from licenses hereunder, except charges fixed by the Commission for the purpose of reimbursing the United States for the costs of administration of this subchapter, shall be paid into the Treasury of the United States, subject to the following distribution: 12½ per centum thereof is hereby appropriated to be paid into the Treasury of the United States and credited to "Miscellaneous receipts"; 50 per centum of the charges arising from licenses hereunder for the occupancy and use of public lands and national forests shall be paid into, reserved, and appropriated as a part of the reclamation fund created by the Act of Congress known as the Reclamation Act, approved June 17, 1902; and 37½ per centum of the charges arising from licenses hereunder for the occupancy and use of national forests and public lands from development within the boundaries of any State shall be paid by the Secretary of the Treasury to such State; and 50 per centum of the charges arising from all other licenses hereunder is reserved and appropriated as a special fund in the Treasury to be expended under the direction of the Secretary of the Army in the maintenance and operation of dams and other navigation structures owned by the United States or in the construction, maintenance, or operation of headwater or other improvements of navigable waters of the United States. The proceeds of charges made by the Commission for the purpose of reimbursing the United States for the costs of the administration of this subchapter shall be paid into the Treasury of the United States and credited to miscellaneous receipts.

#### (b) Delinquent payments

In case of delinquency on the part of any licensee in the payment of annual charges a penalty of 5 per centum of the total amount so delinquent may be added to the total charges which shall apply for the first month or part of



chapter and in such case the provisions of this chapter shall apply to such applicant as a licensee under this chapter: *Provided*, That when application is made for a license under this section for a project or projects already constructed the fair value of said project or projects determined as provided in this section, shall for the purposes of this subchapter and of said license be deemed to be the amount to be allowed as the net investment of the applicant in such project or projects as of the date of such license, or as of the date of such determination, if license has not been issued. Such fair value shall be determined by the Commission after notice and opportunity for hearing.

(June 10, 1920, ch. 285, pt. I, §23(a), 41 Stat. 1075; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§210, 212, 49 Stat. 846, 847.)

**Editorial Notes**

CODIFICATION

Section consists of subsec. (a) of section 23 of act June 10, 1920, as so designated by act Aug. 26, 1935. Subsec. (b) of section 23 of act June 10, 1920, is set out as section 817 of this title.

AMENDMENTS

1935—Act Aug. 26, 1935, §210, amended section generally, substituting ''part'' for ''chapter'' wherever appearing, substituting ''heretofore'' for ''then'', and substituting the last sentence for ''Such fair value may, in the discretion of the commission, be determined by mutual agreement between the commission and the applicant or, in case they cannot agree, jurisdiction is hereby conferred upon the district court of the United States in the district within which such project or projects may be located, upon the application of either party, to hear and determine the amount of such fair value.''

## § 817. Projects not affecting navigable waters; necessity for Federal license, permit or right-of-way; unauthorized activities

(1) It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter. Any person, association, corporation, State, or municipality intending to construct a dam or other project works, across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be af-

fected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State laws.

(2) No person may commence any significant modification of any project licensed under, or exempted from, this chapter unless such modification is authorized in accordance with terms and conditions of such license or exemption and the applicable requirements of this subchapter. As used in this paragraph, the term ''commence'' refers to the beginning of physical onsite activity other than surveys or testing.

(June 10, 1920, ch. 285, pt. I, §23(b), 41 Stat. 1075; renumbered pt. I and amended, Aug. 26, 1935, ch. 687, title II, §§210, 212, 49 Stat. 846, 847; Pub. L. 99–495, §6, Oct. 16, 1986, 100 Stat. 1248.)

**Editorial Notes**

CODIFICATION

Section consists of subsec. (b) of section 23 of act June 10, 1920, as so designated by act Aug. 26, 1935. Subsec. (a) of section 23 of act June 10, 1920, is set out as section 816 of this title.

AMENDMENTS

1986—Pub. L. 99–495 designated existing provisions as par. (1) and added par. (2).
1935—Act Aug. 26, 1935, §210, amended section generally, inserting first sentence, and substituting ''with foreign nations'' for ''between foreign nations'', ''shall before such construction'' for ''may in their discretion'' and ''shall not construct, maintain, or operate such dam or other project works'' for ''shall not proceed with such construction''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–495 applicable to licenses, permits, and exemptions without regard to when issued, see section 18 of Pub. L. 99–495, set out as a note under section 797 of this title.

## § 818. Public lands included in project; reservation of lands from entry

Any lands of the United States included in any proposed project under the provisions of this subchapter shall from the date of filing of application therefor be reserved from entry, location, or other disposal under the laws of the United States until otherwise directed by the Commission or by Congress. Notice that such application has been made, together with the date of filing thereof and a description of the lands of the United States affected thereby, shall be filed in the local land office for the district in which such lands are located. Whenever the Commission shall determine that the value of any lands of the United States so applied for, or heretofore or hereafter reserved or classified as power sites, will not be injured or destroyed for the purposes of power development by location, entry, or selection under the public-land laws, the Sec-



ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### Codification

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### Change of Name

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such ap-

plication is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

**Editorial Notes**

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

(1) acting as an officer or director of an electric utility; or

(2) engaging in the business of purchasing or selling—

(A) electric energy; or

(B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, §314, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, §32(b), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 109–58, title XII, §1288, Aug. 8, 2005, 119 Stat. 982.)

**Editorial Notes**

CODIFICATION

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

(6) Updating the schedule issued with the tendering notice for processing the application.

(b) If the project affects lands of the United States, the Commission will notify the appropriate Federal office of the application and the specific lands affected, pursuant to Section 24 of the Federal Power Act.

(c) For an application for a license seeking benefits under Section 210 of the Public Utility Regulatory Policies Act of 1978, as amended, for a project that would be located at a new dam or diversion, the Applicant must serve the public notice issued under paragraph (a)(1) of this Section to interested agencies at the time the applicant is notified that the application is accepted for filing.

[Order 2002, 68 FR 51121, Aug. 25, 2003; 68 FR 61743, Oct. 30, 2003]

§ 5.23 Response to notice.

(a) *Comments and reply comments.* Comments, protests, interventions, recommendations, and preliminary terms and conditions or preliminary fishway prescriptions must be filed no later than 60 days after the notice of acceptance and ready for environmental analysis. All reply comments must be filed within 105 days of that notice.

(b) *Water quality certification.* (1) With regard to certification requirements for a license applicant under Section 401(a)(1) of the Federal Water Pollution Control Act (Clean Water Act), the license applicant must file no later than 60 days following the date of issuance of the notice of acceptance and ready for environmental analysis provide for in § 5.22:

(i) A copy of the water quality certification;

(ii) A copy of the request for certification, including proof of the date on which the certifying agency received the request; or

(iii) Evidence of waiver of water quality certification as described in paragraph (b)(5)(2) of this Section.

(2) A certifying agency is deemed to have waived the certification requirements of section 401(a)(1) of the Clean Water Act if the certifying agency has not denied or granted certification by one year after the date the certifying agency received a written request for certification. If a certifying agency denies certification, the applicant must file a copy of the denial within 30 days after the applicant received it.

(3) Notwithstanding any other provision in 18 CFR part 4, subpart B, any application to amend an existing license, and any application to amend a pending application for a license, requires a new request for water quality certification pursuant to § 4.34(b)(5) of this chapter if the amendment would have a material adverse impact on the water quality in the discharge from the project or proposed project.

§ 5.24 Applications not requiring a draft NEPA document.

(a) If the Commission determines that a license application will be processed with an environmental assessment rather than an environmental impact statement and that a draft environmental assessment will not be required, the Commission will issue the environmental assessment for comment no later than 120 days from the date responses are due to the notice of acceptance and ready for environmental analysis.

(b) Each environmental assessment issued pursuant to this paragraph must include draft license articles, a preliminary determination of consistency of each fish and wildlife agency recommendation made pursuant to Federal Power Act section 10(j) with the purposes and requirements of the Federal Power Act and other applicable law, as provided for in § 5.26, and any preliminary mandatory terms and conditions and fishway prescriptions.

(c) Comments on an environmental assessment issued pursuant to paragraph (a) of this section, including comments in response to the Commission's preliminary determination with respect to fish and wildlife agency recommendations and on preliminary mandatory terms and conditions or fishway prescriptions, must be filed no later than 30 or 45 days after issuance of the environmental assessment, as specified in the notice accompanying issuance of the environmental assessment, as should any revisions to supporting documentation.

sfrattini on LAPCK6H8L3 with DISTILLER

A24

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 18, 2024. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Scott Ray Ediger*
Scott Ray Ediger
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8509
scott.ediger@ferc.gov

June 18, 2024