NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 21-1042**
(consolidated with 21-1109)

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

Village of Morrisville, Vermont,
*Petitioner,*

v.

Federal Energy Regulatory Commission,
*Respondent,*

Vermont Agency of Natural Resources,
*Respondent-Intervenor*

_____

On Petition for Review of Orders of the Federal Energy Regulatory Commission

_____

**Initial Brief of Respondent-Intervenor Vermont Agency of Natural Resources**
_____

LAURA BUCHER MURPHY
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, Vermont 05609
(802) 828-1059
laura.murphy@vermont.gov

*Counsel for Vermont Agency of Natural Resources*

# CERTIFICATE AS TO PARTIES,
# RULINGS, AND RELATED CASES

## A.    Parties and Amici

Except for amici Vermont Natural Resources Council, Vermont Council of Trout Unlimited, and American Whitewater, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioner Village of Morrisville.

In the Federal Energy Regulatory Commission proceeding below, the parties were the applicant Village of Morrisville and commenters Vermont Agency of Natural Resources, American Whitewater, Vermont Paddlers Club, Vermont Natural Resources Council, and Vermont Council of Trout Unlimited.

## B.    Rulings under Review

References to the rulings at issue appear in the Brief for Petitioner Village of Morrisville and the Brief for Respondent Federal Energy Regulatory Commission.

## C.    Related Cases

The case before this Court was not previously before this Court or any other court.  Because this case does not involve substantially the same parties as other cases dealing with similar issues, there are no related cases under Circuit Rule 28(a)(1)(C).  Respondent Federal Energy Regulatory Commission's Certificate as to Parties, Rulings, and Related Cases identifies cases involving similar issues.

*/s/ Laura Bucher Murphy*
Assistant Attorney General

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES…………i

TABLE OF CONTENTS……………………………………….……...……..…ii

TABLE OF AUTHORITIES………………..……………………………………..iv

GLOSSARY..………………………………………………...……………………vii

STATEMENT OF ISSUES……………………………………..………………..1

STATUTES AND REGULATIONS…………………………….………………1

STATEMENT OF THE CASE……………………………………………………..1

      Background……………..………………………………………………….2

      Morrisville's First Round of Submissions…………………...……………3

      Morrisville's Second Round of Submissions and First Withdrawal…...……4

      Morrisville's Third Round of Submissions and Second Withdrawal……….6

      Final Water Quality Certification……………………………...…………….9

      Waiver Petition…………………………………………..………………10

SUMMARY OF ARGUMENT……………………………..………………..10

ARGUMENT……………………………………………………...……………13

    I.     The Court should dismiss because Morrisville lacks standing…..……13

    II.    If the Court does not dismiss, the Court should affirm FERC's orders because the Agency of Natural Resources did not waive its 401 authority…...…………………………………..………………19

          A.  Withdrawal and resubmittal does not create automatic waiver.….19

    B.  The purposes of the Clean Water Act and Section 401 do not
support waiver…………………………...…………………….24

    C.  Morrisville's withdrawals and reapplications restarted the
one-year clock………………………………………….…….26

CONCLUSION………………………………………….…………………..33

CERTIFICATE OF COMPLIANCE…………………………...……………34

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alcoa Power Generating, Inc. v. FERC,*
    643 F.3d 963 (D.C. Cir. 2011)…………………………………………………12, 26

*Babaei v. U.S. Dep't of State,*
    -- F. Supp. 3d --, No. 23-1244, 2024 WL 1178453 (D.C. Cir. 2024)…...……18

*Brookfield White Pine Hydro LLC v. FERC,*
    No. 23-1075, 2024 WL 3311809 (D.C. Cir. July 5, 2024)22………………22

*Ca. State Water Resources Control Bd. v. FERC,*
    43 F.4th 920 (9th Cir. 2022)……………………….………………11, 23, 30

*Cent. Vt. Pub. Serv. Corp.,*
    113 FERC ¶ 61,167 (2005)…………………………………………..20-21

*DaimlerChrysler Corp. v. Duno,*
    547 U.S. 332 (2006)……………………………………..………………15

*Delmarva Power & Light Co. v. FERC,*
    770 F.2d 1131 (D.C. Cir. 1985)……………………….……………13, 32-33

*Fund for Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003)…………………………...…………………18

*Hoopa Valley Tribe v. FERC,*
    913 F.3d 1099 (D.C. Cir. 2019)……...…11, 12, 19, 21, 22, 26, 27, 28, 30, 31

*Hydro Investors, Inc. v. FERC,*
    351 F.3d 1192 (D.C. Cir. 2003)……………………………………10, 14, 17

*In re Morrisville Hydroelectric Project Water Quality,*
    224 A.3d 473 (Vt. 2019)……………………………..………………..9, 10

*In re Rail Freight Surcharge Antitrust Litigation,*
    593 F. Supp. 2d 29 (D.D.C. 2008)………………………...………………14, 15

*Keating v. FERC,*
    927 F.2d 616 (D.C. Cir. 1991)…………………...………………….12, 25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)…………………………….………………10, 14

*Morrisville Hydroelectric Project Water Quality,*
    No. 103-9-16 Vtec, 2020 WL 5753099 (Vt. Super. Ct. Envtl. Div.)
    (Aug. 26, 2020)……………………………………………………10

*N.C. Dep't of Envtl. Quality v. FERC,*
    3 F.4th 655 (4th Cir. 2021)………………….………….11, 12, 23, 26

*N.Y. Regional Interconnect, Inc. v. FERC,*
    634 F.3d 581 (D.C. Cir. 2011)………………………….………..17

*N.Y. State Dep't of Envtl. Conservation v. FERC,*
    884 F.3d 450 (2d Cir. 2018)……………………………..…………20

*N.Y. State Dep't of Envtl. Conservation v. FERC,*
    991 F.3d 439 (2d Cir. 2021)…………………………………….…..20

*Puerto Rico Sun Oil v. EPA,*
    8 F.3d 73 (1st Cir. 1993)………………………………………………32

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017)………………………………….18

*Tower Kleber Ltd. P'ship,*
    186 FERC ¶ 61,149 (2024)…………………….………….………..20

*Town of Boylston v. FERC,*
    21 F.3d 1130 (D.C. Cir. 1994)………………………...…………..13, 33

*Turlock Irrigation Dist. v. FERC,*
    36 F.4th 1179 (D.C. Cir. 2022)…………………………….………21

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021)……………………..…………13, 33

*Waterkeepers Chesapeake v. FERC,*
    56 F.4th 45 (D.C. Cir. 2022)……………………………………………..21

*Weaver's Cove Energy, LLC v. R.I. Dep't of Envtl. Mgmt.,*
    524 F.3d 1330 (D.C. Cir. 2008)……………………………………..13, 15-16

*Wilcox Elec., Inc. v. FAA,*
    119 F.3d 724 (8th Cir. 1997)……………………………...……………17, 18

**Statutes**

33 U.S.C. § 1251(a)……………………………………….……………..12, 24

33 U.S.C. § 1251(b)……………………………………………....……..25

33 U.S.C. § 1341(a)……………………………………………………12

33 U.S.C. § 1341(a)(1)………………………………………....……..2, 11, 21, 25

33 U.S.C. § 1341(d)…………………………………………….……..2, 12, 25

33 U.S.C. § 1370………………………………………………..………24

**Other Authorities**

Clean Water Act Section 401 Certification Rule,
    85 Fed. Reg. 42,210 (July 13, 2020)………………....………………23-24

Clean Water Act Section 401 Water Quality Certification Improvement Rule,
    88 Fed. Reg. 66,558 (Sept. 27, 2023)……………………....………..23

Conf. Rep. No. 91-940 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2712…....…..12, 26

115 Cong. Rec. 9264 (1969)……………………………………....…………26

S. Rep. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668………………12, 25

Vt. Water Pollution Control Permit Regulations
    16-3 Vt. Code. R. § 301:13.3(c)(2), (g), (h)...……………………....………29

# GLOSSARY

| | |
|---|---|
| Add. | Addendum |
| ANR | Vermont Agency of Natural Resources |
| Br. | Brief |
| Commission or FERC | Federal Energy Regulatory Commission |
| CWA or Act | Clean Water Act |
| EPA | US Environmental Protection Agency |
| JA | Joint Appendix |
| Project | Morrisville Hydroelectric Project |
| R. | Record |
| WQC | Morrisville's Water Quality Certification |

# STATEMENT OF ISSUES

(i) Should the case be dismissed for lack of subject matter jurisdiction because Morrisville lacks standing?

(ii) Did the Federal Energy Regulatory Commission correctly decide that the Vermont Agency of Natural Resources did not waive its authority to issue the August 9, 2016, water quality certification for the Morrisville Hydroelectric Project, consistent with the Clean Water Act, this Court's decision in *Hoopa Valley Tribe v. FERC,* and the record in this case?

# STATUTES AND REGULATIONS

Except for 33 U.S.C. § 1370, all applicable statutes and regulations are contained in the briefs for Petitioner Village of Morrisville and Respondent Federal Energy Regulatory Commission.

# STATEMENT OF THE CASE

On August 9, 2016, the Vermont Agency of Natural Resources (ANR) issued a water quality certification for the Morrisville Hydroelectric Project.  JA__ [R. 140].  Almost four years later, Morrisville petitioned the Federal Energy Regulatory Commission (Commission or FERC) for an order declaring ANR had waived its authority to issue the certification because ANR had not issued the certification within one year of Morrisville's original request.  JA__ [R. 223 at 6-7].  The Commission correctly determined ANR did not waive its authority

because, at a minimum, ANR did not have a "functional agreement" with Morrisville to coordinate withdrawal and refiling for the purpose of delaying a certification decision. JA__ [R. 245 at 10; R. 253 at 6].[1]

*Background*

The Morrisville Hydroelectric Project (Project) includes three power-generating facilities constructed between the 1890s and 1940s on the Lamoille and Green Rivers in Vermont: the Morrisville facility, the Cadys Falls facility, and the Green River facility. JA__ [R. 140 at 2-3]. It also includes a storage facility at Lake Elmore. *Id.* at 3. The Project received its first FERC license in 1981. *Id.* In the FERC proceeding below, Morrisville seeks a new license for the Project. JA__ [R. 1; R. 140 at 2].

The Clean Water Act (CWA or Act) requires an applicant for a federal license for any activity that may cause a discharge to navigable waters to obtain a state certification that the activity will comply with specified provisions of the Act and related state law. *See* CWA § 401, 33 U.S.C. § 1341(a)(1), (d). Therefore, in connection with its FERC relicensing proceeding, Morrisville applied to ANR for a water quality certification (commonly referred to as a "401 application") for the Project. JA__ [R. 140 at 2].

---

[1] References to page numbers in the Record are to the page numbers of the PDF.

As detailed below, following Morrisville's original application, Morrisville continued to submit additional proposals and information in support of its requests for certification, and ANR continued to actively engage with Morrisville on these requests.[2] Twice, ANR was willing for Morrisville to withdraw its application and reapply while the parties continued discussions about Morrisville's new proposals and Morrisville pursued water quality conditions it viewed as more favorable than ANR's proposed conditions. ANR was firm there could be no more withdrawals, and subsequently issued the certification in August 2016.

***Morrisville's First Round of Submissions***

Morrisville filed its original 401 application on January 30, 2014. JA__ [R. 234 (Attachment 2) at 1]. The application included flow proposals for the three power-generating facilities and a drawdown for the Green River Reservoir. *Id.* at 23-24, 38-40. On February 28, 2014, ANR sent a letter to Morrisville requesting additional information—e.g., regarding the hydraulic capacities of turbines, manual run-of-river information, and dissolved oxygen and trashrack information for the Green River facility. JA__ [R. 234 (Attachment 4)]. Morrisville responded with some but not all the information on March 7, 2014, noting the need for additional tests on the hydraulic issue. JA__ [R. 234 (Attachment 5)]. Following

---

[2] The rounds of new submissions and ANR's work in response are summarized in a chart in ANR's comments below. JA__ [R. 234 at 26-27].

this response, on March 21, 2014, ANR met with Morrisville to discuss the

application.  JA__ [R. 234 (Attachment 6) at 1].  During that meeting ANR

discussed its recommended flow and water management conditions.[3]  *Id.*

**Morrisville's Second Round of Submissions and First Withdrawal**

On June 4, 2014, Morrisville wrote to ANR with new proposed flow

conditions for all three facilities, as well as a proposed phase-in schedule.  *Id.* at 2-

4.  ANR provided comments on the new proposals on July 29, 2014, and agreed to

meet with Morrisville to discuss.  JA__ [R. 234 (Attachments 9 & 10)].  This

meeting occurred on October 2, 2014.  JA__ [R. 234 (Attachment 11) at 1].

Morrisville then followed up with another proposal on October 31, 2014, revising

its prior proposed phase-in schedule.  *Id.* at 1-2.

On November 7, 2014, Morrisville told ANR it was withdrawing its January

2014 application "to accommodate [ANR's] review of Morrisville's various

proposals, including its recently submitted phase-in proposal, and in consideration

of other factors that have arisen in discussions with [ANR] over the course of the

past year."  JA__ [R. 234 (Attachment 12) at 1].  The letter stated: "Please consider

this letter, together with Morrisville's FERC relicensing application and all

documents and information furnished to FERC and [ANR] since April 25, 2013, in

---

[3] ANR previously had issued these as "preliminary terms and conditions" in the
FERC licensing proceeding in December 2013.  JA__ [R. 46 (Morrisville
Preliminary Terms and Conditions_Final)].

4

support of Morrisville's initial application for certification, as Morrisville's renewed application for Section 401 water quality certification." *Id.* at 1-2. ANR acknowledged Morrisville's withdrawal and reapplication letter. JA__ [R. 234 (Attachment 13)].

Prior to Morrisville's withdrawal of its application, Morrisville had expressed concern about—in its view—unfavorable water quality conditions should ANR issue the certification. *See* JA__ [R. 236 at 9] (October 30, 2014 email between Morrisville consultants referencing communication with ANR that "if Morrisville withdraws and then re-applies, there is no guarantee that a 401 WQC [water quality certification] would be more favorable than their current stance . . . but if they do not withdraw, the WQC would definitely be unfavorable (ANR['s] current stance would not change)"); *Id.* at 13 (November 3, 2014 handwritten notes referencing conversation with ANR that "withdrawal *will be a better deal* for [Morrisville] than 'stay the course'") (emphasis in original). Around the same time, as shared by Morrisville, Morrisville relayed to its attorney a conversation with a Vermont legislator who in turn was reporting on a conversation with a couple state officials who reportedly had recommended that Morrisville withdraw and resubmit its application to allow more time for the parties to "solve its issues." *Id.* at 6.

After the withdrawal and reapplication, based on Morrisville's June 2014 proposals that included hydropeaking (releasing water from storage to increase power generation during peak demand resulting in a rapid increase in flow downstream) at the Green River facility, ANR analyzed scenarios for the Green River utilizing a water balance model to evaluate flow and water level effects of various operations. JA__ [R. 234 at 27]. ANR also conducted a dual flow analysis on the new proposed peaking flows, a littoral habitat study for the Green River Reservoir because Morrisville's study had not met study plan goals, and other analyses incorporating Morrisville's new proposals. *Id.* On June 9, 2015, ANR again met with Morrisville and then followed up with a request for more information, including operations and generation data for the Green River facility and additional technical information regarding Morrisville's flow studies. JA__ [R. 234 (Attachment 14) at 2-3].

### *Morrisville's Third Round of Submissions and Second Withdrawal*

On June 22, 2015, Morrisville provided another round of information: a chart with a year of hourly generation levels for the Green River facility, along with information regarding downstream flow rates during different times (e.g., conservation flows, generation flows, and capability tests). *Id.* at 1. On August 14, 2015, ANR shared with Morrisville its littoral habitat report and flow study

analysis for the Green River (which included review of Morrisville's June 2014 proposals).  JA__ [R. 234 (Attachment 15) at 1, 4].

After another meeting, Morrisville wrote to ANR on August 27, 2015, urging ANR to accept another withdrawal and reapplication.  JA__ [R. 234 (Attachment 16) at 1].  Morrisville was "concerned about the impending deadline" and said it "would truly like to explore the options . . . discussed."  *Id.*  Morrisville noted ANR had requested information to justify Morrisville's phase-in proposal and said it had "asked a consultant to determine the cost of installing micro-turbines" but the work would "take several months."  *Id.* at 1-2.  Morrisville was "concerned that, if there is no extension, ANR will be compelled to issue[] a WQC before MW&L [Morrisville] can complete the [listed] items."  *Id.* at 2.  Morrisville concluded: "I believe that allowing more time to work on the issues will be in everyone's best interest.  This would only be the second extension, so it is not unduly delaying a final decision.  I hope you agree and would support a MW&L request to extend the time (by way of a withdrawal and reapplication)."  *Id.*

ANR indicated it would be willing to accept a second withdrawal provided Morrisville would complete the remaining work expeditiously, and with the understanding that the Morrisville and Cadys Falls flow conditions would need to be implemented.  JA__ [R. 236 at 21] (September 3, 2015, email from Morrisville to ANR recounting discussion with ANR).  Morrisville did not agree to the flow

conditions, reiterated the reasons for its "request" to withdraw and reapply, and again expressed concern that "ANR will be compelled to issue[] a WQC before [Morrisville] can complete" its desired tasks. *Id.* at 21-22. ANR further considered and then agreed to Morrisville's request, but noted the Morrisville and Cadys Falls conditions were necessary to meet water quality standards and non-negotiable. JA__ [R. 236 at 20] (September 4, 2015, email from ANR to Morrisville). ANR reminded Morrisville to submit the necessary paperwork (withdrawal of application) and that it would not support any extensions beyond December 31, 2015. *Id.*; *see also id.* at 24 (September 9, 2015, email from ANR to Morrisville that ANR would need withdrawal submission by "the close of business today").

On September 9, 2015, Morrisville told ANR it was withdrawing its November 7, 2014, application "to accommodate [ANR's] review of Morrisville's various proposals, including a phase-in proposal of bypass flows," and "in consideration of other factors that have arisen in discussions with [ANR] over the course of the past year." JA__ [R. 234 (Attachment 17) at 1]. Morrisville asked that its letter, its FERC relicensing application, and "all documents and information furnished to FERC and [ANR] since April 25, 2013" be considered "as Morrisville's renewed application." *Id*. at 2. ANR acknowledged receipt. JA__ [R. 234 (Attachment 18)].

Following the September 9, 2015, withdrawal and reapplication, ANR and Morrisville met several more times and Morrisville submitted additional sets of information and proposals to ANR.  JA__ [R. 234 at 13-14 and Attachments 19-22, 26].

***Final Water Quality Certification***

Morrisville could not show all its proposals would meet Vermont's water quality standards.  Therefore, while ANR had considered Morrisville's various proposals, the draft certification ANR issued for public notice on January 7, 2016, rejected some of them.  JA__ [R. 234 at 14-15].  The certification did include revised conditions for the Green River facility based on review and analyses conducted in response to Morrisville's revised Green River proposals and information.  *Id.* at 14 (revised from December 2013 preliminary terms and conditions).  ANR held a public hearing on February 16, 2016, and issued the water quality certification (WQC) on August 9, 2016.  JA__ [R. 140 at 1-2; R. 234 (Attachment 27) at 1].

Morrisville challenged the WQC in the Environmental Division of the Vermont Superior Court, resulting in an eight-day trial, an appeal to the Vermont Supreme Court, and a remand to the Environmental Division.  *See In re Morrisville Hydroelectric Project Water Quality,* 224 A.3d 473, 479-80, 494 (Vt. 2019). ANR's flow conditions for all three facilities and the reservoir drawdown level

were upheld. *See id.* at 484, 488-89, 490-91 (upholding conditions to protect high-quality aquatic habitat); *Morrisville Hydroelectric Project Water Quality,* No. 103-9-16 Vtec, 2020 WL 5753099, at *17 (Vt. Super. Ct. Envtl. Div.) (Aug. 26, 2020).

**Waiver Petition**

On May 28, 2020, Morrisville petitioned FERC for a declaratory order that ANR had waived its authority to issue the WQC. JA__ [R. 223]. FERC denied the petition, JA__ [R. 245; R. 250; R. 253], and this appeal followed.

## SUMMARY OF ARGUMENT

I. The Court should dismiss Morrisville's petition because Morrisville does not have standing. To satisfy Article III's case or controversy requirement, Morrisville must have an injury caused by the conduct it complains of and the injury must be redressable by the Court. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). Morrisville fails this test because it has not claimed any injury caused by so-called "inaction"—that is, ANR not issuing the WQC within one year of Morrisville's original request—and instead actively sought to be able to withdraw and reapply. Even if Morrisville had such an injury, the injury would not be redressable by the Court because there is no "delay" or "inaction" the Court could put an end to: ANR issued the WQC many years ago and four years before Morrisville sought a waiver determination. It is not enough for Morrisville to claim it is "aggrieved" by FERC's orders: Morrisville must have Article III

10

standing for the relief it sought before FERC.  *See Hydro Investors, Inc. v. FERC,* 351 F.3d 1192, 1197 (D.C. Cir. 2003).  It does not.

II.      If the Court does not dismiss, the Court should affirm the Commission's decision that ANR did not waive its authority to issue the water quality certification for the Morrisville Hydroelectric Project.  FERC's decision is consistent with the Clean Water Act, *Hoopa Valley Tribe v. FERC,* and the record in this case.

First, waiver is not automatic whenever an applicant withdraws and resubmits a 401 application.  Section 401 does not say an agency must grant or deny a certification within one year of an applicant's original request, no matter what.  *See* CWA § 401, 33 U.S.C. § 1341(a)(1).  Instead, it provides that waiver occurs if a state does not act on "such request"—meaning, there must be a pending request.  *See id.*  In *Hoopa Valley,* this Court did not foreclose the possibility of a valid withdrawal and resubmittal that would remove the pendency of the prior request or, in other words, restart the one-year clock.  *See Hoopa Valley Tribe v. FERC,* 913 F.3d 1099, 1103-05 (D.C. Cir. 2019).  This is consistent with the law in other circuits.  *See Ca. State Water Resources Control Bd. v. FERC,* 43 F.4th 920, 932 (9th Cir. 2022); *N.C. Dep't of Envtl. Quality v. FERC,* 3 F.4th 655, 671 (4th Cir. 2021).

Second, the purposes of the CWA and section 401 do not support waiver. Instead, their complimentary purposes are (i) to protect the quality of the Nation's waters (CWA) and (ii) to preserve an important state tool for ensuring compliance with water quality requirements at federally licensed facilities (section 401). *See* CWA § 101, 33 U.S.C. § 1251(a); CWA § 401, 33 U.S.C. § 1341(a), (d); S. Rep. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3735; *Keating v. FERC,* 927 F.2d 616, 622 (D.C. Cir. 1991). The purpose of the waiver provision in section 401 also does not support waiver because it was designed to prevent a state's "sheer inactivity," or "'dalliance'" and indefinite delay—none of which occurred here. *See* Conf. Rep. No. 91-940 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2712, 2741; *Hoopa Valley,* 913 F.3d at 1104 (citation omitted); *NCDEQ,* 3 F.4th at 670; *Alcoa Power Generating, Inc. v. FERC,* 643 F.3d 963, 972 (D.C. Cir. 2011).

Third, Morrisville's withdrawals and reapplications *did* restart the one-year clock. FERC correctly determined there was no agreement between ANR and Morrisville to delay certification. ANR did not participate in a "coordinated withdrawal-and-resubmission scheme" to indefinitely delay FERC's licensing proceeding. *Cf. Hoopa Valley,* 913 F.3d at 1104-05. Instead, ANR actively engaged with Morrisville's ongoing requests, submissions, and proposals; acquiesced to two withdrawals and reapplications while Morrisville pursued more favorable water quality conditions; and was firm in its decision there could be no

12

more withdrawals.  Additionally, ANR did not otherwise pursue withdrawal and resubmittal and did not, as Morrisville claims, "need[] more time" to follow procedural requirements.  (Even if it had, this would not amount to a "coordinated withdrawal-and-resubmission scheme" to indefinitely delay FERC's licensing proceeding.)  Indefinite delay is not even possible here—ANR issued the WQC over eight years ago.

Finally, if the Court were to disagree with FERC and ANR that there was no agreement to delay water quality certification (and does not dismiss), the Court should remand for FERC to consider the alternative grounds for denial presented by the parties below, which FERC did not address.  *See, e.g., Delmarva Power & Light Co. v. FERC,* 770 F.2d 1131, 1143 (D.C. Cir. 1985); *Town of Boylston v. FERC,* 21 F.3d 1130, 1134 (D.C. Cir. 1994); *Vecinos para el Bienestar de la Comunidad Costera v. FERC,* 6 F.4th 1321, 1332 (D.C. Cir. 2021).

## ARGUMENT

## I.    The Court should dismiss because Morrisville lacks standing.

The Court should dismiss Morrisville's waiver petition because Morrisville does not have standing.  *See Weaver's Cove Energy, LLC v. R.I. Dep't of Envtl. Mgmt.,* 524 F.3d 1330, 1331, 1334 (D.C. Cir. 2008) (dismissing petition for waiver declaration for lack of jurisdiction because petitioner did not have standing).  Standing is an essential element of the case or controversy requirement for federal

court jurisdiction; it requires (i) injury in fact, (ii) a "causal connection between the injury and the conduct complained of," and (iii) redressability by a favorable court decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). Morrisville fails the second element and, by extension, the first and third.[4]

Morrisville's injury must be caused by the conduct about which it complains. *See, e.g., id.* at 560*; In re Rail Freight Surcharge Antitrust Litigation,* 593 F. Supp. 2d 29, 42 (D.D.C. 2008) ("requirement common to standing for all plaintiffs" is "a causal connection between the prohibited behavior and their injury"). Here, the complained-of conduct is so-called "inaction" (that ANR did not issue the WQC within one year of Morrisville's original request), but Morrisville has not claimed any injury flowing from this conduct.

Quite the opposite, as detailed above: Morrisville actively sought additional time to work on its proposals and submissions during the 401 application process. *See supra* at 4-9. Any "injury" would stem from the need to comply with the WQC's protective conditions, not from the alleged delay. It would arise from the conditions themselves, which are not at issue here and which Morrisville already has litigated in separate proceedings in state court. *See supra* at 9-10. Any

---

[4] FERC did not address ANR's standing argument below, likely because "[a]dministrative agencies need not adjudicate only Article III cases and controversies, but federal courts must." *Hydro Investors, Inc. v. FERC,* 351 F.3d 1192, 1197 (D.C. Cir. 2003).

"injury" arising from its need to comply with the WQC's conditions cannot support Morrisville's waiver claim, where the complained-of conduct is that ANR did not issue the WQC within one year of Morrisville's original request. *See DaimlerChrysler Corp. v. Duno,* 547 U.S. 332, 352 (2006) ("our standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press"). Moreover, the purpose of the waiver provision is not to provide applicants with a loophole to escape water quality requirements, but to prevent dalliance and unreasonable delay that would stymie the federal licensing proceeding. *See infra* at 26. Thus, Morrisville does not have an injury that section 401's waiver provision is "intended to protect against." *See In re Rail Freight,* 593 F. Supp. 2d at 42.

This Court has rejected a claim similar to Morrisville's on standing grounds. In *Weaver's Cove*, the Court held that an energy company did not have standing to seek a declaration that Rhode Island and Massachusetts had waived their 401 authorities. *Weaver's Cove,* 524 F.3d at 1332. The company had submitted 401 applications in 2004 and, when the agencies had not granted or denied certifications within a few years, the company sought waiver declarations. Citing the familiar standing test from *Lujan,* the Court held the company lacked standing because it "d[id] not claim to have been injured by" the "state agencies' inaction." *Id.* at 1332-33. Instead, the company's theory was that it benefited from the

agencies' inaction because said inaction led to waiver.  *See id.* at 1333.  While the company suggested at oral argument the possibility that it *had* been injured by delay in state proceedings, in turn delaying the federal agency's permitting decision, the Court held a waiver declaration would nonetheless provide no redress because the record showed such a declaration would not alter the timetable for the federal decision.  *See id.* at 1333-34.

Though the procedural posture of *Weaver's Cove* was different—the company sought a waiver declaration directly from this Court under the Natural Gas Act's judicial review provision—the standing principles are the same.  There must be an injury caused by the complained-of conduct, and that injury must be redressable by the Court.  Like the petitioner in *Weaver's Cove,* Morrisville makes no claim to have suffered an injury from "inaction" on its 401 application.  Even if it had, this Court could not redress the injury.  There is no "delay" or "inaction" to be stopped.  No one is waiting for the WQC before moving forward in the FERC licensing proceeding—the WQC was final many years ago and many years before Morrisville ever sought waiver.

Morrisville states it is "aggrieved" by FERC's orders and "[t]he injury to its interests is capable of redress because FERC can issue a waiver."  Petitioner's Br. at 1.  But simply being adversely affected by FERC's orders is not sufficient to confer Article III standing (unless those orders were the actual complained-of

conduct). *See N.Y. Regional Interconnect, Inc. v. FERC,* 634 F.3d 581, 586 (D.C. Cir. 2011) ("Parties are 'aggrieved' under the Federal Power Act if they satisfy both the constitutional and prudential requirements for standing."). Standing must flow from the complained-of conduct, not from a decision affirming the conduct. *See Hydro Investors, Inc. v. FERC,* 351 F.3d 1192, 1197 (D.C. Cir. 2003) (holding that if petitioner does not have Article III standing "in receiving the relief requested before the agency," it does not have standing for judicial review of the order denying such relief) ; *Wilcox Elec., Inc. v. FAA,* 119 F.3d 724, 727 (8th Cir. 1997) (explaining the complained-of agency action—in that case, the award of a contract—"must have caused [petitioner's] injury in fact in order for [petitioner] to have Article III standing," not the agency decision denying a protest to the contract). To hold otherwise would create an end-run around Article III standing requirements. *See Hydro Investors,* 351 F.3d at 1197 ("Article III does not permit Congress to expand the federal judicial function through such stratagems. If the party petitioning the agency lacks Article III standing, he has not been independently wronged simply because the agency denied his advisory request."); *Wilcox,* 119 F.3d at 727 ("Were we to . . . deem any loss in an agency protest proceeding an injury of Article III dimensions, we would enable plaintiffs lacking Article III standing at the outset of their protests to bootstrap their way into a federal court.")

This is not intended as a restrictive approach to standing; it merely recognizes that a petitioner's injury must flow from the conduct about which the petitioner complains. *See Wilcox,* 119 F.3d at 728 (noting that, "in the vast majority of cases, a plaintiff who has lost a protest in an agency proceeding" will also have Article III standing). The test can be met in many different circumstances. *See, e.g., Sierra Club v. FERC,* 867 F.3d 1357, 1365-66 (D.C. Cir. 2017) (holding environmental groups had standing to appeal FERC decision where groups' environmental injuries flowed from FERC's alleged deficiencies in assessing pipeline project (the complained-of conduct)); *Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 732-34 (D.C. Cir. 2003) (holding Mongolian government had standing to intervene in defense of United States Fish and Wildlife decision where relief sought by plaintiffs—a different regulatory action (the complained-of conduct)—would result in loss of revenue for Mongolian conservation program); *Babaei v. U.S. Dep't of State,* -- F. Supp. 3d --, No. 23-1244, 2024 WL 1178453, at *3 (D.C. Cir. 2024) (holding plaintiffs had standing to bring unreasonable delay suit where delay in processing visa applications (the complained-of conduct) injured professional and financial interests and delay could be redressed by decision on applications).

It makes sense that 401 applicants would not meet this test when they have not been injured by any "inaction" in processing 401 applications, especially where

the court cannot provide redress because a WQC already has been issued (here, more than eight years ago).  Notably, in *Hoopa Valley,* it was not the applicant who sought a waiver determination, but the Hoopa Valley Tribe.  This Court noted the Tribe would benefit from a waiver determination because "at a minimum, it [would] provide[] Hoopa and FERC an opportunity to rejoin the bargaining table" in the re-commencement of FERC's licensing proceeding.  *See Hoopa Valley Tribe v. FERC,* 913 F.3d 1099, 1105-06 (D.C. Cir. 2019); *see also id.* at 1102 ("Of relevance, Hoopa—whose reservation is downstream of the Project—was not a party to either [Agreement].").

Morrisville lacks standing for the relief it seeks, and the Court should dismiss.

## II.    If the Court does not dismiss, the Court should affirm FERC's orders because the Agency of Natural Resources did not waive its 401 authority.

If the Court does not dismiss Morrisville's petition for lack of subject matter jurisdiction, the Court should affirm FERC's orders because ANR did not waive its 401 authority.

### A. Withdrawal and resubmittal does not create automatic waiver.

Morrisville repeatedly asserts an agency must grant or deny a certification within one year or the agency's authority is waived.  *See* Petitioner's Br. at 6-7 (agency must grant, deny, or waive within one year), 8 (one-year limitation is

"inviolate," 'bright-line" rule), 33 ("When a certifying agency fails to act on an application within one year, waiver occurs by operation of law."), 34-35 (arguing for strict construction of plain language), 36 ("maximum of one year").  However, the existence of a one-year deadline is not at issue; the issue is whether the one-year deadline restarted when Morrisville withdrew its applications and reapplied.

To the extent Morrisville argues waiver is *automatic* one year from the date of an original request, regardless of any withdrawal and submittal, this is incorrect. Morrisville does not cite any case standing for this proposition.  Instead, Morrisville's cases all involve applications that were *not* withdrawn within the one-year timeframe.  *See N.Y. State Dep't of Envtl. Conservation v. FERC,* 884 F.3d 450, 455-56 (2d Cir. 2018) (upholding waiver because one-year clock started with request for certification, not when application was deemed complete, and specifically noting state could "request that the applicant withdraw and resubmit the application"); *N.Y. State Dep't of Envtl. Conservation v. FERC,* 991 F.3d 439, 450, 452 (2d Cir. 2021) (upholding waiver because state could not by agreement change receipt date of application); *Tower Kleber Ltd. P'ship,* 186 FERC ¶ 61,149, at PP 6, 17 (2024) (certification issued 16 months after application); *Cent. Vt. Pub. Serv. Corp.,* 113 FERC ¶ 61,167, at PP 9, 17, 19 (2005) (finding waiver where certification was issued more than one year after most recent certification request

and noting waiver could have been avoided if applicant had withdrawn and refiled application).[5]

Likewise, neither section 401 nor this Court's precedent supports Morrisville's argument that waiver is automatic within one year of an original application regardless of whether the application has been withdrawn and refiled. Section 401 provides that waiver occurs if a state does not act "on a request for certification" within a reasonable time (one year) of "such request," not within one year of the "original" request. CWA § 401, 33 U.S.C. § 1341(a)(1). Logically, the request must be pending for the agency to act on it; and if the original request no longer is pending, neither is its timeline.

In *Hoopa Valley,* this Court held a particular type of withdrawal and resubmittal was ineffective to remove the pendency of a prior request or, put differently, to restart the one-year clock. *See Hoopa Valley,* 913 F.3d at 1103-05. The Court did not hold that a state waives its 401 authority *any time* an applicant

---

[5] *Turlock* and *Waterkeepers* are inapposite and not helpful to Morrisville. *See* Petitioner's Br. at 7 n.3. *Turlock* was not about withdrawal and resubmittal, but whether a state waives its authority when it denies without prejudice within one year; this Court held no. *Turlock Irrigation Dist. v. FERC,* 36 F.4th 1179, 1183-84 (D.C. Cir. 2022). *Waterkeepers* also was not about withdrawal and resubmittal, but whether a state retroactively could waive a certification it already had issued, and this Court again held no. *Waterkeepers Chesapeake v. FERC,* 56 F.4th 45, 49 (D.C. Cir. 2022). In fact, the applicant had withdrawn and resubmitted its application three times. *See* Final Br. of Intervenor State of Md. Dep't of the Env't, 2022 WL 2237477, at *7 (June 21, 2022).

withdraws and reapplies. Instead, the precise question was "whether a state waives its Section 401 authority when, pursuant to an agreement between the state and applicant, an applicant repeatedly withdraws-and-resubmits its request for water quality certification over a period of time greater than one year." *Id.* at 1103.

There were many circumstances in *Hoopa Valley* that are not present in every instance of withdrawal and resubmittal, and certainly not here, including: an original application filed more than a decade earlier; no new requests submitted for the withdrawals and resubmissions; and entry of a written agreement to defer the one-year limit. *See id.* at 1101, 1104-05 (acknowledging "the specific factual scenario presented in this case, *i.e.,* an applicant agreeing with the reviewing states to exploit the withdrawal-and-resubmission of water quality certification requests over a lengthy period of time"). The Court declined to decide the parameters of an effective withdrawal and resubmission and has since affirmed that "our cases have recognized that the one-year clock will not apply to requests that are sufficiently different from the initial submission that started the clock ticking." *See Brookfield White Pine Hydro LLC v. FERC,* No. 23-1075, 2024 WL 3311809, at *3 (D.C. Cir. July 5, 2024), *citing Hoopa Valley,* 913 F.3d at 1104 ("We . . . need not determine how different a request must be to constitute a 'new request' such that it restarts the one-year clock." (internal quotations omitted)).

The idea that withdrawal and resubmittal does not result in automatic waiver is consistent with the law in other Circuits, too. *See, e.g., Ca. State Water Resources Control Bd. v. FERC,* 43 F.4th 920, 932 (9th Cir. 2022) (no waiver where "evidence shows only that the State Board acquiesced in the Project Applicants' own decisions to withdraw and resubmit their applications rather than have them denied"); *N.C. Dep't of Envtl. Quality v. FERC,* 3 F.4th 655, 671 (4th Cir. 2021) ("even if we accept FERC's expansive reading of *Hoopa Valley* and assume that FERC's standard for finding waiver is consistent with the plain language of the CWA, we agree with [North Carolina] that FERC's key factual findings underpinning its waiver determination are not supported by substantial evidence").

It also is consistent with the United States Environmental Protection Agency's (EPA's) 2023 Rule, and even the prior 2020 Rule.[6] *See* Clean Water Act Section 401 Water Quality Certification Improvement Rule, 88 Fed. Reg. 66,558, 66,590 (Sept. 27, 2023) ("Neither the text of section 401 nor *Hoopa Valley Tribe* categorically precludes withdrawal and resubmission of a request for certification."); Clean Water Act Section 401 Certification Rule, 85 Fed. Reg.

---

[6] The regulations do not apply here, *see* 401 Rule, 88 Fed. Reg. at 66,655, but they show how EPA interprets the statute it administers.

42,210, 42,262 (July 13, 2020) ("nothing in the final rule precludes project proponents from voluntarily withdrawing requests of their own accord").

Thus, the question is not whether withdrawal-and-resubmittal constitutes automatic waiver—it does not—but whether Morrisville's two withdrawals and reapplications restarted the one-year clock. As explained further below, they did.

### B. The purposes of the Clean Water Act and Section 401 do not support waiver.

Morrisville asserts that FERC's decision is "inconsistent with the CWA's purpose and legislative history," but does not cite to the CWA's purpose or to any legislative history. *See* Petitioner's Br. at 35-37. Morrisville's position is contrary to both.

The Act's unequivocal purpose is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101, 33 U.S.C. § 1251(a). To that end, the Act "makes states the 'prime bulwark in the effort to abate water pollution . . . expressly empower[ing] them to impose and enforce water quality standards that are more stringent than those required by federal law.'" *Waterkeepers,* 56 F.4th at 47 (citation omitted); *see also* CWA § 510, 33 U.S.C. § 1370 (preserving state authority to be more protective). As this Court has explained:

> At the very outset of the statute, Congress made clear that "[i]t is the policy of the Congress to recognize, preserve, and protect the *primary responsibilities and rights of States to prevent, reduce, and eliminate*

> *pollution*, to plan the development and use . . . of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter."

*Keating v. FERC,* 927 F.2d 616, 622 (D.C. Cir. 1991) (emphasis added), *citing* CWA § 101, 33 U.S.C. § 1251(b).

Regarding section 401 specifically, its purpose is to ensure states maintain an important tool to protect the quality of their waters. *See* CWA § 401, 33 U.S.C. § 1341(a)(1), (d) (no federal license unless discharge "will comply," and certification must "assure" compliance, with state water quality standards and related law); S. Rep. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3735 (goal of section 401 "to assure that Federal licensing or permitting agencies cannot override State water quality requirements"). This Court has recognized the importance of this purpose, underscoring that "[o]ne of the primary mechanisms through which the states may assert the broad authority reserved to them is the certification requirement set out in section 401 of the Act." *Keating,* 927 F.2d at 622.

It decidedly is not consistent with these purposes to find waiver where a state issues a protective water quality certification—which is upheld in state court after vigorous challenge by the applicant—and almost four years later the applicant claims "waiver" based on two instances of withdrawal and reapplication the applicant had pursued in an effort to avoid protective conditions.

25

As for the purpose of the waiver provision, the Act's legislative history shows it is to "insure that sheer inactivity by the State . . . will not frustrate the Federal application." Conf. Rep. No. 91-940 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2712, 2741. Or, even if the goal is to prevent more than "sheer inactivity," the point is to prevent dalliance and indefinite delay. *See Hoopa Valley,* 913 F.3d at 1104 ("Congress intended Section 401 to curb a *state's* 'dalliance or unreasonable delay.'") (emphasis in original), *citing* 115 Cong. Rec. 9264 (1969); *Alcoa Power Generating, Inc. v. FERC,* 643 F.3d 963, 972 (D.C. Cir. 2011) (noting legislative history and agreeing "the purpose of the waiver provision is to prevent a State from indefinitely delaying a federal licensing proceeding"); *NCDEQ,* 3 F.4th at 670 (citing *Alcoa,* 643 F.3d at 972, and stating "the review period was added to prevent States effectively vetoing federal projects by taking no action on § 401 applications").

Here, there was no dalliance, sheer inactivity, or indefinite delay by the State.

### C. Morrisville's withdrawals and reapplications restarted the one-year clock.

The core principle of *Hoopa Valley* is that a state may not engage in "deliberate and contractual idleness" to "indefinitely delay" federal licensing proceedings. *See* 913 F.3d at 1104. Relevant factors include how long ago the original 401 application was filed (in *Hoopa Valley,* more than 10 years before the

waiver finding; here, two-and-a-half years before the certification), whether the withdrawals and resubmittals included any new requests (in *Hoopa Valley,* no; here, yes), and whether there was a written agreement to delay certification (in *Hoopa Valley,* yes; here, no). *See id.* at 1103-04. As ANR explained in the proceeding below, none of these factors support waiver here. JA__ [R. 234 (Comments) at 20-31; R. 237 (Answer) at 1-5]. Because FERC found there was no agreement to delay certification, it did not reach the other factors. JA__ [R. 245 at 12]; JA__ [R. 253 at 9-10].

FERC is correct there was no agreement between Morrisville and ANR to delay certification, functional or otherwise. To begin, there was no idleness on the part of ANR. As summarized above, ANR diligently reviewed and responded to Morrisville's original 401 application as well as Morrisville's reapplications, which encompassed several new submissions and proposals. *See supra* at 4-9; JA__ [R. 234 at 26-27] (chart); JA__ [R. 234 (Attachment 12) at 1] (in 2014 reapplication, asking ANR to consider "all documents and information furnished to FERC and [ANR] since April 25, 2013"); JA__ [R. 234 (Attachment 17) at 2] (same re: 2015 reapplication). It should be unremarkable that an agency would continue to diligently work on a 401 certification when an applicant submits new proposals and materials, while also making clear the agency would not support indefinite delay. *See supra* at 8.

Further—as Morrisville appears to have recognized—ANR was prepared to issue the WQC within a year of Morrisville's original application and within a year of its reapplication. *See supra* at 5, 7-8; JA__ [R. 236 at 9] (referencing communication that, if Morrisville does not withdraw, "the WQC would definitely be unfavorable" (2014)); JA__ [R. 236 at 13] (referencing that "withdrawal *will be a better deal* for [Morrisville]" (2014)) (emphasis in original); JA__ [R. 234 (Attachment 16) at 2] (referencing Morrisville concern that, "if there is no extension, ANR will be compelled to issue[] a WQC before MW&L can complete" desired tasks (2015)); JA__ [R. 236 at 22] (same).

While Morrisville claims ANR "initiated" the first withdrawal (and assuming the accuracy of every reported statement in the record), any suggestion by a state official that Morrisville should withdraw its application appears to be an attempt to resolve disagreements. *See supra* at 5; JA__ [R. 236 at 6]. This is understandable given the risk of protracted proceedings when an applicant takes issue with its water quality certification. *See supra* at 9-10 (four years of state court litigation). But, it does not mean ANR participated in a "coordinated withdrawal-and-resubmission scheme" to indefinitely delay FERC's licensing proceeding. *Cf. Hoopa Valley,* 913 F.3d at 1104-05. On the contrary, ANR is eager for the licensing proceeding to conclude so that its water quality conditions may be incorporated into the license.

Morrisville further claims ANR "needed more time to adhere to its own procedures," "needed the resets," and that it was a "procedural inability" for ANR to issue the certification within a year. *See* Petitioner's Br. at 16, 33, 46. Morrisville has not identified any ANR statement in the record to support this argument. Moreover, it was not procedurally impossible for ANR to issue the certification within a year. The first withdrawal occurred approximately two-and-a-half months before the one-year deadline and the second withdrawal occurred 61 days before the one-year deadline. Within those timeframes, ANR had time for a 30-day public comment period and a public hearing, which ANR is free to proactively schedule during the public comment period. *See* Add. to Petitioner's Br. at 17, 23-24 (Vt. Water Pollution Control Permit Regulations, 16-3 Vt. Code. R. § 301:13.3(c)(2), (g), (h)). This is what ANR did with Morrisville's draft certification, putting the draft certification on notice from January 7 to February 19, 2016, and holding the public hearing on February 16, 2016. JA__ [R. 234 (Attachment 27) at 1]. While resource-intensive, it would not have been impossible for ANR to conduct public notice/comment and a public hearing and to finalize the certification within two-and-a-half months or 61 days.[7] In fact, the

---

[7] ANR already had crafted preliminary terms and conditions as part of the FERC licensing proceeding. *See supra* at 4 n.3; JA__ [R. 46 (Morrisville Preliminary Terms and Conditions_Final)].

record supports that ANR was cognizant of the timeline. JA__ [R. 236 at 24] (reminding Morrisville to submit withdrawal by close of business).

Morrisville also invokes ANR's *Water Quality Certification Practice*, which provides that ANR may "'suggest to the applicant that it withdraw and resubmit its application'" if more time is needed. Petitioner's Br. at 11 (quoting *Practice*). The *Practice* is not law (not a regulation) and does not appear to be in the record, thus it is not clear Morrisville should rely on it. Regardless, the existence of the *Practice* does not mean ANR asked Morrisville to withdraw and reapply to give ANR more time in this case, as fully explained above.

More critically, even if Morrisville were correct—which it is not—that it was a "procedural inability" for ANR to issue the certification within a year, or that ANR had requested withdrawal and reapplication to give itself more time to draft the certification, this would not mean ANR had participated in a "coordinated withdrawal-and-resubmission scheme" to indefinitely delay FERC's licensing proceeding. *Cf. Hoopa Valley,* 913 F.3d at 1104-05. As Morrisville itself submits, ANR "acquiesced" to the withdrawals and reapplications. *See* Petitioner's Br. at 53; *Ca. Bd.,* 43 F.4th at 932 (no waiver where "evidence shows only that [State] acquiesced"); *supra* at 5, 7-8 (demonstrating Morrisville's concerns in both 2014 and 2015 with impending certification). Morrisville's 2015 plea to ANR illustrates the point: "I believe that allowing more time to work on the issues will be in

everyone's best interest. This would only be the second extension, so it is not unduly delaying a final decision. I hope you agree and would support a MW&L request to extend the time (by way of a withdrawal and reapplication)." JA__ [R. 234 (Attachment 16) at 2].[8] And, ANR's acquiescence was short lived. With the second withdrawal and reapplication, ANR was clear this would be the last time. *See supra* at 8.

In sum, ANR acted diligently to issue a protective water quality certification for the Project. It reasonably and in good faith considered Morrisville's various new submissions and requests, including being willing to accept two withdrawals and reapplications. It was clear about the need to move forward with the certification and its unwillingness to accept a third reapplication. It is unfortunate Morrisville now characterizes these communications, in which ANR was transparent about its plans, as threats and coercion. *See* Petitioner's Br. at 4, 18, 33, 49, 53 (threats); *id.* at 18 (coercion). Nevertheless, these communications do not evince an agreement to indefinitely delay either the certification or FERC's

---

[8] While ANR supports FERC's determination that Morrisville's withdrawals and reapplications were unilateral, *Hoopa Valley* did not require "unilateral" action to avoid waiver. The important consideration is whether there has been "deliberate and contractual idleness" to "indefinitely delay" a federal proceeding—e.g., through a written agreement delaying certification for more than ten years without any new submittals. *See Hoopa Valley,* 913 F.3d at 1104-05. None of these have occurred here.

licensing proceeding, and they do not show any dalliance or idleness on the part of ANR.

In fact, it would not be possible to find indefinite delay here, where ANR already has issued the WQC and did so within three years of the original request. To ANR's knowledge, no court ever has found waiver (by withdrawal and resubmission or otherwise) after a state agency has issued a certification, much less when that certification had been issued almost four years prior to a waiver petition.[9]

If the Court were to disagree with FERC and ANR that there was no agreement to delay water quality certification (and does not dismiss on standing), the Court should not grant Morrisville's request to remand with a direction for FERC to enter a finding of waiver. *See* Petitioner's Br. at 54. Instead, the Court should remand for FERC to consider the alternative grounds for denying waiver presented below, which FERC did not address. *See, e.g., Delmarva Power & Light*

---

[9] This is based on a search of federal cases. In one case, acknowledging the lack of precedent and with little analysis, the Court stated a federal permitting agency was "free" to ignore a certification issued after the one-year deadline, but the agency did not have to. *Puerto Sun Oil v. EPA,* 8 F.3d at 73, 79-80 (1st Cir. 1993). In any event, the Court did not find waiver and it was not a withdrawal-and-resubmission case. *See id.* One other case held the federal permitting agency was not obligated to accept state conditions developed after the one-year deadline; but those conditions were imposed by an appeals board and were not actually part of the certification (thus, no certification conditions were waived after the certification was issued). *See Airport Communities Coalition v. Graves,* 280 F. Supp. 2d 1207, 1214-17 (W.D. Wa. 2003).

*Co. v. FERC,* 770 F.2d 1131, 1143 (D.C. Cir. 1985) (remanding to Commission to consider alternative ground for decision); *Town of Boylston v. FERC,* 21 F.3d 1130, 1134 (D.C. Cir. 1994) (similar); *Vecinos para el Bienestar de la Comunidad Costera v. FERC,* 6 F.4th 1321, 1332 (D.C. Cir. 2021) (remanding for Commission to provide additional explanation while likely "reaching the same result").

## CONCLUSION

The Court should dismiss Morrisville's petition for lack of standing or affirm the Commission's orders.  If the Court does not, it should remand for the Commission to consider the alternative grounds for denying waiver presented below.


Dated: August 21, 2024                     Respectfully submitted,

                                                            STATE OF VERMONT
                                                            AGENCY OF NATURAL RESOURCES

                                                            CHARITY R. CLARK
                                                            ATTORNEY GENERAL

                                                            By:     */s/ Laura Bucher Murphy*
                                                                       Assistant Attorney General
                                                                       109 State Street
                                                                       Montpelier, VT 05609
                                                                       (802) 828-1059
                                                                       laura.murphy@vermont.gov

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Circuit Rule 32(e)(2)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), it contains 7,620 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt. Times New Roman font.

*/s/ Laura Bucher Murphy*
Assistant Attorney General

# ADDENDUM

trator, to issue subpenas for attendance and testimony of witnesses and the production of relevant papers, books, and documents, for purposes of obtaining information under sections 1314(b) and (c) of this title. Any papers, books, documents, or other information or part thereof, obtained by reason of such a subpena shall be subject to the same requirements as are provided in paragraph (1) of this subsection.

**(b) Review of Administrator's actions; selection of court; fees**

(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(*l*) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement.

(3) AWARD OF FEES.—In any judicial proceeding under this subsection, the court may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party whenever it determines that such award is appropriate.

(4) DISCHARGES INCIDENTAL TO NORMAL OPERATION OF VESSELS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), any interested person may file a petition for review of a final agency action under section 1322(p) of this title of the Administrator or the Secretary of the department in which the Coast Guard is operating in accordance with the requirements of this subsection.

(B) VENUE EXCEPTION.—Subject to section 1322(p)(7)(C)(v) of this title, a petition for review of a final agency action under section 1322(p) of this title of the Administrator or the Secretary of the department in which the Coast Guard is operating may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

**(c) Additional evidence**

In any judicial proceeding brought under subsection (b) of this section in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(June 30, 1948, ch. 758, title V, § 509, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 891; amended Pub. L. 93–207, § 1(6), Dec. 28, 1973, 87 Stat. 906; Pub. L. 100–4, title III, § 308(b), title IV, § 406(d)(3), title V, § 505(a), (b), Feb. 4, 1987, 101 Stat. 39, 73, 75; Pub. L. 100–236, § 2, Jan. 8, 1988, 101 Stat. 1732; Pub. L. 115–282, title IX, § 903(c)(4), Dec. 4, 2018, 132 Stat. 4356.)

### Editorial Notes

#### AMENDMENTS

2018—Subsec. (b)(4). Pub. L. 115–282 added par. (4).

1988—Subsec. (b)(3), (4). Pub. L. 100–236 redesignated par. (4) as (3) and struck out former par. (3) relating to venue, which provided for selection procedure in subpar. (A), administrative provisions in subpar. (B), and transfers in subpar. (C).

1987—Subsec. (b)(1). Pub. L. 100–4, §§ 308(b), 406(d)(3), 505(a), substituted "transacts business which is directly affected by such action" for "transacts such business", "120" for "ninety", and "120th" for "ninetieth", substituted "1316, or 1345 of this title" for "or 1316 of this title" in cl. (E), and added cl. (G).

Subsec. (b)(3), (4). Pub. L. 100–4, § 505(b), added pars. (3) and (4).

1973—Subsec. (b)(1)(C). Pub. L. 93–207 substituted "pretreatment" for "treatment".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–236 effective 180 days after Jan. 8, 1988, see section 3 of Pub. L. 100–236, set out as a note under section 2112 of Title 28, Judiciary and Judicial Procedure.

## § 1370. State authority

Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of

performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

(June 30, 1948, ch. 758, title V, §510, as added Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 893.)

### §1371. Authority under other laws and regulations

#### (a) Impairment of authority or functions of officials and agencies; treaty provisions

This chapter shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter; (2) affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899, (30 Stat. 1112); except that any permit issued under section 1344 of this title shall be conclusive as to the effect on water quality of any discharge resulting from any activity subject to section 403 of this title, or (3) affecting or impairing the provisions of any treaty of the United States.

#### (b) Discharges of pollutants into navigable waters

Discharges of pollutants into the navigable waters subject to the Rivers and Harbors Act of 1910 (36 Stat. 593; 33 U.S.C. 421) and the Supervisory Harbors Act of 1888 (25 Stat. 209; 33 U.S.C. 441–451b) shall be regulated pursuant to this chapter, and not subject to such Act of 1910 and the Act of 1888 except as to effect on navigation and anchorage.

#### (c) Action of the Administrator deemed major Federal action; construction of the National Environmental Policy Act of 1969

(1) Except for the provision of Federal financial assistance for the purpose of assisting the construction of publicly owned treatment works as authorized by section 1281 of this title, and the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new source as defined in section 1316 of this title, no action of the Administrator taken pursuant to this chapter shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969 (83 Stat. 852) [42 U.S.C. 4321 et seq.]; and

(2) Nothing in the National Environmental Policy Act of 1969 (83 Stat. 852) shall be deemed to—

(A) authorize any Federal agency authorized to license or permit the conduct of any activity which may result in the discharge of a pollutant into the navigable waters to review any effluent limitation or other requirement established pursuant to this chapter or the adequacy of any certification under section 1341 of this title; or

(B) authorize any such agency to impose, as a condition precedent to the issuance of any license or permit, any effluent limitation other than any such limitation established pursuant to this chapter.

#### (d) Consideration of international water pollution control agreements

Notwithstanding this chapter or any other provision of law, the Administrator (1) shall not require any State to consider in the development of the ranking in order of priority of needs for the construction of treatment works (as defined in subchapter II of this chapter), any water pollution control agreement which may have been entered into between the United States and any other nation, and (2) shall not consider any such agreement in the approval of any such priority ranking.

(June 30, 1948, ch. 758, title V, §511, as added Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 893; amended Pub. L. 93–243, §3, Jan. 2, 1974, 87 Stat. 1069.)

#### Editorial Notes

##### References in Text

Act of March 3, 1899, referred to in subsec. (a), is act Mar. 3, 1899, ch. 425, 30 Stat. 1121, which enacted sections 401, 403, 404, 406, 407, 408, 409, 411 to 416, 418, 502, 549, and 687 of this title and amended section 686 of this title. For complete classification of this Act to the Code, see Tables.

The Rivers and Harbors Act of 1910, referred to in subsec. (b), probably means act June 23, 1910, ch. 359, 36 Stat. 593.

The Supervisory Harbors Act of 1888, referred to in subsec. (b), probably means act June 29, 1888, ch. 496, 25 Stat. 209, which is classified generally to subchapter III (§441 et seq.) of chapter 9 of this title. For complete classification of this Act to the Code, see Tables.

The National Environmental Policy Act of 1969, referred to in subsec. (c), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

##### Amendments

1974—Subsec. (d). Pub. L. 93–243 added subsec. (d).

### § 1372. Labor standards

The Administrator shall take such action as may be necessary to insure that all laborers and mechanics employed by contractors or subcontractors on treatment works for which grants are made under this chapter shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the immediate locality, as determined by the Secretary of Labor, in accordance with sections 3141–3144, 3146, and 3147 of title 40. The Secretary of Labor shall have, with respect to the labor standards specified in this subsection,[1] the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176) and section 3145 of title 40.

(June 30, 1948, ch. 758, title V, §513, as added Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 894.)

#### Editorial Notes

##### References in Text

Reorganization Plan Numbered 14 of 1950, referred to in text, is Reorg. Plan No. 14 of 1950, eff. May 24, 1950, 15 F.R. 3176, 64 Stat. 1267, which is set out in the Appen-

[1] So in original. Probably should be "section".